UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AKO K. BURRELL,

                                                Plaintiff,

                                                                        9:17-CV-00906

v.

                                                                        (LEK/TWD)

LISA ZUREK, *et al.*,

                                                Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

AKO K. BURRELL
17-B-2994
Plaintiff, pro se
Attica Correctional Facility
Box 149
Attica, New York 14011

KERNAN PROFESSIONAL GROUP, LLP          DAVID A. BAGLEY, ESQ.
Attorneys for Defendants
1310 Utica Street
P.O. Box 750
Oriskany, NY 13424

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT-RECOMMENDATION**

## I.        INTRODUCTION

        Plaintiff Ako K. Burrell has commenced this civil rights action under 42 U.S.C.

§ 1983 for violation of his constitutional rights during his pretrial detainment in the Oneida

County Correctional Facility ("Oneida CCF").  (Dkt. No. 1.)  Defendants and claims surviving

initial review under 28 U.S.C. §§ 1915(e) and 1915A are: (1) Fourteenth Amendment excessive

force and failure to intervene claims against Oneida CCF employees Defendants Lieutenant Jack

Breen ("Breen"), Deputy Dustin Lewis ("Lewis"), and Deputy Jeffrey Jones ("Jones"); (2) First

Amendment denial of access to newspapers and other reading material claims against Defendants

Captain Lisa Zurek ("Zurek"), Sergeant Clayton Smith ("Smith"), Lewis, and Jones; (3)

Fourteenth Amendment due process claims relating to Plaintiff's L2 status against Deputy Todd

Woodland ("Woodland"); and (4) First Amendment retaliation claims against Defendants Breen,

Lewis, and Deputy Christopher Getchell ("Getchell"), incorrectly sued as Christopher Gatchell.

(*see* Dkt. Nos. 10 at 23[1]; 41-10.)  Plaintiff has sued Defendants in their individual and official

capacities.  (Dkt. No. 1 at 1.)

Defendants have moved for summary judgment (Dkt. No. 41) pursuant to Rule 56 of the

Federal Rules of Civil Procedure on the grounds that: (1) Plaintiff has no claim against non-party

County of Oneida by virtue of the remaining Defendants having been named in their official as

well as individual capacities[2]; (2) Plaintiff has failed to exhaust available administrative remedies

on his Fourteenth Amendment excessive force, sexual abuse, and failure to intervene claims

against Breen, Lewis, and Jones; (3) Plaintiff does not have a cognizable First Amendment claim

against Defendants Zurek, Smith, Lewis, and Jones for denial of access to reading materials[3]; (4)

---

[1]  Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2]  A review of the record reveals that while Plaintiff has sued the Defendants in both their official and individual capacities, his claims against the Defendants are based upon the actions of those Defendants acting in their individual capacities and not in their official capacities on a *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) claim. Therefore, the Court recommends that Defendants be granted summary judgment in their official capacities.

[3]  Defendants have erroneously identified and addressed the First Amendment claim against Defendants Zurek, Smith, Lewis, and Jones related to reading materials that survived initial review as one for due process under the Fourteenth Amendment.  The Court has addressed

Plaintiff's L2 classification by Woodland did not violate his Fourteenth Amendment due process rights; (5) Plaintiff has no First Amendment retaliation claims Defendants Breen, Lewis, and Getchell; and (7) Defendants are entitled to qualified immunity as to all of Plaintiff's claims arising out of his L2 status.  (Dkt. No. 41-12.)  Plaintiff has filed a response.  (Dkt. No. 45.) Defendants have filed a reply and Plaintiff a supplemental response.  (Dkt. Nos. 46, 47.)

For reasons explained below, the Court recommends that Defendants' summary judgment motion be granted in part and denied in part.

## II.    FACTUAL BACKGROUND

### A.    Excessive Force, Sexual Abuse, and Failure to Intervene Claims Against Defendants Breen, Jones, and Lewis

Plaintiff alleges that on the evening of March 30, 2017, he was ordered to report to the Zone -1 area of the Oneida CCF.  (Dkt. No. 1 at ¶ 26.)  He arrived in a room with several chairs and a round table and one metal restraint chair.  *Id*. at ¶ 27.  Defendant Jones ordered Plaintiff to sit in the metal restraint chair and applied handcuffs very tightly to restrain Plaintiff to the chair. *Id.;* Dkt. No. 41-3 at 28.  Defendant Breen entered the room and interviewed Plaintiff regarding an inmate who had allegedly been sexually assaulted by a corrections officer. (Dkt. No. 1 at ¶ 28.)  Plaintiff, who had heard and seen the incident, confirmed the sexual assault in his interview with Breen.  *Id*.  According to Plaintiff, Breen became visibly upset and called Plaintiff a liar, rolled up the documents he had in his hand into a pipe like shape, and began assaulting Plaintiff in the face, causing a swollen cheek and eye.  *Id*. at ¶ 29; Dkt. No 41-3 at 26-27.  Breen then ordered Jones to keep Plaintiff in the chair and contact Breen in ten minutes.  (Dkt. No. 1 at ¶

_____

the claim as one under the First Amendment.

29.)  Plaintiff began having an anxiety attack and requested medical attention, at which point

Jones loosened the handcuffs, applied them extremely lightly, and took Plaintiff to medical.  *Id.*

at ¶ 30.  Because Plaintiff was never on a restraint order, Jones removed the handcuffs when

Breen contacted him to let him know Plaintiff was allowed to go back to his unit.  *Id*. at ¶ 31.

On April 1, 2017, while Plaintiff was asleep, Breen and Defendant Lewis entered his cell,

and one or both of them grabbed Plaintiff's buttocks and pulled, causing Plaintiff immediate

pain.  (Dkt. No. 1 at ¶ 36; 41-3 at 28-29.)  Lewis told Plaintiff they had come in to grab a few

things Plaintiff was not supposed to have, and the two took a Scrabble game board and an empty

tray.  (Dkt. No. 1 at ¶¶ 36-37.)  Plaintiff claims to have sustained a physical injury as a result of

the assault.  *Id.* at ¶ 38.

### B.    Plaintiff's L2 Classification at Oneida CCF

#### 1.    Inmate Classification System

Plaintiff was incarcerated as a pretrial detainee in the Oneida CCF from October 20,

2106, until October 19, 2017.  (Dkt. No. 41-4 at ¶ 3.[4])  During most of Plaintiff's incarceration,

the Oneida CCF maintained a classification system for inmates entitled "Admissions, Discharge,

& Classification," No. CD 09-04-13.  *Id*. at ¶ 9 and pp. 21-23.  No. CD 09-04-13 was a "Point

Scale" classification system.  *Id*. at 22.  Under the system, points were awarded based on the

present charge, criminal history, legal status, incarceration history, and disciplinary

record/severity.  *Id*.  Other factors, including violent behavior, were also considered.  *Id*.  The

first two custody levels, general custody and close custody, were determined by points.  *Id*.  The

---

[4]    Paragraph numbers preceded by the paragraph symbol are used where documents
identified by the CM/ECF docket number contain consecutively numbered paragraphs.

third, level two ("L2") custody was not.  *Id.*

L2 custody was for inmates who had been reclassified "due to their propensity towards facility violence and/or repeated non-compliance with facility rules and regulations."  *Id*. at 23. Inmates were placed in L2 classification "to ensure the safety, security and good order of the facility, as opposed to scoring within a range on either the Initial or Re-classification Point Scales."  (Dkt. No. 41-4 at 23.)  L2 classification was reviewed every thirty days to determine whether to continue the classification for another thirty days or remove the inmate from L2 classification.  *Id*.  Restrictions accompanying L2 status were contained in the Oneida CCF Inmate Handbook for the years 2016 and 2017.  *Id*. at ¶ 15 and 31.  Inmates on L2 status were, among other things, restricted to one hour of recreation a day or one and a half hours five days a week, limited to non-contact visits at special times, allowed limited telephone calls and commissary privileges, and allowed no books other than the Bible, Koran, or Holy book.  *Id.* at 31; *see also* Dkt. No. 1 at ¶¶ 44-48.

The Oneida CCF trained corrections officers to serve as classification officers in accordance with CD 09-04-01, Classification: Staff Training.  (Dkt. No. 41-4 at pp. 25-26.) Classification officers' duties were set forth in No. CD: 09-04-02, Classification, Classification Officer Duties.  *Id.* at 28-29.

### 2.   Plaintiff's L2 Classification and Denial of Access to Reading Materials

Plaintiff was placed on close custody by a classification officer on October 21, 2016, the day after he was booked.  (Dkt. No. 41-4 at ¶ 19.)  The classification was reviewed on December 19, 2016, and remained the same.  *Id*.  at ¶ 19 and pp. 34-36.  On December 26, 2016, Plaintiff's classification was reviewed by Defendant Woodland, an Oneida CCF classifications officer, as a

result of an incident in which Plaintiff reportedly injured a corrections officer.  (Dkt. No. 41-4 at 42-59; 41-5 at ¶ 13 and pp. 7-10.)  Woodland changed Plaintiff's status to L2.  *Id*. at 12.

Plaintiff was kept on L2 status on subsequent status reviews by Oneida CCF classification officers, including Woodland.  (Dkt. Nos. 41-4 at ¶ 22 and pp. 71-88; 41-5 at ¶ 14.)  Woodland conducted the May 24, 2017, thirty day review keeping Plaintiff's status at L2.  (Dkt. No. 41-4 at pp. 83-88.)  According to Plaintiff, Woodland told him at the time of the May 24, 2017, review that "you have 19 felonies, you might never come off this status."  (Dkt. No. 1 at ¶ 58.)  Plaintiff testified at his deposition that Woodland had no justification for maintaining him on L2 status other than the nineteen felonies, that Woodland knew the status was harsh, and he acted with malicious intent to hurt Plaintiff in maintaining the L2 status.  (Dkt. No. 41-3 at 52-55, 58.)

On April 4, 2017, while Plaintiff still had L2 status, Defendant Zurek sent him a memo informing him that while on L2 status, he was not entitled to newspapers or any reading material other than the Bible or Koran.  (Dkt. No. 1-1 at 19.)  Plaintiff claims that the intent of Zurek's memo, which was tailored to newspaper and magazine subscriptions, was to punish Plaintiff for filing a sexual abuse claim against Breen three days earlier, because prior to that time, she had allowed Plaintiff to have the reading material despite his L2 inmate status.  (Dkt. No. 41-3 at 64.)

        3.     New York State Commissioner of Correction Action Taken in Response to Plaintiff's Grievances Regarding the L2 Classification and the Restrictions Imposed By Oneida CCF

Plaintiff filed four Grievances (Nos. 17-0146, 17-0169, 17-0192, and 17-0242) regarding his L2 status and the restrictions imposed, including depriving him of reading materials.  (Dkt. No. 41-3 at 126-152.)  The Grievances were all denied by the grievance coordinator and on appeal to the chief administrative officer, and Plaintiff appealed to the Citizen's Policy and

6

Complaint Review Council ("CPCRC").  (Dkt. No. 41-3 at 126-29, 137-39, 144-46, 149-52.)

On July 13, 2017, Thomas J. Loughren ("Loughren"), Commissioner of Correction for New York State, wrote to Oneida County Sheriff Robert M. Maciol ("Maciol") informing him that the CPCRC had reviewed Plaintiff's Grievance Nos. 17-0169 and 17-0242 regarding the L2 restrictions and had voted to accept the Grievances in part.  (Dkt. No. 41-4 at 121-23, 165-67.) In identical determinations on the two Grievances, the CPCRC found that the Oneida CCF's blanket policy restricting L2 status inmates from possessing any printed material or publication other than a Bible, Koran, or Holy book, violated 9 NYCRR § 7026.1, which states that inmates are entitled to receive any printed material or publication available to the public, absent a censorship determination under §7026.2(e), (f), and (g).  (Dkt. No. 41-4 at 121, 166.)  Maciol was instructed that the blanket policy must be discontinued immediately.  *Id*.

Loughren further advised Maciol that the CPCRC had determined that: (1) the blanket prohibition on contact visits for inmates with an L2 classification violated 9 NYCRR § 7008.2(d) and had to be discontinued immediately; (2) Oneida CCF's policy of allowing L2 status inmates one hour each day or one and one-half hours five days a week violated §7028.2(d), which required one hour of recreation all seven days of the week; (3) the denial of specified privileges, such as access to the commissary, can only be taken as part of sanctions issued during a disciplinary hearing, is not allowed due to an inmate's classification, and violates the standard at § 7006.9; and (4) the policy of not allowing L2 status inmates to attend programs with the general population may violate Part 7024, Part 7070, and stipulations included in court ordered programs.  *Id.* at 121-22, 166-67.

Loughren also reminded Maciol with respect to the Oneida CCF policy allowing L2

classified inmates to only make phone calls on Saturdays and Mondays, that the facility was not allowed to limit an inmate's telephone access to counsel, and that personal phone calls could only be taken away as a sanction in a disciplinary hearing. *Id*. at 122, 167. Loughren directed Maciol to provide an appropriate remedy pursuant to § 7032.5(d)(1), with verification of compliance, to be submitted to the CPCRC within thirty days pursuant to § 7032.5(e). *Id*.

As a result of the CPCRC determination on Plaintiff's Grievances, Plaintiff began receiving his newspapers and magazines again in August 2017. (Dkt. No. 41-4 at 115, 118.) In addition, in a September 15, 2017, letter, Maciol informed Loughren that the Oneida CCF had abolished L2 status, sent the inmate handbook to the printer for revisions, and that all inmates, regardless of classification, would be allowed printed materials and other paper materials within their living area. *Id*. at 117-19. Maciol also described other changes that had been made to address the issues raised in the CPCRC determination. *Id*. at 118-20.

### C.    Retaliation Claims

Plaintiff's First Amendment retaliation claims against Defendants Breen, Lewis, and Getchell survived initial review. (Dkt. No. 10 at 23.) Plaintiff alleges that Breen assaulted him with the rolled up documents in retaliation for Plaintiff speaking to Breen in support of the inmate who was allegedly sexually assaulted by a corrections officer. (Dkt. No. 1 at ¶ 81.) Plaintiff further alleges that Breen filed a disciplinary report on him in retaliation for Plaintiff filing a petition seeking removal from the Oneida CCF. *Id*. at ¶ 89.

Plaintiff claims that Lewis and Getchell stole legal material, writing supplies, and personal reading material from him in retaliation for Plaintiff seeking redress from law enforcement in connection with the criminal investigation of his sexual abuse claim. (Dkt. Nos.

1 at ¶ 96; 41-3 at 39-42; 45 at ¶¶ 14, 20.)

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A verified complaint, as Plaintiff has filed in this case (Dkt. No. 1 at 12), is to be treated as an affidavit.  *Colon v. Coughlin*, 58 F.3d

9

865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981

10

(WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[5] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.    FAILURE TO RESPOND TO MOVANTS' STATEMENT OF MATERIAL FACTS

Plaintiff has failed to respond to Defendants' Statement Pursuant to L.R. 7.1(a)(3) setting forth the material facts as to which Defendants assert no genuine issue of fact exists. (*See generally* Dkt. No. 45.) L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."

While *pro se* litigants are undeniably "entitled to some measure of forbearance when defending against summary judgment motions, the deference owed to pro se litigants . . . does not extend to relieving them of the ramifications associated with the failure to comply with the courts local rules." *Liberati v. Gravelle*, No. 12-CV-00795 (MAD/DEP), 2013 WL 5372872, at * 7 (N.D.N.Y. Sept. 24, 2013) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)); *Latouche v. Tompkins*, No. 09-CV-0308 (NAM), 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2911) ("a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a summary judgment motion").

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of

---

[5] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

failing to respond to the motion.[6] *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted); *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (requirement that *pro se* be advised of possible consequences of failing to respond to summary judgment motion, including movant's statement of material facts pursuant to local rules).

Courts in this district have found it appropriate to enforce L.R. 7.1(a)(3) and its predecessor L.R. 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon the opposing party's failure to properly respond to the statement.  *See, e.g., Borihane v. Outhouse*, No. 9:05-CV-1256 (NAM/DEP), 2007 WL 2071698, at *3 (N.D.N.Y. July 18, 2007) (following L.R. 7.1(a)(3) and accepting statement of material facts as uncontroverted) (citing *Elgamil v. Syracuse Univ.*, No. 99-CV-611 (NPM/GLS), 2000 WL 1264122, at * 1 (N.D.N.Y. Aug. 22, 2000) (listing cases)).

However, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules, "including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz*

_____

[6] Both Defendants and the Clerk's Office provided Plaintiff with a copy of the requisite notice of the consequences of his failure to respond properly to Defendants' summary judgment motion, including the failure to respond to Defendants' statement of material facts.  (Dkt. Nos. 41-1 at 2; 42 at 2.)

12

*v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks

omitted).  In deference to Plaintiff's *pro se* status, the Court has opted to review the entire

summary judgment record on the Defendants' motion.

## V.      ANALYSIS

### A.      Exhaustion of Plaintiff's Fourteenth Amendment Excessive Force, Sexual Abuse, and Failure to Intervene Claims Against Breen, Jones, and Lewis

Defendants Breen, Jones, and Lewis's sole ground for seeking summary judgment on

Plaintiff's Fourteenth Amendment excessive force, sexual abuse, and failure to intervene claims

alleged against them is that Plaintiff failed to exhaust his administrative remedies.  (Dkt. No. 41-

12 at 11-12.)

#### 1.      Exhaustion Requirements under the PLRA

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with

respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a); *see also Ross v. Blake*, __ U.S. ___, 136 S. Ct. 1850, 1854-55 (2016).  "[T]he

PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege excessive force or

some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "There is no question that

exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in

court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the

administrative review process applicable to the institution in which an inmate is confined and

doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted). Generally, if a plaintiff fails to follow each of the required steps of the applicable grievance procedure, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.") (internal quotations and citations omitted)).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id*. at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. "Next, an administrative scheme might be

14

so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative

remedy is not "available" when "prison administrators thwart inmates from taking advantage of a

grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second

Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]"

The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v.*

*City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing

that a prisoner has failed to satisfy the exhaustion requirements. *See Jones,* 549 U.S. at 216;

*Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). Plaintiff must then establish that the IGP

grievance procedure was unavailable to him under *Ross*. *Jones*, 549 U.S. at 216.

### 2.    The Oneida CCF Inmate Grievance Program

The Oneida County Sheriff's Office has a written grievance program ("IGP") to address

Oneida CCF inmate complaints as mandated by the New York State Commission of

Corrections.[7] (Dkt. No. 41-4 at ¶¶ 5-7 and 10-16); *see also* N.Y. Correction Law § 139; 9

NYCRR § 7032.2, *et seq*. Instructions regarding the facility IGP were set forth in the Oneida

CCF Inmate Handbooks for 2016 and 2017. *Id.* at 18.

Pursuant to the IGP, an inmate has the option of initially filing an Inmate Complaint

Form ("Complaint" or Complaint Form") instead of a formal Grievance, but cannot be required

---

[7] 9 NYCRR § 7032.3(a) requires the chief administrative officer of each local correctional facility to "ensure the development and implementation of written policies and procedures consistent with this Part." Section 7032.2(b)(1) requires the policies and procedures to include "a detailed description of grievance program operations including steps, timeliness, investigative processes and available internal and external appeal procedures."

to do so.  (Dkt. No. 41-4 at 10.)  A Complaint Form is described in the IGP as "[a] form to be offered to inmates as an avenue to informally resolve complaints/concerns regarding written or unwritten facility policies, procedures, rules, practices, programs, or that action or inaction of any person within the facility."  (Dkt. No. 41-4 at 10.)   A Complaint Form must be submitted within five days of the occurrence.  *Id*. at 11.

An inmate is required to provide a brief description of the complaint and the corrective action requested and sign the Complaint.  (*See* Dkt. No. 1-1 at 14.)  A House Unit Officer is required to provide a summary of attempts to resolve the Complaint, and the inmate must indicate whether he accepts or does not accept the suggested resolution.  (Dkt. Nos. 1-1 at 14; 41-4 at 11.)   If not accepted, the Complaint is handed off to a Tour Supervisor who also provides a summary of attempts to resolve, which the inmate may accept or reject.  (Dkt. Nos. 1-1 at 14-15; 41-4 at 11.)

The Watch Commander receives the Complaint if Plaintiff rejects the Tour Supervisor's attempt at resolution, and if the Watch Commander's attempt to resolve is rejected, the Watch Commander delivers a formal New York State Commission of Correction Grievance Form (Part I) to the Inmate for completion.[8]  *Id*. at 11.  All Part I Forms are to be assigned a Grievance Tracking Number by the Watch Commander, with the number recorded in the Grievance Tracking Number Logbook located in the Sergeant's Office.  *Id*. at 12.  When the inmate has filed a Complaint Form, the Formal Grievance Number is recorded on the Complaint.  *Id.*

When an inmate begins with a Formal Grievance, the Watch Commander or Tour

---

[8]  The Grievance process consists of three forms: Part 1 Form, Part 2 Form, and the Investigation Form.  (Dkt. No. 41-4 at 10.)

Supervisor delivers the formal Grievance Form to the inmate and "ensure[s] that the deliverance of the form is documented in the unit log." (Dkt. No. 41-4 at 12.) Information documented must include "the name of inmate receiving the grievance form, the name of the supervisor delivering the form, the time of the deliverance, and the grievance tracking number." *Id.* Grievances must be filed within five days of the date of the occurrence giving rise to the grievance and Part I forms must be completed within twenty-four hours of the inmate filing the grievance. *Id.* The completed Part I form must be submitted to the Grievance Coordinator no later than forty-eight hours after receiving the formal Grievance Form from the inmate. *Id.*

Upon receipt of the grievance, the Grievance Coordinator(s) assigns a staff member to investigate, and the staff member records the findings on the Part III Investigation Form and reports back in the timeline set by the Coordinator. The Coordinator makes a decision based on the investigative findings and notifies the inmate of the decision within five days of the date the grievance was received. *Id.* The written determination by the Coordinator must specify the facts and circumstances underlying the decision. *Id.* at 13. The Coordinator gives the inmate a copy of the Part II form upon completion. *Id.* at 12.

The inmate has two business days to appeal to the Chief Administrative Officer, who must render a decision and provide a copy to the inmate. *Id.* at 13. The inmate has three days to appeal that decision to the CPCRC, which will thereafter render a final decision. *Id.*

       3.      <u>Analysis of the Exhaustion Issue</u>

Defendants Breen, Lewis, and Jones seek summary judgment on Plaintiff's Fourteenth Amendment excessive force, sexual abuse, and failure to intervene claims for failure to exhaust administrative remedies available under the Oneida CCF IGP. (Dkt. No. 41-12 at 11-12.)

Defendants rely upon the rejection, based upon untimeliness, of Plaintiff's grievances arising out of the March 30, 2017, alleged use of excessive force and failure to intervene against Breen and Jones, and the April 1, 2017, alleged sexual assault by Breen and Lewis. *Id.* Plaintiff submitted Inmate Grievance Forms regarding the March 30, 2017, and April 1, 2017, incidents on May 7, 2017, well after the five day period within which grievances must be filed under the Oneida CCF IGP. (Dkt. Nos. 1-1 at 50-52, 58; 41-4 at 12.) The grievances were rejected as untimely. *Id.* Therefore, the Court finds that Plaintiff failed to exhaust his administrative remedies as to both claims.

The Court also finds, however, that there are material questions of fact regarding the availability of the IGP with regard to the two incidents which preclude summary judgment on the issue of exhaustion. The record evidence shows that Plaintiff submitted Complaint forms concerning the March 30, 2017, and April 1, 2017, incidents on April 2, 2017, well within the five day limit under the IGP. (Dkt. Nos. 1 at ¶ 42, 1-1 at 14-17; 45 at ¶ 15.)

Both Complaints were ultimately forwarded to the Watch Commander, who wrote that there was an ongoing investigation into Plaintiff's allegations, and that he could not assist him at that time. Plaintiff was instructed to express his concerns in his interview during the investigative process. (Dkt. No. 1-1 at 15, 17.) According to Plaintiff, the Watch Commander did not provide Plaintiff with Grievance Forms as required in the IGP. (Dkt. No. 45 at ¶ 15.) The Court has found nothing in the record establishing that when unable to resolve Plaintiff's Complaints, Watch Commander, Lieutenant Robert Carollo, delivered Grievance Form (Part I) to Plaintiff for completion, or that the Watch Commander assigned Plaintiff's formal Complaints Grievance Tracking Numbers, or that the numbers were recorded in the Grievance Tracking

Number Logbook.  (*See* Dkt. No. 41-4 at 11-12.)

An Oneida CCF Incident Report, Incident # 17-0678, dated 4/7/2017, and charging

Plaintiff with diversion, intentional misuse of equipment, and disrespect, submitted by Carollo,

includes the following narrative which adds to the confusion regarding whether the IGP was

available to Plaintiff:

> On 04/07/2017, I Lt. Carollo, Robert was assigned as a Shift
> Supervisor for the C-Line shift.  At approximately 2200 hours, I
> had received back grievance forms completed by Inmate (Burrell,
> Ako #19070).  Upon review of the grievance forms, I had notices
> that the original complaint forms had still not been located.
> Earlier, Officer Jones returned the grievance forms and stated that
> Inmate (Burrell) had called me a liar and that he didn't get the
> complaint forms.  I then further reviewed the completed grievances
> and found that these grievance forms had numbers assigned to
> them.  I then returned to my office and reviewed the grievance
> logbook.  I also spoke with Lt. Breen, Jack and he stated he did not
> assign them grievance numbers.  These numbers had not been
> assigned to the forms by either grievance coordinator.  It was later
> determined that Inmate (Burrell) had assigned the numbers himself.
> These numbers were 17-0139, 17-0140, 17-0141, 17-0142, and 17-
> 0143.  Inmate (Burrell) has been informed that these grievances
> will be void.  Inmate (Burrell) also advised that he must begin the
> complaint process over again, if he wishes to make the complaints.

(Dkt. No. 45-1 at 82.)

While there appears to be no question but that Plaintiff's formal Grievances filed on May

7, 2017, were untimely, resolving all ambiguities and drawing all reasonable inferences in

Plaintiff's favor, the Court finds that there are unresolved issues of material fact regarding

whether Plaintiff's efforts to comply with the requirements of the Oneida CCF IGP were

thwarted by Oneida CCF staff members at the formal Complaint stage.  Therefore, the Court

recommends that Defendants Breen, Lewis, and Jones be denied summary judgment on

Plaintiff's excessive force, sexual abuse, and failure to intervene claims on the grounds that

19

Plaintiff failed to exhaust administrative remedies under the Oneida CCF IGP.  The Court further

recommends that the issue of exhaustion of the claims against the three Defendants be

determined in an exhaustion hearing conducted by the District Court or be referred to this Court

for an exhaustion hearing.

### B.    First Amendment Denial of Access to Newspapers and Other Reading Material Claims Against Defendants Zurek, Smith, Lewis, and Jones

"It is well-settled that the First Amendment serves to protect the flow of information to

prisoners; thus any limitations on prisoner access to information must be reasonably related to a

legitimate penological interest." *Rapp v. Barboza*, No. 9:13-CV-0599 (NAM/DEP), 2016 WL

4223974, at *7 (N.D.N.Y. July 19, 2016) (citing *Turner v. Safley*, 482 U.S. 78, 89-90 (1987);

*Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989); *Bell v. Wolfish*, 441 U.S. 520, 545, 550-51

(1979)).  Subject to restrictions related to legitimate penological interests, a prisoner's First

Amendment rights have been found to include access to newspapers and magazines.  *See Beard*

*v. Banks*, 548 U.S. 521, 535 (2006) (recognizing that prison inmates' First Amendment right to

newspapers and magazines "is an important one," but holding that there were legitimate

penological interests in a policy forbidding a specific group of inmates from access to both);

*Wilkinson v. Skinner*, 462 F.2d 670, 673 n.5 (2d Cir. 1972) ("refusal to deliver a newspaper [to a

prison inmate] would ordinarily be interference with appellant's first amendment rights");

*Sizemore v. Williford,* 829 F.2d 608, 610 (7th Cir. 1987) (absent restrictions on legitimate goals of

confinement, prison inmates retain First Amendment rights to receive and read newspapers);

*Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986) (absolute bans on inmate access to newspapers

and magazines, as a general rule, violate the First Amendment because they are an "exaggerated

response to legitimate penological needs.") (quoting *Bell*, 441 U.S. at 547-47); *Green v. Ferrell*,

801 F.2d 765, 772 (5th Cir. 1986) ("jail's prohibition on newspapers violates the first

amendment"); *Nelson v. Hjorth*, No. 8:18CV88, 2018 WL 2050571, at *6 (D. Neb. May 2, 2018)

(finding inmate plaintiff stated a plausible First Amendment claim for denial of access to

newspaper and magazine subscriptions) (citing *Cooper v. Schiro*, 189 F.3d 781, 784 (8th Cir.

1999) (reversing dismissal on initial review of inmate's First Amendment claim he was denied

access to printed material, including all magazines; and finding that given the allegation that

prisoner was denied publications, the prison was obligated to proffer a legitimate reason for the

decision to deny the printed material)); *United States ex rel Manicone v. Corso*, 365 F.Supp. 576,

577 (E.D.N.Y. 1973) ("There is no basis for total restrictions on prisoner's access to the news in

view of their clear First Amendment rights.")

        In *Turner*, the Supreme Court identified four factors that inform the issue of whether a

prison regulation reasonably relates to a legitimate penological interest, including whether (1)

there is a rational relationship between the regulation and the proffered legitimate governmental

interest; (2) inmates have an alternative means of exercising their asserted rights available; (3)

accommodating the asserted constitutional right will have a significant "ripple effect" on fellow

inmates, prison staff, and the allocation of prison resources; and (4) alternative means exist for

the prison to easily serve its interests without infringing upon the rights of prisoners.  482 U.S. at

89-90; *Giano v. Senkowski*, 54 F.3d 1050, 1053-54 (2d Cir. 1995).  Courts have applied the four-

factor test to pretrial detainees as well as inmates.  *See Mauro v. Arpaio*, 188 F.3d 1054, 1058-60

(9th Cir. 1999) (applying the *Turner* factors to a First Amendment free exercise claim brought by

a pretrial detainee).

        In direct conflict with the substantial body of case law cited above, Defendants Zurek,

Smith, Lewis, and Jones, who erroneously argue Plaintiff's First Amendment reading material

claim as one for violation of due process and as a conditions of confinement claim under the

Fourteenth Amendment, contend that they are entitled to summary judgment on Plaintiff's First

Amendment claim because "[i]nmates do not have constitutional rights to privileges such as

reading materials." (Dkt. No. 41-12 at 13.)  That is clearly not the case.

Defendants' final argument is that not being allowed his requested reading materials was

nothing more than a source of irritation for Plaintiff, and that Defendants did not act with

deliberate indifference or punitive intent, but merely imposed the restrictions allowed under the

New York Commission of Correction's Minimum Standards, 9 NYCRR § 7026.3, and by reason

of Plaintiff's L2 status.  *Id.* at 14.  Defendant Zurek makes only cursory note of the fact that on

appeal of Plaintiff's grievances the CPCRC found that the Oneida CCF ban of all reading

material other than the Bible or Koran, or other Holy book imposed on L2 status inmates violated

9 NYCRR §7026.1, pursuant to which "inmates are entitled to receive any printed material or

publication that is generally available to the public," as well as regulations at

§ 7026.2(e), (f), and (g), establishing the manner in which determinations on censorship of

printed material must be handled.  (Dkt. Nos. 41-4 at 6, 121, 139, 165-6.)

Defendants have failed to identify specific legitimate penological interests for the ban

imposed on L2 status inmates and to consider the four *Turner* factors in arguing that there were

legitimate penological interests in limiting L2 status inmates' access to newspapers and

magazines, as well as other reading materials.  (*See generally* Dkt. Nos. 41-4; 41-7; 41-8; 41-9;

41-12 at 13-14.)  The Court therefore finds that they have failed to satisfy their initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists, and they are entitled to judgment as a matter of law on Plaintiff's First Amendment claim, and recommends denial of summary judgment on the claim.  *See, Salahuddin*, 467 F.3d at 272-73.

Defendants Zurek, Smith, Lewis, and Jones are also seeking summary judgment on qualified immunity grounds because the L2 status had been in effect for twenty years without the New York Commission of Correction notifying Oneida CCF that aspects of the L2 classification were improper.  (Dkt. No. 41-12 at 16-17.)  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992).

To establish a qualified immunity defense at the summary judgment stage, the defendants must show, based on undisputed facts, "either that [their] conduct did not violate 'clearly established rights' of which a reasonable person would have known, or that it was 'objectively reasonable' [for them] to believe that [their] acts did not violate clearly established rights." *Soares v. State of Conn.*, 8 F.3d 917, 920 (2d Cir. 1993).  Defendants appear to be relying on the failure of the New York Commission on Corrections failure to inform them that the L2 status restriction on reading materials may have violated Plaintiff's First Amendment rights as justification for any ignorance on their part that implementation of the restriction violated a clearly established right of the Plaintiff.  (Dkt. No. 41-12 at 16-17.)

A governmental officer is presumed to be aware of "basic, unquestioned constitutional rights."  *Harlow*, 457 U.S. at 815.  It is well-settled that the flow of information to prisoners,

23

including reading material, is protected under the First Amendment, and limitations on prisoner access to information must be reasonably related to a legitimate penological interest. *Turner,* 482 U.S. at 89-90. It is equally well settled that the protection extends to newspapers and magazines. *Beard,* 548 U.S. at 535.

The presumption may be rebutted if a defendant proves that he neither knew nor should have known that his conduct would violate those rights. *Harlow*, 457 U.S. at 819; *Valenti v. Torrington Bd. of Educ*., 601 F. Supp. 2d 427, 441 (D. Conn. 2009). It is unclear from the summary judgment record whether acting in accordance with the long time acceptance of Oneida CCF restrictions on L2 status by the New York Commission of Corrections should be found sufficient to rebut the awareness presumption in this case. Therefore, the Court recommends denial of summary judgment to Defendants Zurek, Smith, Lewis, and Jones on Plaintiff's First Amendment claim on qualified immunity grounds without prejudice to reconsideration of the issue of qualified immunity at trial.[9]

**C.     Fourteenth Amendment Due Process Claims Relating to Plaintiff's L2 Status Against Woodland**

1.     Legal Standard

Conditions of confinement claims of pretrial detainees are analyzed under the Fourteenth Amendment Due Process Clause. *Bell,* 441 U.S. at 535 & n.16. In *Palacio v. Pagan*, 345 F. App'x. 668, 669 (2d Cir. 2009), the Second Circuit explained that:

_____

[9] The Court believes further development of the evidence will be necessary regarding Plaintiff's claim that because Zurek had allowed him to have his reading material, despite his L2 status, until three days after Plaintiff had filed a sexual abuse claim against Breen, Plaintiff believes imposition of the restriction in Zurek's April 4, 2017, memorandum was to punish him for filing the complaint. (Dkt. No. 41-3 at 64.)

> In order to establish a procedural due process claim under § 1983, a
> plaintiff must demonstrate that he possessed a protected property
> or liberty interest and was deprived of it without due process.  *See,
> e.g., McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d
> Cir. 2001).  As a general rule, conditions of confinement imposed
> in pretrial detention do not give rise to a violation of a prisoner's
> due process rights unless they are punitive.  *See Bell v. Wolfish*,
> 441 U.S. 520, 535 [ ] (1979) ("in evaluating the constitutionality of
> conditions or restrictions of pretrial detention that implicate only
> the protection against deprivation of liberty without due process of
> law, we think that the proper inquiry is whether these conditions
> amount to punishment of the detainee.")

*See also Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007) (quoting *Benjamin v. Fraser*, 343 F.3d

35, 49-50 (2d Cir. 2003), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

("Pretrial detainees have not been convicted of a crime and thus 'may not be punished in any

manner – neither cruelly and unusually nor otherwise.'")).  "Unlike convicted prisoners, who

must satisfy the standard of 'atypical and significant hardship' outlined in *Sandin v. Conner*, 515

U.S. 472 (1995), a pretrial detainee need not meet such a stringent standard because '[a]

detainee's interest in freedom from unjustified infliction of pain and injury is more substantial

. . . .'" *Parson v. York*, No. 16-CV-167 (DNH/CFH), 2017 WL 1076536, at *4 (N.D.N.Y.

(quoting *Benjamin*, 343 F.3d at 188-90).

      "Not every disability imposed during pretrial detention amounts to 'punishment' in the

constitutional sense . . . ." *Bell*, 441 U.S. at 537.  "[I]f a particular condition or restriction is

reasonably related to a legitimate governmental objective, it does not, without more, amount to

'punishment.'"  *Id*.  The Supreme Court has held that maintaining institutional security and

maintaining a facility are examples of valid governmental objectives that could justify the

impositions of restrictions on pretrial detainees.  *Id*. at 540.  In addition, the Supreme Court has

cautioned courts that the implementation of measures to maintain institutional security is

"peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to those considerations, courts should ordinarily defer to their expert judgment in such matters. *Bell,* 461 U.S. at 540 n.23.

2.    Analysis

Plaintiff alleges that the restrictive confinement that went with his L2 inmate status subjected him to restrictions virtually identical to those imposed on inmates held on disciplinary confinement, and that his restrictive confinement was unjustified and improperly intended by Defendant Woodland as punishment and to cause Plaintiff harm for his nineteen pending felonies.  (Dkt. Nos. 1 at 5, 10; 41-3 at 52-53.)  According to Plaintiff, he knew from conversations with Woodland that Woodland thought L2 inmate status was harsh, and if Woodland knew it was harsh, and gave Plaintiff that status when he had the option not to, his intent to harm Plaintiff was evident.  (Dkt. No. 41-3 at 52-54.)

Plaintiff testified at his deposition that he has sued Woodland because he intended to punish Plaintiff, whereas the other corrections officers, Fahey and Noonan, who reviewed Plaintiff's classification and kept Plaintiff on L2 status, were simply following facility procedures and did not intend to punish Plaintiff.  *Id*. at 54, 57-58.  Plaintiff further explained that Woodland had a malicious intent that equated to punishment as evidenced by a kiosk correspondence message where Woodland clearly stated that "you have nineteen felonies, you should be lucky."  *Id*. at 58 (unaltered transcript).  According to Plaintiff, case law dictates that there is no right to consider outside charges in dealing with a pretrial detainee who has not been convicted of any crime, and for Woodland to "place [him] on the status that [he] deemed to be

26

harsh, that equates to punishment based off the mere fact that [Plaintiff's] crimes charge solely, that's an intent of punishment and that's not up for him to decide." *Id*. at 58-59 (unaltered transcript).

Plaintiff has alleged in his complaint that it was in connection with the May 24, 2017, review of his L2 status that Woodland told him "you have 19 felonies, you might never come off this status." (Dkt. No. 1 at ¶ 58.)  An Oneida County Print Message Report submitted by Plaintiff in opposition to Defendants' motion includes a May 31, 2017, message from Plaintiff to Woodland regarding the nineteen felony comment allegedly made by Woodland in connection with Woodland's May 24, 2107, review of Plaintiff's L2 status and Woodland's response of the same date.  (Dkt. No. 45-1 at 188.)

Plaintiff wrote:

> I don't want a problem with your office, but I copped out to cpcs 3rd two counts, I have only one prior violent conviction cpw, 2009, I have a cpw 3rd non violent 2013, but no other violent convictions or charges, im to get sentenced 8-4 but its not gonna be an excuse to act crazy, my last review 5-24- was null and void due to the 19 felony factor, the incident 17-0886 was the onlyjust cause to remain l-2 I want my newspaper please Im stressed not to be bad but I just want read and go about my time please I aint gonna do nothing but beg (unaltered text).

Woodland responded "[y]our last review is not null and void.  Those current charges cannot be addressed until you are sentenced.  Our office is not messing with you we enter your data and it calculates a score." *Id.*

In his declaration, Woodland states that he changed Plaintiff's status from close custody status to L2 status on December 26, 2016, by reason of an incident in which Plaintiff reportedly injured a corrections officer.  (Dkt. Nos. 41-4 at 42-69; 41-5 at ¶ 14.)  The Classification Review

Forms used in the monthly review of Plaintiff's L2 status reveal that Oneida CCF personnel Woodland, Noonan, and Fahey, who conducted the monthly reviews of Plaintiff's L2 status through May 24, 2017, all retained Plaintiff's L2 status.  (Dkt. Nos. 41-4 at 71-88.)  According to Woodland, he never classified Plaintiff differently from other inmates for purposes of punishing him, and did not place or keep Plaintiff on L2 status by reason of his criminal record, but instead applied the Facility classification criteria on the Classification Review form, of which current charges and past convictions are only a part.  (Dkt. No. 41-5 at ¶¶ 17, 18.)

Plaintiff alleges in his complaint that when he was placed on L2 status he was subjected to restrictions that were virtually identical to those imposed on inmates held on disciplinary confinement.  (Dkt. No. 1 at ¶¶ 44-45.)  According to the Oneida CCF inmate classification system, No. CD 09-04-13, which provided for the L2 inmate classification, the purpose of the system was "to provide for the effective management of the inmate population and facility housing units in a safe and secure correctional environment."  (Dkt. Nos. 41-4 at ¶ 16 and p. 21; 41-5 at ¶ 16.)   As noted above, maintaining institutional security has been found by the Supreme Court to be a valid governmental objective in evaluating a pretrial detainee's Fourteenth Amendment claims.  *Bell*, 441 U.S. at 540.

Plaintiff's surviving Fourteenth Amendment due process claim regarding his L2 inmate status is solely against Defendant Woodard.  As the record has developed in this case, particularly through Plaintiff's deposition testimony, it has become clear that Plaintiff's claim that his L2 status was punitive is specifically directed at Woodard's actions in continuing him at L2 status on his May 24, 2017, thirty day review, as opposed to the Oneida CCF policy itself.  As an example, Plaintiff made it clear in his deposition testimony that in his mind, Woodland

28

intended to punish him for the nineteen felonies with which he had been charged by keeping him at L2 status when there was no other basis, whereas Fahey and Noonan had simply followed Oneida CCF policy and procedures when they kept Plaintiff on L2 status. (Dkt. No. 41-3 at 55-58.)

The Court finds that the record does not support Plaintiff's Fourteenth Amendment claim that the nineteen felonies statement attributed to Woodland revealed an intent to punish him by keeping him at L2 status, despite no other justification. The Classification Reviews conducted by Woodland, Fahey, and Noonan consistently supported Plaintiff's L2 status, and there is no evidence that changes in the scoring on any of the factors considered in the Classification Reviews rendered the L2 status no longer justified. (Dkt. Nos. 41-4 at 72-88.) Therefore, the Court recommends that Woodland be granted summary judgment on Plaintiff's Fourteenth Amendment due process claim against him.[10]

### D. First Amendment Retaliation Claims Against Defendants Breen, Lewis, and Getchell

To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the

---

[10] The Court notes that the CPCRC's findings that a number of the Oneida CCF L2 inmate status restrictions violated state regulations (see Dkt. No. 41-4 at 121-23, 165-67), cannot form the basis of a § 1983 action. See, e.g., Telesford v. Annucci, No. 9:16-CV-0793 (BSK/DEP), 2017 WL 3600941, at *6 (N.D.N.Y. July 26, 2017) ("it is well settled that violations of state regulations, standing alone, are not cognizable under § 1983"); Livigni v. Ortega, No. 15-cv-9454 (CM), 2016 WL 6143351, at *4 (S.D.N.Y. Oct. 19, 2016) ("violation of state regulations cannot form the basis of a § 1983 claim, which must be based on a deprivation of a federal constitutional or statutory right.") (emphasis in original) (citing Graham v. Connor, 490 U.S. 386, 394 (1989)).

adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema*, 534 U.S. 506, 508 (2002)).

First Amendment retaliation claims "fit[ ] within the category of 'inmate suits about prison life,' and therefore must be preceded by the exhaustion of state administrative remedies available to him." *Mateo v. O'Connor*, No. 10 Civ. 8426(LAP), 2012 WL 1075830, at *6 (S.D.N.Y. March 29, 2012) (quoting *Lawrence v. Goord*, 304 F.3d 198, 200 (2d Cir. 2002)). Therefore, Plaintiff was required to fully exhaust his retaliation claims under the Oneida CCF IGP before asserting the claims in this lawsuit. For the reasons set forth below, the Court finds that Plaintiff failed to exhaust his administrative remedies with regard to his retaliation claims against Breen, Lewis, and Getchell.

### 1.    Retaliation Claim Against Breen

Plaintiff's First Amendment retaliation claims against Breen for using excessive force against him on March 30, 2017, and issuing a false misbehavior report in retaliation for engaging in conduct protected under the First Amendment survived in initial review. (Dkt. No. 10 at 19.)

### a.    March 30, 2017, Incident

Neither the formal Complaint filed against Breen by Plaintiff regarding the alleged use of excess force on March 30, 2017, nor the untimely May 7, 2017, formal Grievance that Plaintiff filed on May 11, 2017, included any claim of retaliation by Breen.[11] (Dkt. No. 1-1 at 14-15; 50-

---

[11] The Court has concluded above that there are issues of fact precluding summary judgment in Breen and Jones's favor on exhaustion grounds with regard to Plaintiff's March 30, 2017, excessive force and failure to intervene claims.

52.)  Rather, Plaintiff claimed that Breen had used excess force in retaliation for Plaintiff's

responses to questions asked during an interview with Breen about a sexual assault by an officer

regarding a grievance filed by another inmate.  *Id*. at 50-52.  Therefore, even if Plaintiff's

Grievance had been accepted, and he had been allowed to exhaust his excessive force claim, his

retaliation claim would not be deemed exhausted because the grievance makes no mention of

alleged retaliation by Breen in connection with the incident.  *See Lee v. O'Harer*, No. 9:13-CV-

1022 (TJM/ATB), 2014 WL 7343997, at * 5 (N.D.N.Y. Dec. 23, 3014) (failure to exhaust a

retaliation claim where no mention of retaliation in grievance).  Plaintiff has failed to identify any

fully exhausted grievances alleging retaliation in connection with the March 30, 2017, incident.

Therefore, the Court recommends that Breen be granted summary judgment on the First

Amendment retaliation claim arising out of the alleged March 30, 2017, excessive force on the

grounds of failure to exhaust administrative remedies.

### b.    Misbehavior Report

On May 5, 2017, Plaintiff filed a request for transfer to another facility due to a conflict

of interest created by his writing two § 1983 complaints against officers and administrators at

Oneida CCF.  (Dkt. No. 45-1 at 184.)  On May 9, 2017, Plaintiff submitted a request indicating

he had a petition needing the signature of sergeants, lieutenants, a captain, and others to show to

a judge on May 30, 2017, when he went to court to request a transfer.  *Id*. at 185.  The second

request was denied.  *Id*.  Plaintiff claims that Breen filed a false misbehavior report, ultimately

expunged, against him in retaliation for seeking a transfer.  (Dkt. No. 1 at ¶¶ 89, 23-24.)

According to Breen, he was informed that Plaintiff had approached one or more Oneida

CCF personnel regarding a petition for which he was soliciting signatures from senior officers.

(Dkt. No. 41-6 at ¶¶ 11-12.)  On May 14, 2017, Breen charged Plaintiff with harassment in violation of 7 N.Y.C.R.R. § 270.2, Standards of Inmate Behavior, Rule Series 107(ii).  *Id.* at ¶ 12 and pp. 8-11.  Breen claims in his declaration that the charge was expunged because of a parallel investigation being conducted by another Oneida CCF officer.  *Id.* at ¶ 14.

The record contains no evidence of Plaintiff having filed and exhausted a grievance regarding his retaliation claim arising out of Breen's filing of the misbehavior report.  Therefore, the Court recommends that Breen be granted summary judgment on Plaintiff's retaliation claim arising out of his filing the misbehavior report for failure to exhaust under the Oneida CCF IGP.

2.    Retaliation Claims Against Lewis and Getchell

Plaintiff claims that on April 1, 2017, Lewis and Getchell stole legal materials and writing supplies from his cell for exercising his right to seek redress from law enforcement by reporting misconduct to the Criminal Investigation Division and for an Article 78 he had planned to file.  (Dkt. Nos. 1 at ¶ 96; 41-3 at 41-42.)  Plaintiff testified at his deposition that he filed Grievance No. 17-0198 on his retaliation claim against Lewis and Getchell.  (Dkt. No. 41-3 at 44.)  However, the Grievance, which was not submitted until May 7, 2017, was denied on the grounds it was submitted beyond the five day period allowed under the Oneida CCF IGP.  (Dkt. No. 41-3 at 108-09.)

A grievance which is denied as untimely does not satisfy the PLRA's exhaustion requirements.  *See Verrilli v. Winchell*,   2010 WL 39090965, at *2 (N.D.N.Y. Sept. 29, 2010).  Therefore, the Court recommends that Defendants Lewis and Getchell be granted summary judgment for failure to exhaust on Plaintiff's First Amendment retaliation claim against them.

## VI.    CONCLUSION

The Court recommends that summary judgment be granted to: (1) all Defendants in their official capacities; (2) Defendant Woodland on Plaintiff's Fourteenth Amendment due process claim against him; and (2) Defendants Breen, Lewis and Getchell on Plaintiff's First Amendment retaliation claims.  The Court further recommends that summary judgment be denied to: (1) Defendants Breen, Jones, and Lewis on Plaintiff's Fourteenth Amendment claims for excessive force, sexual abuse, and failure to intervene on exhaustion grounds, with a recommendation that the District Court conduct an exhaustion hearing or refer the exhaustion issue to this court for an exhaustion hearing; and (2) Defendants Zurek, Smith, Lewis, and Jones on Plaintiff's First Amendment denial of access to newspapers, magazines, and other reading material, and that the denial of summary judgment to Zurek, Smith, Lewis, and Jones on qualified immunity grounds be without prejudice to reconsideration at trial.  Therefore, if the District Court adopts this Court's Report-Recommendation, the only claims remaining for trial will be Plaintiff's Fourteenth Amendment claims for excessive force, sexual abuse, and failure to intervene against Defendants Breen, Jones, and Lewis, and First Amendment denial of reading materials claim against Zurek, Smith, Lewis, and Jones.[12]

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be

---

[12]  If an exhaustion hearing is held on Plaintiff's Fourteenth Amendment excessive force, sexual abuse, and failure to intervene claims, and Plaintiff is found to have failed to exhaust despite the availability of exhaustion under the IGP in this case, the sole claim remaining for trial will be Plaintiff's First Amendment claim against Zurek, Smith, Lewis, and Jones.

**GRANTED** in part and **DENIED** in part; and it is further

     **RECOMMENDED** that all Defendants be **GRANTED** summary judgment on all claims asserted against them in their official capacities; and it is further

     **RECOMMENDED** that Defendants Woodland and Getchell, incorrectly sued as Gatchell, be **GRANTED** summary judgment; and it is further

     **RECOMMENDED** that Defendants Breen and Lewis be **GRANTED** summary judgment on Plaintiff's First Amendment retaliation claims; and it is further

     **RECOMMENDED** that Defendants Breen, Jones, and Lewis be **DENIED** summary judgment on Plaintiff's Fourteenth Amendment claims for excessive force, sexual abuse, and failure to intervene on the grounds that Plaintiff failed to exhaust his administrative remedies, and the Court further recommends that an exhaustion hearing be conducted by the District Court or that the issue of exhaustion of the claims against the three Defendants be referred to this Court for an exhaustion hearing before trial; and it is further

     **RECOMMENDED** that Defendants Zurek, Smith, Lewis, and Jones be **DENIED** summary judgment on Plaintiff's First Amendment claim for denial of access to newspapers, magazines, and other reading material, and that the denial of summary judgment on qualified immunity grounds be without prejudice to reconsideration of qualified immunity at trial; and it is hereby

     **ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

     Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[13]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated:  June 21, 2019
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[13]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a  Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that s not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 36 of 118
Borihane v. Outhouse, Not Reported in F.Supp.2d (2007)
2007 WL 2071698

2007 WL 2071698
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Inthanousone BORIHANE, Plaintiff,
v.
Robert OUTHOUSE, Sheriff, Defendant.

No. 9:05-CV-1256.
|
July 18, 2007.

**Attorneys and Law Firms**

Inthanousone Borihane, pro se.

Kenneth M. Alweis, Esq., Sandra J. Sabourin, Esq., of Counsel, Goldberg Segalla, LLP, Syracuse, NY, for the Defendant.

## ORDER

NORMAN A. MORDUE, Chief Judge.

 **\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge David E. Peebles, duly filed on the 25th day of June, 2007. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion seeking the entry of summary judgment dismissing plaintiff's complaint against him (Dkt. No. 22) is granted, and the plaintiff's complaint is dismissed in all respects on the basis of mootness.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Inthanousone Borihane, a federal prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against Cayuga County Sheriff Robert Outhouse, alleging deprivation of his civil rights occurring during a time when he was a federal detainee at the Cayuga County Jail ("CCJ"), awaiting sentencing on a bank robbery conviction. In his complaint, plaintiff alleges that while at the CCJ, he was denied access to a pastor, clergy, priest, or other ordained person for religious worship, and a proper law library and related materials meeting minimum standards under the governing state regulations. The remedial portion of plaintiff's complaint seeks only equitable relief, in the form of an order directing his transfer to a facility where he would be permitted to worship and afforded access to a proper law library.

Defendant has moved seeking dismissal of plaintiff's claims against him. Defendant's motion is predicated upon plaintiff's transfer out of the CCJ and into a federal prison facility, an occurrence which, Outhouse asserts, renders plaintiff's claim for injunctive relief academic. For the reasons set forth below I agree, and therefore recommend that defendant's motion be granted.

## I. *BACKGROUND*

When his complaint in this action was filed, plaintiff was an inmate incarcerated in the CCJ, located in Auburn, New York, awaiting sentencing on a federal conviction. [1] Complaint (Dkt. No. 1) ¶ 6. During the times relevant to his claims, plaintiff was housed in the facility's Restrictive Housing Unit ("RHU"). *Id.* Plaintiff maintains that while confined in the CCJ RHU he was subject to constitutional deprivations falling into two distinct areas. [2]

Initially, plaintiff's complaint alleges that he was not provided with adequate legal resources and assistance while confined within the RHU. *Id.* at ¶ 7. Specifically, plaintiff asserts that the law library at the CCJ did not include all of the materials required under the New York

2007 WL 2071698

Code of Rules and Regulations; did not offer the services of a notary public available to inmates, upon request, also as required; and did not make available a trained person to help him with his preparation of legal documents. Complaint (Dkt. No. 1) Attachment ¶ 4. Plaintiff further claims that over time, his requests for photocopies and law books were denied or severely restricted by prison officials, and these actions had the effect of unlawfully interfering with his access to the courts. *Id.* at ¶¶ 2, 3.

**\*2** The second aspect of plaintiff's claim surrounds defendant's alleged failure to provide him with access to a pastor or other clergy member while housed in the RHU, despite his multiple requests. *Id.* at ¶ 1. Borihane contends that this denial unlawfully interfered with the free exercise of his chosen religion. [3] Complaint (Dkt. No. 1) ¶ 6.

## II. *PROCEDURAL HISTORY*
Plaintiff commenced this action on October 3, 2005, and was subsequently granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 4. In his complaint, plaintiff alleges interference with the free exercise of his religious beliefs and impaired access to the courts due to the inadequacy of the law library at the CCJ and the denial by prison officials of his requests for legal materials. Plaintiff's complaint requests only equitable relief, seeking a directed transfer to another facility where he would have access to the requisite religious and legal resources; plaintiff has not requested recovery of monetary damages against the defendant. [4] Complaint (Dkt. No. 1) ¶ 9.

Issue in the case was joined on July 7, 2006 by the filing of an answer generally denying plaintiff's allegations and asserting various affirmative defenses including, *inter alia,* the lack of existence of a justiciable controversy, in light of plaintiff's transfer to another jail facility. Dkt. No. 9. Defendant has since moved, by motion filed on February 15, 2007, under Rules 56 and 12(b)(1) & (6) of the Federal Rules of Civil Procedure, in the alternative, urging dismissal of plaintiff's claims against him as moot, based upon his transfer out of the CCJ. Dkt. No. 22. Defendant's motion, to which plaintiff has filed no opposition, is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Legal Significance of Plaintiff's Failure to Oppose Motion*
Confronted with a motion by the defendant seeking dismissal of his complaint, plaintiff has not provided the court with the benefit of any argument as to why that motion should not be granted. Before turning to the merits of defendant's motion, I must address the plaintiff's failure to respond to that motion and determine what, if any, consequences should result from that failure.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). While recognizing that *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Pub. Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.), courts in this district have found it appropriate to grant a dispositive motion pursuant to Local Rule 7.1(b)(3) based upon a *pro se* plaintiff's failure to respond. *Robinson v. Delgado,* 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted in this instance, even in the absence of opposition, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001)

(Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

**\*3** While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to his motion, plaintiff has left the facts set forth in defendant's Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have found it appropriate to enforce Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[5] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this longstanding practice and, notwithstanding plaintiff's *pro se* status, accept defendant's assertion of facts as set forth in his Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendant's motion for facial sufficiency.

B. *Summary Judgment Standard*[6]

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro*

*se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*4** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (stating that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Mootness*

Article III of the United States Constitution confers upon federal courts the authority to decide actual cases and controversies. *Catanzano v. Wing,* 277 F.3d 99, 107 (2d Cir.2001); *see also Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 1253 (1990); *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950-51 (1969). Consequently, a federal court presented with an action in which no live controversy exists may not entertain jurisdiction, but instead order dismissal of the case as moot. *Catanzano,* 277 F.3d at 107.

Addressing the concept of mootness, the Second Circuit has noted that

[t]he hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed.

*Martin-Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). Under most circumstances, the transfer of an inmate plaintiff complaining of civil rights violations out of the prison facility in which those violations are alleged to have occurred presents just such a situation, thus mooting any claim for injunctive relief against prison officials of the transferring facility. *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006); *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996); *Young v. Coughlin,* 866 F.2d 567, 568 n. 1 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224 (1989); *Beyah v. Coughlin,* 789 F.2d 986, 988 (2d Cir.1986); *Candelaria v. Greifinger,* No. 96-CV-0017, 1998 WL 312375, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J. and Scanlon, M.J.).

The constitutional deprivations of which Borihane now complains allegedly occurred while he was confined as an inmate within the CCJ. It has been established to the court's satisfaction, both by virtue of plaintiff's failure to respond to the portion of defendant's Local Rule 7.1(a)(3) Statement making this allegation, and from the court's own records, that plaintiff is no longer an inmate at that facility, having instead apparently been transferred into the custody of the Federal Bureau of Prisons, following his sentencing in connection with his bank robbery conviction. *See* Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 22-6) ¶ 3; *see also* Dkt. No. 14. Since it thus appears that plaintiff is no longer incarcerated at the CCJ, and there is no reason to conclude that the defendant, as the Cayuga County Sheriff, has any further involvement with the terms and conditions of Borihane's confinement, plaintiff's complaint, which

seeks only equitable relief including a transfer to another facility where he can be provided with the requested legal and religious materials and services, must be dismissed as moot. *Prins,* 76 F.3d at 506; *Salahuddin,* 467 F.3d at 272.

IV. *SUMMARY AND RECOMMENDATION*

**\*5** In his complaint plaintiff has sought only equitable relief, and does not request monetary damages arising from the alleged denial of his constitutional rights. Since commencement of this action, plaintiff has been transferred out of the CCJ, which the constitutional violations of which he complains are alleged to have occurred, and the named defendant is no longer responsible for the conditions of his confinement. Plaintiff's claims for equitable relief against the defendant are therefore moot, and must be dismissed for failure to satisfy the case and controversy requirement of Article III of the United States Constitution. It is therefore hereby

RECOMMENDED that defendant's motion seeking the entry of summary judgment dismissing plaintiff's complaint against him (Dkt. No. 22) be GRANTED, and that plaintiff's complaint, be DISMISSED in all respects on the basis of mootness.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2071698

Footnotes

1   At the times relevant to his claims, plaintiff was in the custody of the United States Marshal. Because there is no federal facility for housing unsentenced detainees in this district, the United States Marshal contracts with various local authorities, including Cayuga County, for the housing of federal inmates awaiting trial and/or sentencing.

2   Plaintiff also alleges, generally, that his rights to due process, equal protection, and freedom from cruel and unusual punishment were violated, but makes no specific factual allegations in his complaint or the accompanying attachment to support any of those general claims. Complaint (Dkt. No. 1).

**Borihane v. Outhouse**, Not Reported in F.Supp.2d (2007)
Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 40 of 118
2007 WL 2071698

3    According to his complaint, Borihane is a practicing Christian. *See* Complaint (Dkt. No. 1) Attachment at ¶ 1.

4    An application by plaintiff for leave to amend his complaint was denied by order issued on December 20, 2006, based upon his failure to comply with the requirements of this court's local rules that he provide a copy of a fully integrated, proposed amended complaint with his motion. Dkt. No. 20. It appears that plaintiff's motion sought leave to name additional defendants and, while injunctive relief remained the focus of plaintiff's quest for relief, to add a claim for recovery of $5,000 "to cover any occurring expenses for filing [his] complaint and for hindering [his] spiritual growth with God." Dkt. No. 14 at p. 23.

5    According to Local Rule 7.1(a)(3), "[a]ny facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis omitted).

6    Because the defendant has answered, his motion, to the extent that it seeks relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure, is no longer appropriate; instead, under such procedural circumstances a defendant intending to challenge the facial sufficiency of a pleading should move for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure-a provision which gives rise to an analysis generally informed by the same principles as those applicable to motions brought under Rule 12(b)(6). *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). In light of the fact that the defendant has moved in the alternative under Rule 56, and submitted a Local Rule 7 .1(a)(3) Statement in support of his application for summary judgment, I have treated defendants' motion as seeking the entry of summary judgment, and have analyzed it on that basis.

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048– 49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

Cole v. Artuz, Not Reported in F.Supp.2d (1999)
Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 43 of 118
1999 WL 983876

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

**Cole v. Artuz, Not Reported in F.Supp.2d (1999)**

1999 WL 983876

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

---

End of Document    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 45 of 118

2011 WL 1103045
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Valery LATOUCHE, Plaintiff,

v.

Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton
Correctional Facility; Michael B. King, Sgt.,
Clinton Correctional Facility; D. Mason, C.O.,
Clinton Correctional Facility; B. Malark, C.O.,
Clinton Correctional Facility; John Reyell, C.O.,
Clinton Correctional Facility; Bob Fitzgerald, R.N.,
Clinton Correctional Facility; John Doe, C.O. (C.O.
Gallery Officer Company Upper F–6); John Doe,
C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).
|
March 23, 2011.

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State
of New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.

Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in
part. Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following:
(1) plaintiff's claims for monetary relief against all
defendants in their official capacity; (2) plaintiff's claims of
medical indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment
on plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that
the Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force claims
against defendant Reyell are subject to dismissal for lack
of personal involvement. (Dkt. No. 61). Plaintiff does not
object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C.
§ 636(b) (1)(c), this Court conducts a *de novo* review of
these issues. The Court reviews the remaining portions of
the Report–Recommendation for clear error or manifest
injustice. *See Brown v. Peters,* 1997 WL 599355, *2–3
(N.D.N.Y.), af'd without op., 175 F.3d 1007 (2d Cir.1999);
see also Batista v. Walker,* 1995 WL 453299, at *1
(S.D.N.Y.1995) (when a party makes no objection to a
portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

**DISCUSSION**

**I. Local Rule 7.1(a)(3)**

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [1]

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties. [2]

## II. *Jeffreys* Exception
Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006)

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 47 of 118
Latouche v. Tompkins, Not Reported in F.Supp.2d (2011)
2011 WL 1103045

(citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained those discrepancies and testified:

> Q. —did Nurse Fitzgerald ask you any questions while he was examining you?
>
> A. I think he asked me how am I feeling, how did this happen?
>
> Q. And what did you say?
>
> A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.
>
> Q. What did you say?

> A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—
>
> Q. Which was—
>
> A. —and that I started this.
>
> Q. And is that the truth?
>
> A. No.
>
> Q. Why did you tell the nurse that?
>
> A. Because I was being forced to.
>
> Q. Forced to how?
>
> A. By the officers that [sic] was there.
>
> Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?
>
> A. Yes, ma'am.
>
> Q. Why did you do that?
>
> A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able

to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" .[3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be

inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloody [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

* * *

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

[T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may

ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1103045

Footnotes

1    Local Rule 7.1(a)(3) provides:
     Summary Judgment Motions
     Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*

2011 WL 1103045

The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

2    While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

3    Officer Rock is not a defendant herein.

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 7343997
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kareem LEE, Plaintiff,
v.
David O'HARER, et al., Defendants.

No. 9:13–CV–1022.
|
Signed Dec. 23, 2014.

**Attorneys and Law Firms**

Kareem Lee, pro se.

Rachel M. Kish, AAG, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This action, in which Plaintiff seeks review of a decision by the Commissioner of Social Security denying her son's application for Supplemental Security Income ("SSI"), was referred to the Honorable Andrew T. Baxter, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

In the Report–Recommendation, dated May 28, 2014, Magistrate Judge Baxter recommends that Defendants' motion to dismiss (dkt.# 23) be granted and the complaint dismissed in its entirety without prejudice for failure to exhaust administrative remedies. Magistrate Judge Baxter also recommends that Plaintiff's First Amendment retaliation claim be dismissed without prejudice for failure to exhaust and for failure to state a claim, and that Plaintiff's claims against Defendants in their official capacities be dismissed with prejudice, as they are barred by the Eleventh Amendment.

Plaintiff has filed objections to the Report–Recommendation. Because objections have been filed, the Court has reviewed the record *de novo. See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge. The Court may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.* Having reviewed the record *de novo,* the Court has determined to accept and adopt the recommendation for the reasons stated therein.

It is therefore ordered that:

(1) The Report–Recommendation, dkt. # 33, is hereby ADOPTED;

(2) Defendants' motion to dismiss, dkt. # 23, is hereby GRANTED;

(3) Plaintiff's complaint is hereby DISMISSED WITHOUT PREJUDICE for failure to adopt administrative remedies;

(4) Plaintiffs First Amendment retaliation claim is DISMISSED WITHOUT PREJUDICE for failure to exhaust and for failure to state a claim upon which relief can be granted; and

(5) Plaintiff's claims against Defendants in their official capacities are DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas J. McAvoy, Senior United States District Judge.

In this civil rights complaint, plaintiff alleged that defendants O'Harer and Mattie denied plaintiff access to courts; defendants O'Harer, Mattie, Kimak, and Graham retaliated against plaintiff for filing a New York Court of Claims ("Court of Claims") action; defendants Mattie and Kimak used excessive force against him; defendants O'Harer and Graham failed to conduct adequate investigations; defendant Mattie destroyed some of plaintiff's property; and defendant Graham failed to correct staff misconduct after he learned about the

misconduct through reports. (*See generally* Compl.) (Dkt. No. 1).

**\*2** After initial review, on November 7, 2013, Senior Judge McAvoy dismissed several of the above claims. (Dkt. No. 8). There are two claims remaining in this action: (1) the First Amendment retaliation claim against defendants O'Harer and Mattie (a sergeant and a corrections officer); and (2) an Eighth Amendment excessive force claim against defendants Mattie and Kimak. (Dkt. No. 8 at 14). Presently before the court is the defendants' motion to dismiss this action for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 23). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt.Nos.28, 29). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint.

**I. *Motion to Dismiss***
To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant ' "fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d

Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). In light of the mandate to read the papers of pro se litigants generously, it is appropriate to consider plaintiff's additional materials, such as the factual statements in his memorandum in opposition to the defendants' motion if those statements clarify or "amplify" matters in the complaint. *Dolan v. Connolly,* No. 13 Civ. 5726, 2014 WL 1876524, at \*1 (S.D.N.Y. May 8, 2014) (Rep't–Rec.) (citing inter alia *Woods v. Goord,* No. 01 Civ. 3255, 2002 WL 731691, at \*1 n. 2 (S.D.N.Y. Apr. 23, 2002)).

**II. *Facts***
**\*3** The court will outline the facts of this case relative to the two remaining claims. The court has examined the complaint and plaintiff's response to defendants' motion to dismiss in which he has clarified the factual assertions that he made in the complaint. Plaintiff's claims arose out of his incarceration at Auburn Correctional Facility ("Auburn"). Plaintiff alleges that on November 2, 2011, he filed an action in the Court of Claims for "medical negligence" against defendants at Attica Correctional Facility ("Attica"). (Compl. at 3). On June 13, 2013, plaintiff was placed on a list at Auburn, granting him "special access" to the law library because he had a June 27, 2013 deadline in his Court of Claims action. (*Id.* at 4). Defendant O'Harer removed plaintiff from the special access list on June 20, 2013 because plaintiff had allegedly missed two library call-outs. (*Id.*) Plaintiff alleged that defendant O'Harer never "investigated" [1] why plaintiff missed the call-outs, but also claims that defendant O'Harer denied plaintiff access to the law library "in retaliation" for plaintiff's pending Court of Claims action. (*Id .* at 5, 12–13). Plaintiff states that on June 28, 2013, he filed a grievance against defendant O'Harer for his actions.

Plaintiff claims that defendant O'Harer had "numerous conversations" with defendant Mattie and discovered that plaintiff was housed in defendant Mattie's "area." (*Id.* at 6, ¶ 15). Apparently at the behest of defendant O'Harer, on June 22, 2013, defendant Mattie misinformed plaintiff that he had a law library call-out, when plaintiff knew he had been removed from the special access list. Plaintiff asserted that defendant Mattie hoped that plaintiff would attempt to go to the library, based upon

this information, and then defendant Mattie would be able to file a misbehavior report against plaintiff for being "out of place, and, or, place something in plaintiff['s] cell that consisted of contraband." (*Id.*) Plaintiff claims that defendant Mattie did this "in retaliation for Officer David O'harer [sic]." [2] (*Id.*)

When defendant Mattie's alleged plan failed, on June 30, 2013, plaintiff claims that defendant Mattie filed a false misbehavior report against plaintiff, alleging that plaintiff approached her while masturbating. (*Id.* at 6–7). Plaintiff claims that defendant Kimak, defendant Mattie, and other unknown officers assaulted plaintiff prior to taking plaintiff to the Special Housing Unit ("SHU"), after issuing the false misbehavior report. (*Id.* at 6–7). Finally, plaintiff alleges that when defendants Mattie and another unknown officer were packing plaintiff's cell on June 30, 2013, they destroyed legal documents in retaliation for plaintiff filing the grievance against defendant O'Harer.

## III. *Exhaustion of Administrative Remedies*

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted). Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents. *Weidman v. Wilcox,* No. 6:12–CV–6524, 2014 WL 1056416, at *2–3 (W.D.N.Y. Mar. 17, 2014) (dismissing for failure to state a claim because plaintiff admitted that he failed to exhaust his administrative remedies); *Pagan v. Westchester County,* No. 12 Civ. 7669, 2014 WL 982876,

at *10 (S.D.N.Y. Mar. 12, 2014) (citing inter alia *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003)).

**\*4** In *Jones v. Bock,* the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. 549 U.S. at 218 (citing *Woodford v. Ngo,* 548 U.S. 81, 88 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must *complete* the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). However, if the inmate wishes to file a grievance, he must first file his grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty one days of the alleged occurrence forming the basis for his grievance. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the facility within seven (7) calendar days after receipt of the IGRC's written response. *Id.* § 701.5(c)(1). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC") within seven calendar days after receipt of the Superintendent's written response. *Id.* § 701.5(d)(1).

There are also special procedures that may be used when the grievance is categorized as "harassment." *Id.* § 701.8. A grievance alleging harassment by staff may be sent directly to the Superintendent, and the Superintendent must issue a decision within twenty-five (25) days. The CORC has thirty (30) days to resolve any appeal. *Id.* §§ 701.8(f), 701.8(i) (incorporating by reference § 701.5(d)(2)(h)).

Extensions of the statutory time deadlines may be granted where the inmate demonstrates "mitigating circumstances." *Id.* § 701 .6(g). However, section 701.6 states that, except when the late appeal asserts a failure to implement a decision, "[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence" *Id.* § 701.6(g)(1) (*b* ). The

inmate may pursue a complaint that he was improperly denied an exception to the time limit by filing a separate grievance. *Id.* § 701.6(g)(1) (*b* ) (ii). Finally, matters that are not decided within the statutory time frames, without a request for an extension by facility personnel, and the grievant's consent, may be appealed to the next level by the inmate. *Id.* § 701.6(g)(1) (6)(ii)(2).

Because courts have held that there are still some limited exceptions to the exhaustion requirement, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id. See also Johnson v. Schriro,* No. 12 Civ. 7239, 2013 WL 5718474, at *3 (S.D.N.Y. Oct. 15, 2013) (citing *Pease v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir.2006)).

### B. Application

**\*5** In this case, plaintiff alleges that he "used the prison grievance procedure" at Auburn "to try and solve the problem, concerning the alleged June 30, 2013 assault. (Compl. ¶ 22; Dkt. No. 1 at 11). Plaintiff states that the grievance was investigated, and plaintiff was informed by the investigating Sergeant that he would "return to see [plaintiff]," but when plaintiff did not hear anything after two weeks, he appealed to the superintendent. (*Id.*) At the time plaintiff filed his complaint, he was "awaiting such decision." (*Id.*)

Plaintiff alleges that he "use[d] the appeal mechanism" for the June 30, 2013 "false" misbehavior proceeding by appealing the adverse determination to the "Commissioner of disciplinary appeals." (*Id.* ¶ 24; Dkt. No. 1 at 12). Plaintiff also alleges that he "used" the prison grievance procedure regarding the June 30, 2013 incident in which defendants allegedly destroyed his property, and at the time he filed his complaint, he was "awaiting a decision." [3]

In plaintiff's response to the defendants' motion to dismiss, plaintiff concedes that the PLRA requires exhaustion of

administrative remedies, but argues that he sufficiently exhausted his remedies because the "retaliation for bringing forth such grievance complaints against all named defendants was cruel and unusual punishment," and that this "warranted immediate relief through this court." (Dkt. No. 28 at 7–8). Plaintiff also states that the CORC "now" has up to six months to render a final decision, and implies that this is too long to wait because of the defendants conduct, which plaintiff could not "endure." (*Id.* at 9). Plaintiff is apparently arguing that he was compelled to file this action prematurely because the defendants were "retaliating" against him for filing the grievances, to the point where he had to ask the court for a temporary restraining order ("TRO") to "stop the retaliation." (*Id.* at 8–9).

Plaintiff states that this court denied his motion for injunctive relief, and in the interim, plaintiff exhausted all administrative appeals. (*Id.* at 8) Plaintiff has attached copies of the grievances and the final decisions to his response to the defendants' motion to dismiss. (*Id.* at 19–35). Defendants maintain that plaintiff has still failed to show that he properly exhausted his administrative remedies. (Dkt. No. 29).

This court agrees. As stated above, the plaintiff must "complete" the administrative appeal process *prior to* filing his civil rights action. Although plaintiff filed a grievance against defendant O'Harer, complaining about the lack of access to the law library, he never alleged that the denial was due to retaliation for filing the Court of Claims action. (Dkt. No. 28 at 19–20). Plaintiff also filed a grievance regarding the allegedly false misbehavior report and the alleged assault, but never completed the administrative process until long after he filed *this* federal complaint. (Dkt. No. 28 at 31–32). The Superintendent referred plaintiff's "staff misconduct" grievance to the DOCCS Inspector General's Office on August 21, 2013. (Dkt. No. 28 at 33). Plaintiff mailed his federal complaint on August 20, 2013. (Dkt. No. 1). Plaintiff admits on the face of his complaint that he was awaiting "responses" from his grievances. (Compl. at ¶¶ 21–23). He *never* mentions any grievances that alleged retaliation for filing his Court of Claims Action. Thus, he admittedly failed to exhaust his administrative remedies, and these admissions are borne out by the documents attached to his response to defendants' motion to dismiss.

**\*6** In his response to the motion to dismiss, plaintiff claims that the assault grievance also contained the retaliation claim. (Dkt. No. 28, ¶ 16). The grievance that plaintiff filed on July 1, 2013[4] alleges that defendant Mattie filed a false misbehavior report, and then assaulted plaintiff together with "other officers."[5] (Dkt. No. 28 at 31–32). Plaintiff claimed that defendant Mattie "has a history of falsely accusing and setting inmates up ...." (*Id.* at 31). However, there is absolutely no mention of retaliation for filing the June 24th claim against defendant O'Harer, nor is there any mention that defendant O'Harer asked defendant Mattie to falsely accuse plaintiff or assault plaintiff because he filed a Court of Claims action. Thus, plaintiff has completely failed to exhaust any retaliation claims.

Plaintiff believes that he should be excused from the exhaustion requirement with respect to the claims that were exhausted *after* plaintiff filed this federal action, because he claims that he was compelled to file a request for injunctive relief in federal court prior to exhaustion due to the defendants' conduct. (Dkt. No. 28 at 8). However, an examination of plaintiff motion for a TRO, and the court's decision on this issue, shows that the TRO/ Preliminary Injunction was denied because plaintiff was seeking to enjoin speculative "future" conduct. Thus, the court found that there was no "retaliation" occurring, contemporaneous to plaintiff moving for the injunctive relief. The plaintiff's administrative remedies were clearly "available" because plaintiff utilized them; the defendants did not prevent plaintiff from filing grievances; and there are no other "special circumstances" that would excuse plaintiff's failure to wait until the administrative process was complete.

Even though plaintiff ultimately received a response from the CORC regarding the assault, (Dkt. No. 28 at 35), the law is quite clear that if the administrative remedies were completed after plaintiff filed his federal complaint, the action is still subject to dismissal for failure to exhaust. *See e.g. Neal v. Goord,* 267 F.3d 116, 122 (S.D.N.Y.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516 (2002) (subsequent exhaustion after suit is filed is insufficient); *Ford v. Smith,* No. 9:12–CV–1109, 2014 WL 652763, at *3 (N.D.N.Y. Feb. 19, 2014) (receiving a decision from CORC *after filing* a federal lawsuit does *not* satisfy the exhaustion requirement); *Harris v. Gunsett,* No. 12 Civ. 3578, 2013 WL 3816590, at *2 (S.D.N.Y. July 22, 2013) (stating that even if plaintiff had exhausted

his administrative remedies since he filed his complaint, it did not "change the fact that he failed to do so at the time at which he initiated the instant litigation"); *Baez v. Kahanowicz,* 469 F.Supp.2d 171, 179 (S.D.N.Y.2007) (claim must be completely exhausted prior to filing suit).

Thus, plaintiff's failure to exhaust his administrative remedies as to his remaining two claims may not be excused, and his failure to do so prior to filing this lawsuit requires dismissal of the entire action. The dismissal would be without prejudice to plaintiff re-filing his complaint, having obtained final dispositions of the grievances that he filed. It appears from the documents submitted by plaintiff that he only completed the administrative process with respect to the excessive force claim, and he never raised his retaliation claims in any of the grievances. Because plaintiff has only 21 days to file a grievance, any grievance that he attempts to file regarding his retaliation claims may be met with dismissal as untimely.[6] If so, plaintiff would not be able to return to federal court to raise the retaliation claims. This court need not engage in speculation about whether plaintiff would be given the opportunity to file a late grievance claiming retaliation because the court finds that plaintiff's retaliation claim may also be dismissed on the merits, leaving only his excessive force claim as a viable claim to re-file.

## IV. *Retaliation*

### A. Legal Standard

**\*7** In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389

Lee v. O'Harer, Not Reported in F.Supp.3d (2014)
Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 56 of 118
2014 WL 7343997

F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. "Threadbare" assertions of retaliation will not survive a motion to dismiss. *Dolan v. Connolly,* 2014 WL 1876524, at *11 (citing inter alia *Crenshaw v. Hartman,* 681 F.Supp.2d 412, 417 (W.D.N.Y.2010) (dismissing retaliation claim where it was unsupported by any facts showing a nexus between the adverse action and any constitutionally protected activity by plaintiff)).

### B. Application

**\*8** The first of plaintiff's two remaining claims is a First Amendment retaliation claim against defendants O'Harer and Mattie. Plaintiff alleges that the defendant O'Harer's actions in *2013* at *Auburn,* were in retaliation for a Court of Claims action that plaintiff filed in *2011* against medical personnel at *Attica.* While there is no dispute that filing a lawsuit is a constitutionally protected act, there is only the most conclusory basis for asserting a nexus between the defendant O'Harer's actions and plaintiff's protected activity.

First, plaintiff must state how defendant O'Harer would even be aware of the 2011 lawsuit in order for plaintiff to allege that this defendant retaliated against plaintiff for filing the 2011 action. Plaintiff alleges that defendant O'Harer was well aware of all the details of the action because he had to "approve" her special access. In plaintiff's response to the motion to dismiss, he clarifies the facts of the alleged "retaliation." (Dkt. No. 28 ¶ 8). Plaintiff states that he was granted "special access to the law library on June 13, 2013, and that in order to obtain permission for special access, plaintiff had to "confirm [that plaintiff] does have a Court Order[ed] deadline before the defendant David O'Harer." (*Id.*) Plaintiff claims that he presented his legal documents to defendant O'Harer, [7] who became "angry and hostile" because he disliked the fact that plaintiff was suing New York State and was seeking the names of key witnesses, but he granted plaintiff two weeks of special access. (*Id.*) Assuming that plaintiff was actually granted two weeks of special access, [8] rather than one week, it is not plausible that defendant O'Harer was so upset about plaintiff's lawsuit that he granted plaintiff twice time allowed under the special access rules. [9]

With respect to defendant O'Harer taking plaintiff off of the special access list, plaintiff *admits* that he failed to attend two call-outs. He asserts in his response to the defendants' motion to dismiss that there was a good excuse for failing to attend the call-outs. (*Id.* at 4–5). Plaintiff states in his response and in the grievance he filed regarding this incident that he did not attend the call-outs because he was given a mandatory call-out for his "institutional job," and his supervisor was going to call the library to let someone know about plaintiff missing the library call-out. (*Id.* at 4). Plaintiff claimed in his grievance that Officer Myers and defendant O'Harer failed to properly investigate the plaintiff's reasons. [10] Plaintiff claimed that the officers never called his job supervisor to confirm his whereabouts. (*Id.*) It is clear, however, that plaintiff did miss the call-outs, and that defendant O'Harer could have removed plaintiff from the special access list notwithstanding any intent to retaliate.

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 57 of 118
Lee v. O'Harer, Not Reported in F.Supp.3d (2014)
2014 WL 7343997

Plaintiff's grievance never mentioned that defendant O'Harer was retaliating for plaintiff's lawsuit.[11] In any event, defendant O'Harer was a law library officer, who may or may not have seen plaintiff's documents. Even assuming that he did see the documents, it not plausible that defendant O'Harer would have become angry and hostile because plaintiff was suing "New York State" in the Court of Claims and was looking for the names of witnesses. Most of the inmates who use the law library are doing so because they are filing or have filed a lawsuit. Any time that defendant O'Harer took an adverse action against an inmate, the inmate could claim that defendant O'Harer was retaliating due to the inmate's legal activities. Thus, plaintiff's retaliation claim against defendant O'Harer would be subject to dismissal regardless of his failure to exhaust.

**\*9** Finally, it unlikely that defendant O'Harer, a law library officer at Auburn, would be retaliating against plaintiff for a lawsuit that plaintiff filed two years earlier against New York State,[12] claiming malpractice against medical personnel at Attica that defendant O'Harer probably did not even know. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendants retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at \*8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action). Thus, plaintiff's claims of retaliation against defendant O'Harer fail to state a claim.

Plaintiff claims that defendant Mattie's motivation for filing the false misbehavior report, for orchestrating the assault on plaintiff, and for the various forms of property destruction claimed by plaintiff, was plaintiff's grievance against defendant O'Harer. The court would first point out that plaintiff's claims against defendant Mattie for attempting to misinform plaintiff so that he would receive a misbehavior report for "being out of place" occurred on June 22, 2013, six days prior to the grievance committee even receiving plaintiff's grievance against defendant O'Harer on June 28, 2013. It is impossible for defendant Mattie to retaliate for a grievance that would not be filed for six days against another officer.

When plaintiff brought his grievance on July 1, 2013, against defendants Mattie and Kimak, accusing defendant Mattie of filing a false misbehavior report and defendants Mattie and Kimak of the subsequent assault, plaintiff never mentioned that defendant Mattie was retaliating against plaintiff "on behalf of" defendant O'Harer because of the one grievance that he filed against defendant O'Harer. (Dkt. No. 28 at 31). In fact, plaintiff accused defendant Mattie of having mental problems and having a "history" of false accusations against *"inmates."* (*Id.* at 31). This has nothing to do with plaintiff's legal activities or his grievance against defendant O'Harer.

**\*10** Plaintiff similarly accuses defendant Kimak of "retaliation" in addition to the assault.[13] His allegation against defendant Kimak is even more speculative. (Compl.¶ 29). Plaintiff simply alleges that defendant Kimak was called to the housing unit to escort plaintiff to SHU after defendant Mattie accused plaintiff of misbehavior. (Compl. ¶ 15 at p. 7). There is absolutely no indication that defendant Kimak was aware of, or retaliated for, any "grievance" filed by plaintiff against defendant O'Harer, the only one of which plaintiff alleges was filed two days prior to the "assault." Thus, the retaliation claim may be dismissed as against defendant Kimak.

Thus, plaintiff's claims of retaliation may be dismissed without prejudice for failure to state a claim. The only claim that remains is plaintiff's claim against defendants Mattie and Kimak for their involvement with the alleged assault, which is a claim apart from any retaliation claim.

## V. *Eleventh Amendment*

### A. Legal Standards
The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815

(2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3. An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991) (citations omitted).

#### B. Application

In this case, to the extent that plaintiff is attempting to sue the defendants in their official capacities for *damages,* the Eleventh Amendment would also bar the action. In his response to defendants' motion, plaintiff alleges that he is also seeking injunctive relief that would not be barred by the Eleventh Amendment. The Eleventh Amendment immunity does not preclude suits for prospective declaratory and injunctive relief against state officers in their "official" capacities. *Neroni v. Zayas,* No. 3:13–CV–127, 2014 WL 1311560, at *7 (N.D.N.Y. March 31, 2014) (citing inter alia *Ex Parte Young,* 209 U.S. 123(1908)).

However, in order to avoid the Eleventh Amendment bar, a plaintiff must (a) allege an ongoing violation of federal law, and (b) seek relief that is properly characterized as prospective. *In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir.2007) (quoting *Verizon Maryland, Inc. v. Pub. Service Comm'n of Maryland,* 535 U .S. 635, 645 (2002); *In re Dairy Mart Convenience Stores, Inc.,* 411 F.3d 367, 372 (2d Cir.2005)). A plaintiff seeking injunctive relief may not rely on past injury, but must show a likelihood that he will be injured in the future and the existence of an official policy or its equivalent. *Peck v. Baldwinsville Cent. School Dist.,* 351 F. App'x 477, 479 (2d Cir.2009) (citations omitted). If he cannot make this showing, he lacks standing for declaratory and prospective injunctive relief. *Id.*

**\*11** In this case, plaintiff cannot meet the first requirement for prospective injunctive relief: an ongoing violation of federal law for his remaining claims.

He claims one incident in which he was assaulted by defendants Mattie and Kimak. His speculation about future harassment, "physical violence, threats, [and] destruction of personal property" are completely speculative. (Compl.¶ 32). Even plaintiff's retaliation claim, if it were to proceed, does not allege anything other than speculative future conduct. There is no allegation of any ongoing policy that could be enjoined.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 23) be **GRANTED AND THE COMPLAINT DISMISSED IN ITS ENTIRETY WITHOUT PREJUDICE FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES,** and it is

**RECOMMENDED,** that plaintiff's First Amendment retaliation claim be dismissed **WITHOUT PREJUDICE FOR FAILURE TO EXHAUST AND FOR FAILURE TO STATE A CLAIM,** and it is

**RECOMMENDED,** that plaintiff's official capacity claims be dismissed **WITH PREJUDICE** as barred by the Eleventh Amendment.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Dated: May 28, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 7343997

#### Footnotes

1    Plaintiff apparently did not dispute that he missed the call-outs, but asserted that his prison job prevented him from attending the law library. Plaintiffs claim that O'Harer did not properly investigate the reasons for plaintiff's missing the call-outs was dismissed in Senior Judge McAvoy's initial order. (Dkt. No. 8 at 9–10).

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 7343997

2  Plaintiff's meaning is unclear. When he states that defendant Mattie attempted to have plaintiff receive a misbehavior report on June 22, 2013, it appears that he is stating that defendant Mattie was doing this at the behest of defendant O'Harer, (who wished to retaliate against plaintiff for the Court of Claims action), because plaintiff states that the grievance department did not receive plaintiff's grievance against defendant O'Harer until June 28, 2013, and plaintiff asserts that he wrote the grievance against defendant O'Harer on June 24, 2013. (Compl. at ¶¶ 13–15). Defendant Mattie could not have been retaliating against plaintiff on June 22, 2013 for a grievance that he did not write until June 24 and that was not filed until June 28.

3  It is unclear from the complaint whether plaintiff filed a grievance only with respect to the destruction of his property or whether he included the claim that the destruction of the property was in retaliation for the Court of Claims action. In order to exhaust his retaliation claim, plaintiff would have to include "retaliation" in the grievance. In any event, it is clear that at the time plaintiff filed the complaint, his "use" of the grievance program was not "complete."

4  The grievance is attached to plaintiff's response papers. (Dkt. No. 28 at 31–32).

5  As stated above, this grievance is attached to plaintiff's response to defendants' motion to dismiss. (Dkt. No. 28). Because plaintiff refers to the grievances in his complaint and makes statements in his response about facts contained in those grievances, the court may consider them in conjunction with the motion to dismiss without converting the motion into one for summary judgment.

6  The dismissal of grievances as "untimely" constitutes failure to exhaust. *Robinson v. Hens chel,* No. 10 Civ. 6212, 2014 WL 1257287, at *10 (S.D.N.Y. Mar. 26, 2014) (citing *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004)). Thus, if plaintiff's should return to bring anew grievance with respect to his retaliation claim, and the grievance is dismissed as untimely, he will not be able to re-file his claim in federal court in any event.

7  Although the court is not making such a finding, it appears that the plaintiffs special access request was not approved or signed by defendant O'Harer. (Dkt. No. 28 at 17). Thus, plaintiff may never have submitted his legal documents to this defendant. Plaintiff makes this claim because it is the only way that he could claim that defendant O'Harer became angry over plaintiff's lawsuit.

8  The court will simply assume that plaintiff was granted the two week special access.

9  The court notes that the special access rules only allow "seven (7) consecutive days" of special access, and that the last day of special access would have been June 20, 2013, the second day that plaintiff missed his call-outs. (Dkt. No. 28 at 17–18). Thus, under normal circumstances, plaintiff would not have been allowed to continue his special access to the law library after June 20, 2013 (seven consecutive days after access was granted on June 13, 2013. (Dkt. No. 28 at 17).

10  Plaintiff's library grievance was filed against defendant O'Harer and Officer Myers, who is not a defendant in this action. (Dkt. No. 28 at 19). There is no claim of retaliation in the grievance, and Officer Myers is listed before defendant O'Harer on the grievance. (*Id.*)

11  It is not necessary for the court to base its decision on any information in plaintiff's grievance for this particular issue, because he admits that he failed to appear for two call-outs. However, plaintiff has referred to the grievances specifically in his complaint, and he has filed copies of the grievances in his response to the motion to dismiss. Thus, the court could consider the documents in conjunction with the motion to dismiss for failure to state a claim. As stated above, in deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d at 88; *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

12  There is no individual liability in the Court of Claims, thus, plaintiff cannot claim that defendant O'Harer was trying to "protect" an individual who he may have known.

13  Senior Judge McAvoy's decision did not address any claim of retaliation as against defendant Kimak. This may be so because plaintiff only briefly alleged retaliation in one conclusory sentence in the complaint. (Compl.¶ 29).

---

**End of Document**                           © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5372872
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Aldo Contreras LIBERATI, Plaintiff,
v.
GRAVELLE, Sgt., Clinton County Jail, Defendant.

No. 9:12–CV–00795 (MAD/DEP).
|
Sept. 24, 2013.

**Attorneys and Law Firms**

Aldo Contreras Liberati, Philipsburg, PA, pro se.

Lemire, Johnson Law Firm, Gregg T. Johnson, Esq, Mary E. Kissane, Esq, of Counsel, Malta, NY, for Defendant.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** On May 14, 2012, Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging that upon arrival at Clinton County Correctional Facility, Defendant used excessive force against Plaintiff, causing him injury. *See* Dkt. No. 1. On December 28, 2012, Defendant moved for summary judgment seeking dismissal of Plaintiff's claim pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 22–7 at 5. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated Plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. *See generally* Dkt. No. 22–7. Plaintiff failed to oppose Defendant's motion for summary judgment. *See* Dkt. No. 31 at 6.

In a Report–Recommendation and Order dated August 9, 2013, Magistrate Judge Peebles recommended that the Court grant Defendant's motion for summary judgment and dismiss Plaintiff's complaint. *See* Dkt. No. 31 at 2. Specifically, although Magistrate Judge Peebles found that questions of fact preclude granting the motion on

exhaustion grounds, he found that the motion should be granted on the merits because no reasonable factfinder could conclude that Defendant violated Plaintiff's Eighth Amendment rights. *See* id. at 21. Neither party objected to Magistrate Judge Peebles Report–Recommendation and Order.

On February 5, 2012, Plaintiff was transferred to Clinton Correctional Facility ("Clinton") located in Dannemora, New York. *See* Dkt. No. 22–2 at 3. During the transfer, the corrections officers escorting Plaintiff called Clinton to notify them that Plaintiff was difficult and combative. *See id.* Upon arrival, the staff at Clinton prepared Plaintiff for housing by performing the routine intake and booking procedures. See id. at 4. Part of the normal procedure was to conduct a patdown search to detect any contraband that was not detected by the "BOSS" chair. *See id.* at 3. During the pat-down, Plaintiff disobeyed orders on at least two occasions when he refused to face and keep his hands on the wall. See id. at 4.

When the Clinton officers realized that Plaintiff had a second layer of pants underneath his jeans, they instructed him to remove them in a private changeout room. See id. at 4. After removal of the pants Plaintiff refused to remain on the wall, so they attempted to physically restrain him. See id. at 5. Upon hearing this commotion, Defendant entered the changeout room to assist with the situation. See id. He observed Plaintiff resisting the officers that were trying to restrain him. See id. Defendant administered "a single, one second, application of O.C. spray towards other officers to continue to gain control over Plaintiff and secure his hands." *Id* . After he administered the spray, Defendant placed it back in his holster and retreated to allow the other officers to gain control of Plaintiff. See id. Although Defendant remained in the room, he used no further force against him other than to place his feet near the Plaintiff to prevent him from putting his hands under his body. See id. at 5–6. When the Plaintiff was fully secured, Defendant left the room. See id. at 6. Plaintiff was then escorted to a holding cell to provide him an opportunity to calm down, decontaminate his eyes with eye wash and see medical staff at the facility. See id.

**\*2** Plaintiff's verified complaint alleges that Defendant punched him in the head twice and that he did not file a grievance regarding these allegations because the corrections officers at Clinton refused to provide him with the necessary form. See id. at 2.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Morever, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' *"Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. See *id.* at 295 (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidenced" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Upon review of Magistrate Judge Peebles' Report–Recommendation and Order, the Court finds that the report correctly determined that Defendant's motion for summary judgment should be granted. In support of the motion for summary judgment, Defendant argues that he did not violate Plaintiff's Eighth Amendment rights because there is no record evidence that he punched Plaintiff in the head or used excessive force. *See* Dkt. No. 22–7 at 8–11. To state a claim for excessive force, a plaintiff must show defendant's acts are "incompatible with 'the evolving standards of decency that mark the process of a maturing society,' or involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958); *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). Even though the Eighth Amendment does not mandate that prisons be comfortable, they must be sufficiently humane. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two componentse subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The

subjective element is satisfied when plaintiff demonstrates that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the alleged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry looks at "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 6 (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)).

The objective element examines the harm inflicted in relation to "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8). Malicious or sadistic harm caused by prison officials, notwithstanding the extent of injury, always violates the "contemporary standards of decency." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9). The amount of force is examined in proportion to the need reasonably perceived by prison officials and what, if anything, did they do to limit such force. *See Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993).

In the present matter, no evidence in the record suggests that Defendant, Gravelle used force maliciously or sadistically against Plaintiff. The record reveals that action was initiated against Plaintiff in response to his repeated failures to obey orders to keep his hands on the wall during the pat-down search. Defendant administered a single O.C. spray to assist the corrections officers and then moved away from Plaintiff, using no more force or spray than was necessary to control Plaintiff. The undisputed material facts make clear that no reasonable factfinder could conclude that Defendant used malicious or sadistic force against Plaintiff because such actions were taken in response to Plaintiff's failure to obey orders and the need to restore order. Although Plaintiff's claim that Defendant punched him in the head would constitute malicious or sadistic force in violation of Plaintiff's Eighth Amendment rights, there is no evidence in the record to support such claim. Therefore, Plaintiff fails to state a claim that Defendant violated his Eighth Amendment rights.

**\*4** After careful review of Magistrate Judge Peebles' Report–Recommendation and Order, the parties' parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 9, 2013 Report–Recommendation and Order is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 22) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Aldo Conteras Liberati has commenced this action pursuant to 42 U.S.C. § 1983, alleging the deprivation of his rights under the United States Constitution. In his complaint, plaintiff alleges that, upon his arrival at the Clinton County Correctional Facility ("Clinton"), he suffered injuries arising from the use of excessive force by defendant Gravelle, a sergeant corrections officer stationed at Clinton at the times relevant to this action.

Currently pending before the court is defendant's motion for summary judgment on the merits, and based also on plaintiff's failure to exhaust the available administrative remedies and defendant's assertion that he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendant's motion be granted, and plaintiff's complaint be dismissed.

I. *BACKGROUND* [1]
On February 5, 2012, plaintiff was transported to Clinton, located in Dannemora, New York, by United States immigration officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 8. Prior to his arrival at Clinton, immigration officers called Clinton to notify staff that, during the transport,

plaintiff was difficult and combative. *Id.* Upon arriving at Clinton, facility staff began to prepare plaintiff for housing by subjecting him to routine intake and booking procedures. *Id.* at ¶ 10. This process included scanning plaintiff using a "BOSS" chair, which is designed to detect any metal contraband, as well as pat-searching him in a private room called the "changeout room" for any contraband not detected by the BOSS chair.[2] Id. at ¶¶ 3, 10.

During the pat-search, plaintiff was directed by Clinton corrections officers to face and keep his hands on the wall. Gravelle Decl. (Dkt. No. 22–2) at ¶ 11. On at least two occasions, however, plaintiff disobeyed this order, and turned toward the officer conducting the search. Gravelle Decl. Exh. A (traditionally filed) at 0:33, 1:05. At some point during the search, the officer performing the pat-down discovered that plaintiff was wearing a second layer of pants underneath his jeans. Gravelle Decl. (Dkt. No. 22–2) at ¶ 12. Plaintiff was then directed to move into a more private part of the changeout room and remove his jeans. *Id.* When plaintiff refused to remain on the wall after he removed his jeans, several Clinton corrections officers attempted to take physical control of the plaintiff to restrain him. *Id.;* Gravelle Decl. Exh. A (traditionally filed) at 1:11.

**\*5** Moments after the pat-search began, defendant Gravelle, whose office is located nearby the changeout room, heard the commotion arising from plaintiff's search, and went to assist the other officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:15. Upon entering the changeout room, defendant observed plaintiff resisting the officers attempting to restrain plaintiff. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13. Defendant immediately ordered one, single application of "O.C. spray" to regain control of plaintiff.[3] Gravelle Decl. (Dkt. No. 22–2) at ¶¶ 13, 14; Gravelle Decl. Exh. A (traditionally filed) at 1:17. Defendant then moved back away from Liberati and allowed the other corrections officers to secure plaintiff's hands. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:18. Although defendant remained in the changeout room until plaintiff was secured, he did not use any further force against him. Gravelle Exh. A (traditionally filed) at 1:18–2:16. After plaintiff was secured, Clinton corrections officers escorted him to a holding cell to provide him opportunity to clam down, following which his eyes were decontaminated with

eye wash and he was seen by medical staff at the facility. Gravelle Dec. (Dkt. No. 22–2) at ¶ 15.

In plaintiff's verified complaint, he alleges that defendant punched him twice in the head. Compl. (Dkt. No. 1) at 8. He also contends that he did not file a grievance regarding these allegations due to the refusal of corrections officers at Clinton to provide him with the necessary form. *Id.* at 2.

## II. *PROCEDURAL HISTORY:*
Plaintiff commenced this action on May 14, 2012, by the filing of a complaint, motion to stay deportation, and application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1–3. Plaintiff's complaint is comprised of eight claims, and names six defendants, including defendant Gravelle. *See generally* Compl. (Dkt. No. 1). On August 27, 2012, District Judge Mae A. D'Agostino issued a decision and order granting plaintiff's request to proceed IFP, denying his motion to stay deportation, and dismissing all claims with the exception of plaintiff's Eighth Amendment excessive force cause of action asserted solely against defendant Gravelle. Dkt. No. 9.

Now that discovery in this matter is closed, the remaining defendant, Sergeant Gravelle, has moved for the entry of summary judgment, dismissing plaintiff's remaining claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 22. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. *See generally* Def.'s Memo. of Law (Dkt. No. 22–7).

**\*6** Defendant's motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure to Oppose Defendant's Motion*
The court's local rules require that a party seeking summary judgment must submit a statement of material

facts that it contends are undisputed by the record evidence. N.D.N.Y. L.R. 7.1(a)(3). The local rules also instruct the non-moving party to respond to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in the moving party's statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y.,* Nos. 09–CV0360, 09–CV–0363, 2011 WL 1770301, at *1 n. 2 (N.D.N.Y. May 9, 2011) (Sharpe, J.).[4] To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

In this instance, defendant Gravelle has complied with local rule 7.1(a)(3), providing a statement setting forth twenty-three facts as to which, he contends, there is no genuine triable issue. Def.'s L.R. 7.1(a)(3) Statement (Dkt. No. 22–6). Plaintiff, however, has failed to respond either to that statement, or to defendant's motion generally.[5] See *generally* Docket Sheet.

By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this provision in cases where a non-movant fails to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a *pro se* litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.).

**\*7** Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's rule 7.1(a)(3) statement, Dkt. Nos. 22–1, 24–1, but has nonetheless failed to do so, I have construed defendant's facts contained therein as true to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only

in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson, 477 U.S. at 250* (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Exhaustion of Available Administrative Remedies*

**\*8** In his motion, defendant Gravelle argues that, because plaintiff did not file a grievance addressing the issues now raised in this action before commencing suit and pursue that grievance through the administrative grievance procedure available at Clinton, he is procedurally barred from pursuing this action. Def.'s Memo of Law (Dkt. No. 22–7) at 11–12.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." [6] *Jones v. Bock,* 549 U.S. 199, 216 (2007). In the event a defendant establishes that the inmate-plaintiff failed to complete the administrative review process prior to commencing the action, the

plaintiff's complaint is subject to dismissal. *See Woodford, 548 U.S. at 93* ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford, 548 U.S. at 95; see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [7]

There are grievance procedures in place and available to any Clinton inmate who desires to complain regarding prison conditions at the facility. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17; Johnson Decl. Exh. B (Dkt. No. 22–5). In this case plaintiff's complaint, which is signed under penalty of perjury, and thus has the same force and effect as an affidavit, [8] alleges that he requested a grievance form from Clinton corrections officers but they refused to provide one to him. Compl. (Dkt. No. 1) at 4, 8. In support of his motion, defendant Gravelle avers that plaintiff did not file a grievance regarding the events giving rise to this action while at Clinton. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17.

**\*9** Although it is clear from the record that plaintiff failed to avail himself of the administrative remedies available to him, his failure to do so does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

In this instance, although there is no record evidence to suggest that grievance procedures at Clinton were not fully available to plaintiff while he was at the facility, plaintiff does allege that corrections officers stationed at the facility refused to provide him with a grievance form. Under ordinary circumstances, this could justify a recommendation to the assigned district judge that she hold a hearing to develop plaintiff's allegation regarding special circumstances pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir.2011). However, as is discussed more fully below, because I recommend that defendant's motion be granted based on a finding that no reasonable factfinder could conclude that defendant violated plaintiff's rights, a determination of whether plaintiff should be precluded from bringing this action based on a failure to exhaust administrative remedies is not necessary.

D. *Plaintiff's Excessive Force Claim*

In support of defendant's motion, defendant Gravelle argues that there is no record evidence to support the allegation that he punched plaintiff, and that the record instead supports a finding that defendant's use of force against plaintiff did not violate his Eighth Amendment rights. Def.'s Memo. of Law (Dkt. No. 22–7) at 8–11.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman*, 452 U.S. 337, 349 (1981)).

**\*10** A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (internal quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and

the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson*, 503 U.S. at 7–8 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir.1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (internal quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (internal quotation marks omitted), accord, *Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9–10 (internal quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency." *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991), accord *Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 67 of 118
Liberati v. Gravelle, Not Reported in F.Supp.2d (2013)
2013 WL 5372872

prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins,* 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano,* 998 F.2d at 105.

**\*11** Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003)) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")).

In this case, although plaintiff's complaint alleges that defendant Gravelle punched him twice in the head, there is no record evidence to support his claim. Compl. (Dkt. No. 1) at 8. Instead, the record reveals that defendant used O.C. spray against plaintiff on one occasion during the course of an altercation with corrections officers, while those officers attempted to gain control over him. The video recording submitted in support of defendant's motion shows defendant coming into the changeout room after plaintiff was already on the ground with several officers trying to restrain him. Defendant quickly applied the O.C. spray to plaintiff's face, and then moved away from plaintiff and the other officers. According to defendant, corrections officers initiated the use of force against plaintiff as a result of his failure to obey orders to keep his hands on the wall during the pat-search. Defendant's use of force lasted a matter of seconds, and he sprayed him only to assist corrections officers in restraining him. In addition, although defendant states that plaintiff was seen by medical staff at Clinton

following the incident, nothing in the record, including plaintiff's complaint, indicates that plaintiff suffered a physical injury as a result of the incident. In light of all of this record evidence, I find that no reasonable factfinder could conclude that defendant used force against plaintiff maliciously or sadistically, or for any other purpose than restoring order. *See Kopy v. Howard,* No. 07–CV0417, 2010 WL 3808677, at \*3 (N.D.N.Y. Aug. 11, 2010) (Treece, M.J.), *report and recommendation adopted by* 2010 WL 3807166 (N.D .N.Y. Sept. 21, 2010) (Hurd, J.) (granting summary judgment where the record evidence demonstrated that the defendants used pepper spray on the plaintiff only once after plaintiff was repeatedly ordered to return to his cell and plaintiff suffered no injuries). Accordingly, I recommend that defendant's motion be granted. [9]

### IV. *SUMMARY AND RECOMMENDATION*
In defendant's motion, he challenges the legal sufficiency of plaintiff's excessive force claim. Because the record contains a dispute of material fact as to whether plaintiff's failure to exhaust available administrative remedies may be excused, defendant is not entitled to dismissal on that basis. However, after a careful review of the record evidence, including a video recording of defendant's use of force, I find that no reasonable factfinder could conclude that defendant violated plaintiff's Eighth Amendment rights.

**\*12** Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 22–7) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 86 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

2013 WL 5372872

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5372872

Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2    A camera is installed in the changeout room. *Id.* at ¶ 10. In support of his motion, defendant submitted, as Exhibit A to his declaration, a copy of the recording from plaintiff's intake during the pat-search on February 5, 2012. Gravelle Decl. Exh. A (traditionally filed).

3    The term "O.C. spray" is not defined in defendant's motion papers. *See,* e.g., Gravelle Decl. (Dkt. No. 22–2); Def.'s L.R. 7 .1(a)(3) Statement (Dkt. No. 22–6).

4    Copies of all unreported decisions cited have been appended to this report for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

5    Plaintiff's response was due on January 22, 2013. Notice to Plaintiff (Dkt. No. 24). On July 24, 2013, the court received a letter from plaintiff requesting leave to file a response in opposition to the pending motion. Dkt. No. 29. Because plaintiff's request was over six-months late, and he was adequately put on notice previously of the consequences of failing to respond to defendant's motion, and in light of the unfair prejudice that defendant would incur as a result of such a delayed response, I denied that motion. Text Order Dated July 24, 2013.

6    In this case, defendant Gravelle raised failure to exhaust administrative remedies as a defense in his answer to plaintiff's complaint. Dkt. No. 14 at ¶ 14.

7    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

8    18 U.S.C. § 1746; *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes[.]").

9    Because I recommend dismissal of plaintiff's complaint based on the merits, I have not considered defendant's qualified immunity argument.

---

**End of Document**      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 69 of 118

2016 WL 6143351
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

John LIVIGNI, Plaintiff,
v.
C.O. ORTEGA (#18099); C.O.
Torres (#13202), Defendants.

No. 15-cv-9454 (CM)
|
Signed October 19, 2016

**Attorneys and Law Firms**

John Livigni, New York, NY, pro se.

**DECISION AND ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS**

McMahon, C.J.

 **\*1** Plaintiff John Livigni ("Plaintiff"), proceeding *pro se*
and *in forma pauperis*, brought this action on December
2, 2015, against three employees of the New York City
Department of Correction, C.O. Ortega (Shield #18099),
C.O. Torres (Shield #13202) ("Defendants"), and Captain
Najah (Shield #366), under 42 U.S.C. § 1983. Pursuant
to this Court's order dated January 6, 2016, the claims
against Captain Najah were dismissed.

On March 17, 2016, the remaining Defendants moved to
dismiss the complaint pursuant to Rule 12(b)(6) for failure
to state a claim. Plaintiff failed to file any opposition. On
September 28, 2016, this Court ordered Plaintiff to file
opposition by October 12, 2016, or the motion would be
deemed submitted. Plaintiff failed to file any opposition
by the October 12, 2016, deadline.

For the reasons set forth below, Defendants' motion to
dismiss for failure to state a claim is GRANTED.

**Background**

Plaintiff alleges that at 6:30 p.m. on October 2, 2015,
he and two other inmates were taken by Defendants
to the intake area of the Manhattan Detention Center

("MDC")[1] to prepare for transfer to the Brooklyn
Detention Center ("BDC"). Compl. Ex. A. Plaintiff
alleges that he told Defendants that he would not be
allowed into the BDC because he has a family member
who works there, but that Defendants ignored him. *Id.*
When they arrived at the BDC, Plaintiff alleges that
another officer directed Defendants to return to the MDC
with the three inmates. *Id.* Plaintiff alleges that he and
the other two inmates were handcuffed and placed back
in the cold transport bus at approximately 11:30 p.m.,
where they were left until 6:30 a.m. the next morning. *Id.*
Plaintiff alleges that he was denied access to water or the
restroom for the entire period, and that Officer Torres
placed the handcuffs too tightly onto his right wrist. *Id.*
As a result, his wrists "lost circulation and are chronically
debilitated." Compl. § III.

At 6:30 a.m., Plaintiff alleges that Captain Najah came
out to see what was going on with the bus. Compl. Ex. A.
After Plaintiff and the other inmates told Captain Najah
what was going on, Captain Najah directed Defendants
to return to the MDC with the inmates. Plaintiff claims
that he was returned to MDC's intake area, where he
remained until October 4, when he was sent back to the
BDC before being returned that evening to the MDC
after staff confirmed he did indeed have a family member
working at the BDC. *Id.*

Defendants have moved to dismiss the complaint on the
grounds that: (1) the complaint fails to state a conditions-
of-confinement claim; (2) Plaintiff failed to exhaust his
administrative remedies for a conditions-of-confinement
claim; (3) the complaint fails to state a claim of excessive
force; (4) the complaint fails to state a claim for the
violation of the Department of Correction's Minimum
Standards regulations.

**Legal Standards**

 **\*2** In deciding a motion to dismiss under Rule 12(b)
(6), the Court must liberally construe all claims, accept all
factual allegations in the complaint as true, and draw all
reasonable inferences in favor of the plaintiff. *See Cargo
Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir.
2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir.
2007).

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 70 of 118

Livigni v. Ortega, Not Reported in Fed. Supp. (2016)

2016 WL 6143351

However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal*, 556 U.S. at 680.

"A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). A court must interpret *pro se* filings "to raise the strongest arguments that they suggest." *Harris v. Westchester Cnty. Medical Ctr.*, No. 08 Civ. 1128, 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006)).

### Confinement on Transport Bus

Plaintiff's allegations regarding the conditions of his confinement on the transport bus are best construed as asserting a claim of deliberate indifference to his health and safety in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.[2] "The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). Prison officials are liable for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety: "[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983." *Morales v.*

*New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988).

**\*3** The test for deliberate indifference is twofold, with "objective" and "subjective" prongs. First, the plaintiff must demonstrate that he is incarcerated "under conditions posing a substantial risk of serious harm." *Hayes*, 84 F.3d at 620. Second, he must demonstrate that the defendants "possessed sufficient culpable intent." *Id.* A prison official acts with culpable intent "if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.*

Defendants argue that Plaintiff has failed to allege that he was placed in conditions that posed a substantial risk of serious harm, because being locked in a cold transport bus for seven hours without access to water or the restroom did not, objectively, "pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

First, Defendants argue that Plaintiff was required to allege that he suffered injury as a result of his confinement. This is false. The objective prong of the test for deliberate indifference merely requires Plaintiff to allege that he was exposed to conditions that "pos[ed] a *substantial risk* of serious harm." *Hayes*, 84 F.3d at 620 (emphasis added). "Although the seriousness of the harms suffered is relevant to calculating damages and may shed light on the severity of an exposure, serious injury is unequivocally not a necessary element of an Eighth Amendment claim." *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) (citing *Hudson v. McMillian*, 503 U.S. 1, 4 (1992)). Defendants misleadingly quote from a case to suggest that the Eighth Amendment inquiry requires an allegation that "actual harm resulted," omitting from the quotation that a Plaintiff may also allege that harm "was likely to result" from the exposure to conditions. *Goolsby v. Cicconi-Crozier*, No. 13-CV-822-A, 2014 WL 1279066, at *4 (W.D.N.Y. Mar. 27, 2014). The Court strongly suggests that the New York City Law Department familiarize itself with the relevant legal standards and avoid such disingenuous tactics in the future.

Second, Defendants argue that the alleged conditions of Plaintiff's confinement do not rise to the level of an Eighth Amendment violation. The Eighth Amendment prohibits States from depriving prisoners of basic human

needs — food, water, clothing, shelter, medical care, and reasonable safety. *Shariff v. Coombe*, 655 F. Supp. 2d 274, 297 (S.D.N.Y. 2009). However, a temporary deprivation of food and water, while unpleasant, does not necessarily equate to a constitutional violation. Courts in the Second Circuit have repeatedly found temporary deprivations of basic needs to be constitutional, including cases where the deprivations were more severe than those Plaintiff alleges occurred here. *See, e.g., Walker v. Schriro*, No. 11 CIV. 9299 JPO, 2013 WL 1234930, at *12 (S.D.N.Y. Mar. 26, 2013) (finding two-day confinement without access to food, shower, linens, running water, or a bathroom did not constitute an Eighth Amendment violation); *Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 269 (N.D.N.Y. 2008) (finding overnight deprivation of food and water was not a constitutional violation); *see also Rush v. Astacio*, 159 F.3d 1348 (2d Cir. 1998) (finding six-and-a-half-hour detention in a "very cold" room without food did not violate the Fourteenth Amendment). As distasteful as the practice of leaving inmates in a transport van overnight may be, this Court is compelled to conclude that it does not, standing alone, constitute a violation of the Eighth Amendment. Given that conclusion, it is unnecessary to address Defendants' remaining conditions-of-confinement arguments, including whether Plaintiff properly alleged deliberate indifference or exhausted his administrative remedies. Consequently, this claim is dismissed.

### Handcuffs

**\*4** Construing the complaint in the light most favorable to Plaintiff, his allegation that Officer Torres placed handcuffs on him too tightly, resulting in a loss of circulation and ongoing disability, should be construed as a claim of excessive force in violation of the Fourth Amendment. [3] To prevail on a claim of excessive force, Plaintiff must show that Officer Torres's use of force was objectively unreasonable in light of the circumstances, without regard to Officer Torres's underlying intent or motivation. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Although handcuffs must be reasonably tight to be effective, overly tight handcuffing can constitute excessive force. *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008). In evaluating the reasonableness of handcuffing, the Court must consider

three factors: 1) whether the handcuffs were unreasonably tight; 2) whether the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists. *Id.* A failure to allege any continuing injury from the handcuffing is "fatal" to a claim of excessive force. *Id.*

Here, Plaintiff alleges that his handcuffs were unreasonably tight, and that as a result he suffered a loss of circulation and that his wrists are "chronically debilitated." Plaintiff does not provide any more information about the extent of his alleged injuries, nor does he allege that Defendants ignored a request to loosen the handcuffs. Plaintiff's conclusory allegations are therefore insufficient to plead the second and third factors of a viable handcuffing-related claim of excessive force. *See Corsini v. Bloomberg*, 26 F. Supp. 3d 230, 243 (S.D.N.Y. 2014). This claim must be dismissed as well.

Plaintiff is granted leave to file an amended complaint to the extent he can allege permanent injuries resulted from his handcuffing. Plaintiff must submit the amended complaint to this Court's Pro Se Intake Unit within sixty days of the date of this order, caption the document as an "Amended Complaint," and label the document with docket number 15-cv-9454 (CM). An Amended Civil Rights Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed with prejudice. The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

### Violation of Minimum Standards Regulations

Lastly, Plaintiff's complaint appears to suggest that he is also asserting a § 1983 claim based on a violation of "minimum standards," Compl. §§ II.D(f), V, which Defendants argue is potentially a reference to the Department of Correction's Minimum Standards regulations contained in Title 40 of the Rules of the City of New York. To the extent that the complaint can be read to assert such a claim, Defendants are correct that violations

**Livigni v. Ortega, Not Reported in Fed. Supp. (2016)**

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 72 of 118

2016 WL 6143351

of city or state regulations cannot form the basis of a § 1983 claim, which must be based on a deprivation of a *federal* constitutional or statutory right. *See, e.g., Graham,* 490 U.S. at 394 (1989). To the extent Plaintiff attempts to assert this claim, it is also dismissed.

### Conclusion

**\*5**  For the foregoing reasons, Defendants' motion to dismiss is GRANTED, with prejudice, except that Plaintiff has leave to amend his excessive force claim to assert objective facts tending to show permanent injury resulting from his handcuffing.

The Clerk of the Court is directed to mark the motion at Docket #9 as GRANTED and dismiss the case against defendants C.O. Ortega and C.O. Torres.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6143351

Footnotes

1    The Manhattan Detention Center is a city facility and is not to be confused with the Metropolitan Detention Center, also often abbreviated "MDC," a federal facility located in Brooklyn.

2    Although it is unclear from the complaint whether Plaintiff was a pre-trial detainee or a convicted prisoner at the time, and thus whether his complaint is asserted under the Eighth Amendment (convicted prisoners) or the Fourteenth Amendment (pre-trial detainees), the standard of review for deliberate indifference claims is the same under either Amendment. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir. 2009).

3    If Plaintiff was a convicted prisoner at the time of the incident, his claims would be evaluated under the Eighth Amendment, rather than under the Fourth Amendment. But the Eighth Amendment's standard is more forgiving to Defendants than the Fourth Amendment's, because it requires proof of both an objective and subjective element.

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1075830
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Cesar MATEO, Plaintiff,

v.

Kevin O'CONNOR, Jeffrey Macisaac, Steven Purcell,
Richard Ward, J. Jarvis, Paul Guarino, Lieutenant
Laporto, Mark Royce, and New York State
Department of Correctional Services, Defendants.

No. 10 Civ. 8426(LAP).
|
March 29, 2012.

### MEMORANDUM OPINION AND ORDER

LORETTA A. PRESKA, Chief Judge.

**\*1** This is one of several actions Cesar Mateo
("Mateo"), a prisoner currently incarcerated at Sing Sing
Correctional Facility ("Sing Sing"), has brought *pro se*
against various New York State prison officials under
42 U.S.C. § 1983. In this case, Mateo is suing the
New York State Department of Correctional Services
("DOCS") and eight of its employees: Corrections
Sergeant Kevin O'Connor ("O'Connor"), Corrections
Officer Jeffrey Macisaac ("Macisaac"), Corrections
Officer Steven Purcell ("Purcell"), Corrections Officer J.
Jarvis ("Jarvis"), Corrections Lieutenant Richard Ward
("Ward"), Corrections Lieutenant Laporto ("Laporto"),
Corrections Captain Mark Royce ("Royce"), and Civilian
Maintenance employee Paul Guarino ("Guarino"). All of
these defendants worked at the Green Haven Correctional
Facility ("Green Haven") while Mateo was incarcerated
there.

Mateo's complaint alleges verbal and physical harassment
by O'Connor, Macisaac, Purcell, and Jarvis on August
21 and 22, 2008; the filing of a false inmate misbehavior
report ("IMR") by O'Connor, Macisaac, Purcell, Ward,
and Guarino on August 22, 2008; a biased disciplinary
hearing conducted by Laporto, Guarino and O'Connor
on September 3, 2008; and a biased appeal conducted by
Royce on September 9, 2008. Mateo claims these actions
directly violated his civil rights under the Fourteenth

Amendment and that they were undertaken in retaliation
for Mateo's past grievance filings, in violation of the
First Amendment. Mateo also alleges that O'Connor,
Maclsaac, Purcell, Ward, Royce, Guarino, and Laporto
conspired in this retaliation. With his complaint, Mateo
provided a copy of a grievance filed on August 22, 2008
against O'Connor, Maclsaac, Purcell, Jarvis, Ward, and
Rodriguez (the "Grievance"). Mateo concedes that he
never completed an appeal of the Grievance. (Compl.¶
20.)

On April 15, 2011, defendants moved to dismiss the
complaint in its entirety. (Defs.' Mem. Law Supp. Mot.
Dismiss ("MTD") (Doc. No. 17).) Defendants argue that
the Eleventh Amendment bars Mateo's claims against
DOCS, (*id.* at 4–6), and that Mateo failed to: exhaust his
administrative remedies before bringing suit, (*id.* at 68);
allege the personal involvement of each defendant (*id.* at
9–14); state claims for retaliation or conspiracy (*id.* at 14–
18), and allege a liberty interest requiring due process (*id.*
at 18–21). On April 26, 2011, Mateo filed an affirmation
in opposition to the motion, seeking in part to excuse his
failure to exhaust his administrative remedies. (Doc. No.
25.) On June 17, 2011, defendants entered a reply. (Doc.
No. 20.) For the reasons that follow, the Court grants
defendants' motion and dismisses all of Mateo's claims
with prejudice.

### BACKGROUND

The following facts are taken from Mateo's complaint and
are not a finding of fact by the Court. Instead, the Court
assumes these facts to be true for purposes of deciding the
pending motion to dismiss, and construes them in a light
most favorable to plaintiff, the non-moving party. [1]

**\*2** On August 11, 2008, Mateo was moved from
Green Haven's "F–Block" housing unit to its "H–Block"
housing unit "to be harassed, framed and set-up ... in
retaliation for ... numerous written grievances against
correction officers at Green Haven." (Compl.¶ 6.)

On the morning of August 21, defendant Corrections
Officer Maclsaac, while issuing Mateo a pass to
participate in a hearing for an unrelated grievance,
"belligerently and menacingly, said ... do not ever write
grievances against H–BLOCK staffs" or that Mateo
would "get fucked up." (*Id.* ¶ 7.) Upon his return to

H–Block, MacIsaac ordered Mateo to face the wall, defendant Corrections Officer Jarveis stood watch, and non-defendant Corrections Officer J. Vasquez pressed Mateo against the wall and pat-frisked him. (*Id.*) MacIsaac then said in a low tone of voice that "he can fuck me up, knock off my teeth, that it will happen to me right in this place ... for writing grievances." (*Id.*) After a long wait, MacIsaac sent Mateo to his cell, where he discovered that the water and electricity had been cut off. (*Id.* ¶ 8.) Mateo wrote a complaint to the prison superintendent but did not file a grievance. (*Id.*)

On the afternoon of August 21, Mateo returned from the recreation yard to find his clothes on the floor and his possessions tampered with, and MacIsaac, Jarveis and J. Vasquez standing outside his cell laughing. (*Id.* ¶ 9.) MacIsaac then said "that is what happen [sic] when you write grievances" and threatened to beat up Mateo unless he entered his cell. (*Id.*) That evening, Mateo wrote another letter to the superintendent explaining the situation but was denied permission to leave his cell for dinner and went to bed without mailing the letter. (*Id.*)

On the morning of August 22, MacIsaac observed Mateo carrying letters en route to breakfast. (*Id.* ¶ 10.) MacIsaac asked Mateo if the letters were grievances, but Mateo stated they were legal mail. (*Id.*) MacIsaac demanded to see the letters, and Mateo said no. (*Id.*) Defendant Corrections Sergeant O'Connor was then called on the radio. (*Id.*) O'Connor escorted Mateo back to his cell with a large group of officers, again denying him a meal. (*Id.*)

Shortly afterward, an officer informed Mateo that he had been transferred to "G–Block." (*Id.* ¶ 11.) While Mateo was carrying his property out of his cell, MacIsaac "was harassing and provoking [Mateo], calling [him] pussy, bitch, and standing [in his] way." (*Id.*) O'Connor and Jarveis were with MacIsaac, who then threw some of Mateo's property down the stairs. (*Id.*) As O'Connor escorted Mateo to G–Block, he told Mateo that he should know better than to write grievances. (*Id.*)

On the evening of August 22, in G–Block, Mateo received a "false, fabricated" inmate misbehavior report, charging Mateo with threatening MacIsaac and with causing a flooding and disturbance. (*Id.* ¶ 12.) The misbehavior report was allegedly authored by MacIsaac and signed by MacIsaac, O'Connor, defendant Corrections Officers

Purcell and Ward, and defendant maintenance worker Guarino. (*Id.*)

**\*3** That night, Mateo handed the duty officer the Grievance. (*Id.* ¶ 18.) The Grievance describes the morning incidents of August 22 but without much detail. (*Id.*) It then states that Mateo was issued a "retaliatory misbehavior report" and that he now fears being "hurt by staffs," noting "I fear for my life; I fear to be set up. My property, legal / personal file is not secure ." (*Id.* at 811.) Mateo's Grievance was stamped by Green Haven's Inmate Grievance Program as "received" on August 26, 2008 and annotated "retaliation by block 8/26/08." (*Id.*)

Mateo claims that the Grievance "was coded '49' which indicates Staffs Harassment, which required an expedite process, and to be responded to within 25 days by the Superintendent." (*Id.* ¶ 20 .) The Grievance was ultimately investigated by non-defendant Corrections Captain Burnett and denied by the superintendent, but Mateo complains that the investigation "took over 90 days." (*Id* .) Mateo claims that, at the time, he "had problems understanding the grievance process and its Directive." (*Id.*) Nevertheless, he alleges that as soon as he received the superintendent's response to the Grievance, he "immediately, appealed it to CORC [Central Office Review Committee], which is the last step." (*Id.*) Mateo alleges that he placed his appeal form in the appropriate box outside of the mess hall but that he

> never received a response from
> CORC, which had 30 days to
> issue a response or decision, which
> indicates that it either refused or
> waived its response or decision or
> this grievance's appeal seems to
> have not been processed to CORC,
> intentionally, to frustrates [sic] the
> exhaustion of this administrative
> remedy, which I assert as the
> deliberated action of defendants
> O'Connor and MacIsaac.

(*Id.*) Mateo does not provide a copy of the appeal form, claiming that his copy was removed from his personal property, either when he was moved into Green Haven's

Special Housing Unit, or when he was transferred out of Green Haven. (*Id.*)

On September 3, Mateo was found guilty by hearing officer Laporto of the charges in the inmate misbehavior report on the "fabricated evidence and biased testimony of Guarino and O'Connor." (*Id.* ¶ 15.) Mateo claims that he received "a disposition of the maximum penalty, in retaliation." (*Id.*) Mateo was apparently assigned to thirty days in keeplock, with a loss of commissary and phone privileges, from August 22 through September 21, and also a loss of package privileges from September 3 through October 3. (*Id .* at 11.) Mateo appealed the guilty finding on September 9 to defendant Royce, who "arbitrarily and capriciously, affirmed the guilty finding and disposition, in retaliation, in favor of his comrades [sic] officers." (*Id.* ¶ 16.)

Mateo filed harassment and retaliation claims against O'Connor, MacIsaac, and Purcell on August 27, 2008 in the Northern District of New York. (*Mateo v. O'Connor,* No. 08–0923(DNH) (N.D.N.Y.).) Mateo's case was subsequently transferred here, because the complaint's allegations involved incidents at Green Haven, which is in this district. This Court dismissed Mateo's complaint because he filed it within mere days of the incidents of alleged harassment and retaliation, making exhaustion "impossible in so short a time frame ." *Mateo v. O'Connor, No. 08 Civ. 11053(RJH)(DCF), 2010 WL 3199690, at *3 (S.D.N.Y. Aug. 12, 2010).* This Court informed Mateo that his case could be re-filed "with the addition of paragraphs explaining how administrative remedies have been exhausted." *Id.* (citations omitted).

**\*4** On September 21, 2010, Mateo filed the present complaint.

## DISCUSSION

### A. Standards

### I. Motion to Dismiss
"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*). This standard is met

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. See *Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002).* However, the Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal, 129 S.Ct. at 1949.*

In the case of a *pro se* litigant, the Court reads the pleadings leniently and construes them "to raise the strongest arguments that they suggest." *McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999)* (citations and internal quotation marks omitted). This guidance applies with particular force when the plaintiff's civil rights are at issue. See *McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir.2004); see also Flaherty v. Lang, 199 F.3d 607, 612 (2d Cir.1999).* To survive a Rule 12(b) (6) motion to dismiss, a *pro se* plaintiff's factual allegations must, however, be "enough to raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555.*

## II. Section 1983
To state a claim under *42 U.S.C. § 1983,* a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. See *West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); McKithen v. Brown, 481 F.3d 89, 99 (2d Cir.2007).*

Mere threats, verbal harassment or profanity, without any injury or damage, are not actionable under Section 1983. *Harris v. Keane, 962 F.Supp. 397, 406 (S.D.N.Y.1997).* Likewise, the filing of a false misbehavior report against an inmate does not constitute "a *per se* constitutional violation" actionable under Section 1983, provided the inmate is afforded due process protection via a disciplinary hearing. *Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir.1986).* However, such actions, if taken in retaliation against an inmate for pursuing a grievance, may "violate[ ] the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments" and thus become actionable under Section 1983. *Graham v. Henderson, 89 F.3d 75, 80 (2d Cir.1996).*

To state a *prima facie* retaliation claim for filing a grievance, an inmate must allege that an official took an "adverse action" against him, and that there was a causal relationship between the grievance filing and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). An "adverse action" is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Id.* at 381 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). Actions below this threshold are deemed *de minimis* and outside the ambit of actionable First Amendment retaliation. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001)). Because retaliation claims are easily fabricated, the courts must "examine prisoners' claims of retaliation with skepticism and particular care," *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir., 1995), requiring "detailed fact pleading ... to withstand a motion to dismiss." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

### III. Exhaustion of Administrative Remedies

**\*5**  The Prison Litigation Reform Act of 1995 ("PLRA") states in relevant part, "[n]o action shall be brought with respect to prison conditions under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

DOCS maintains a three-tiered administrative review and appeals system for prisoner grievances. *See* N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, § 701.5. Prior to pursuing a Section 1983 action in federal court, an inmate in the DOCS system must exhaust all three levels. *See Porter,* 534 U.S. at 524. First, he must file an inmate grievance complaint form or a written grievance with the Inmate Grievance Resolution Committee ("IGRC"). *See* 7 NYCRR § 701.5(a). Second, if he is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. *See id.* § 701.5(c). Finally, an inmate may appeal any superintendent's written denial to the CORC. *See id.* § 701.5(d).

For inmate allegations of harassment or other misconduct by prison employees, DOCS provides an expedited procedure. Such grievances are forwarded directly to the prison superintendent who will determine whether the grievance presents a bona fide harassment issue. *See id.* §§ 701.8(a)(c). The superintendent may request an investigation by the Inspector General's Office and must render a decision within twenty-five calendar days of receiving the grievance. *See id.* §§ 701.8(d)-(f). An inmate may appeal the superintendent's response by filing a notice of decision to appeal to CORC within seven calendar days of receiving the response. *See id.* § 701.8(h). If the superintendent does not render a decision within twenty-five calendar days, the inmate may appeal the grievance to the CORC. *See id.* § 701.8(g).

A final decision by CORC is required in order to exhaust administrative remedies. *Torres v. Carry,* 672 F.Supp.2d 338, 344 (S.D.N.Y.2009). Such a requirement is particularly appropriate for expedited harassment grievances, which, unlike regular grievances, have only one level of administrative review at which to address violative practices and take ameliorative steps to mitigate damages. *See Cruz v. Jordan,* 80 F.Supp.2d 109, 119–120 (S.D.N.Y.1999).

The Court of Appeals has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Id.* at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, the Court should consider whether special circumstances have been plausibly alleged that otherwise justify the prisoner's failure to comply with the administrative procedural requirements. *Id.* (citations omitted).

### B. Relief Available

**\*6**  As an initial matter, Mateo seeks injunctive relief and monetary damages from the individual defendants.

But Mateo cannot obtain injunctive relief from them, because he is no longer incarcerated in Green Haven. An inmate's transfer out of a facility moots any claims he has for injunctive relief against officials of that facility. *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006). Mateo also claims to seek damages from the DOCS and from the other defendants in their official capacities. Such claims are barred by the Eleventh Amendment. *Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002). Accordingly, only Mateo's claims for damages from defendants in their individual capacities are properly before this Court.

**C. Analysis**

Defendants argue that all of Mateo's claims are subject to dismissal for failure to exhaust his administrative remedies. (MTD at 6–8.) Because this Court agrees, it need not reach defendants' alternative arguments.

Failure to exhaust "is an affirmative defense under the PLRA, and ... inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Dismissal under Rule 12(b)(6) for non-exhaustion is appropriate only if a plaintiff's failure to exhaust is evident on the face of the complaint. *Id.* at 215. Here, Mateo's complaint includes a copy of the Grievance purportedly supporting his claims and a section of his complaint entitled "Exhaustion of Grievance", which squarely admits his failure to exhaust his remedies with CORC. (*See* Compl. ¶ 20 ("I have never received a response from CORC....".) Accordingly, an exhaustion defense is available with this Rule 12(b)(6) motion.

Retaliation claims "fit[ ] within the category of 'inmate suits about prison life,' and therefore must be preceded by the exhaustion of state administrative remedies available." *Lawrence v. Goord,* 304 F.3d 198, 200 (2d Cir.2002). Likewise, the policies and procedures of a prison's disciplinary and grievance programs may themselves be the subject of a grievance. *Taylor v. Artus,* No. 05 Civ. 271, 2007 WL 4555932, at *7 (N.D.N.Y. Dec. 19, 2007) (citing 7 NYCRR § 701.3(e)(1), (2); N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E). Thus, all of Mateo's present claims are subject to the PLRA's administrative exhaustion requirement.

Mateo's August 22 Grievance alleges that he was verbally and physically harassed by defendants O'Connor and MacIsaac and that these defendants, together with defendants Purcell, Ward, Guarino, and Jarveis, conspired to submit a false misbehavior report against Mateo, all in retaliation for filing grievances. (*See* Compl. at 8–11.) Because the Grievance included allegations of harassment, it was sent directly to the facility superintendent pursuant to 7 NYCRR § 701.8. (*See* Compl. ¶ 20.) Mateo claims that he appealed the first denial of his Grievance to CORC immediately after it was denied in late November but concedes that he never received an appellate decision on his Grievance from CORC, and that he never otherwise pursued his appeal to its conclusion. (*See id.*) As Mateo failed to obtain a final decision from CORC before bringing suit, these claims are subject to dismissal unless he can show that his failure is justified.

**\*7** Mateo did not identify any grievance directed to his claims of bias at the hearing and appeal. Accordingly, these claims are also subject to dismissal unless Mateo can show that he was justified in failing to grieve them.

Mateo presents four arguments under *Hemphill* to excuse the absence of administrative exhaustion, but none are availing.

First, Mateo argues that "the Inmate Grievance directive is confusing and at the time of the incidents and filing grievances I did not understood [sic] it." (Opp.¶ 11.) However, as this Court has previously recognized, Mateo appealed at least six other grievances to CORC, all filed at the same time as the events in this action. *See Mateo v. O'Connor,* 2010 WL 3199690, at *3 n. 5 (noting CORC's recognition of grievances filed on August 11, 2008; September 9, 2008; September 15, 2008; September 22; 2008; September 24, 2008; and October 1, 2008). In a separate action before this Court, Mateo has provided proof of exhaustion of three grievances from this time. Complaint Ex. A *Mateo v. Alexander,* No. 10 Civ. 8427(LAP)(DCF), 2012 WL 864805 (S.D.N.Y. Mar. 14, 2012) (grievance filed June 18, 2008, CORC decision rendered November 26, 2008); *id .* Ex. B (grievance filed July 2, 2008, CORC decision rendered August 27, 2008); *id.* Ex. C (grievance filed August 11, 2008, CORC decision rendered October 1, 2008). Thus, when Mateo allegedly appealed his Grievance to CORC in late November, 2008, (*see* Compl. ¶ 20), he had already received at least two CORC decisions on other grievances and possibly more. Mateo cannot plausibly have reasonably misunderstood,

at the end of 2008, the procedures for grieving an issue or
for obtaining a response from CORC.

Second, Mateo argues under *Boyd v. Corrections Corp.
of America,* 380 F.3d 989 (6th Cir.2004), that the
superintendent's untimely response and CORC's alleged
failure to reply rendered the grievance procedure
"unavailable." (Opp.¶ 11). Defendants deny that CORC
received an appeal, (MTD at 8). But even assuming
that Mateo filed an appeal and that the superintendent
and CORC missed their response deadlines, the Court
of Appeals has not adopted the position taken in cases
like *Boyd* that a delay in responding to a grievance
demonstrates *per se* unavailability. *See Rivera v. Anna
M. Kross Center,* No. 10 Civ. 8696, 2012 WL 383941, at
*4 (S.D.N.Y. Feb.7, 2012) (citing *Hemphill,* 380 F.3d at
686 n. 6). In any event, Mateo's immediate appeal of the
superintendent's reply, his familiarity with the grievance
process, and his receipt of other decisions of appeals from
CORC all demonstrate that the administrative process
was "available" to him throughout this period and that
he could reasonably have inquired with CORC as to the
status of his appeal of the Grievance.

Third, Mateo argues that his failure to fully grieve his
complaints should be excused because he feared reprisal
from by MacIsaac and O'Connor. (*See* Compl. ¶ 18 ("I
risked my person to write and file grievances ... taking
a chance, and risking physical harm from MacIsaac and
O'Connor as they threatened...."); Opp. ¶ 8 ("At H–Block
my first amendment to file grievance and of speech was
chilled, temporarily ... The defendants threats of harm
against my person and the issued false inmate misbehavior
report chilled my speech.").)

**\*8** The threat of retaliation can render grievance
procedures "unavailable" if " 'a similarly situated
individual of ordinary firmness' " would be so fearful as to
believe that such procedures were unavailable. *See Snyder
v. Whittier,* 428 Fed. Appx. 89, 91 (2d Cir.2011) (summary
order) (quoting *Hemphill,* 380 F.3d at 688). Alternatively,
defendants can be estopped from the defense of non-
exhaustion if they prevented an inmate from availing
himself of grievance procedures. *Id.* (citing *Hemphill* at
686).

Mateo's argument is again undermined by his continued
filing of grievances and lawsuits during and after the
period in question. *See id.* at 92 ("[Petitioner's] assertion

that he feared retaliation in the first place ... is belied by
his testimony that he complained ... within two hours of
the assault.... Our conclusion is further underscored by the
fact that [petitioner] complained to no less than four other
individuals about the attack, between the time he disclosed
details of the attack to [the officer], and the time when
he finally attempted to file a formal grievance."); *Davis
v. Torres,* No. 10 Civ. 00308, 2011 WL 3918098, at *6
(S.D.N.Y. Aug. 29, 2011) ("Where plaintiff alleges that he
submitted numerous grievances, he cannot also contend
that he was meaningfully deterred from doing so.").
Mateo filed his Grievance about the H–Block staff on the
night of August 22, within 48 hours of the threatening
events. Mateo then filed two additional grievances while
on keeplock, and at least three more grievances before
receiving an initial response to his August 22 Grievance.
(Compl.¶ 20.) Mateo even filed federal claims against
O'Connor and MacIsaac within days of the incident in
the predecessor to this case. Mateo's own behavior thus
renders implausible claims that defendants' threats made
the grievance process unavailable from September 2008
(when grievances as to the hearing were due) through the
end of 2008 (when his appeal to CORC was due) or that
he reasonably relied on their threats. *See also Harrison
v. Stallone,* No. 06 Civ. 902, 2007 WL 2789473, at *6
(N.D.N.Y. Sept. 24, 2007) ("If every plaintiff bringing a
retaliation claim could have the exhaustion requirement
excused by alleging a fear of further retaliation, it would
create a general exception to exhaustion for retaliation
claims").

Finally, Mateo suggests that MacIsaac and O'Connor may
have intercepted his grievance appeal after he deposited
it, preventing it from reaching CORC (*See* Compl. ¶ 20;
Opp. ¶ 9,) This conclusory suggestion is unsupported by
any factual allegations and belied by Mateo's complaint
insofar as he claims to have deposited his appeal in
late November, 2008, but alleges no interactions with
MacIsaac or O'Connor after the September 3, 2008
hearing.

In sum, because Mateo clearly availed himself of an
available grievance procedure throughout the period
at issue in this complaint and because no special
circumstances have been plausibly alleged that would
justify Mateo's failure to exhaust his administrative
remedies in that procedure, all of his claims are dismissed.

2012 WL 1075830

**\*9** In 2010, this Court dismissed Mateo's claims without prejudice, and with leave to refile them upon a showing of administrative exhaustion. Mateo has failed to do so in the present action, and the time limits for him to file new grievances, or to complete an appeal of his August 22 Grievance with CORC, have long since passed. The Court of Appeals has held that "dismissal with prejudice, when remedies are no longer available, is required 'in the absence of any justification for not pursuing [such] remedies.' " *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (quoting *Berry v. Kerik,* 366 F.3d 85, 87–88 (2d Cir.2004)); *see also Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239–240 (W.D.N.Y.2010); *Baez v. Kahanowicz,* 469 F.Supp.2d 171, 180 (S.D.N.Y.2007).

### CONCLUSION

Accordingly, because Mateo failed to properly grieve any of the claims in his complaint, defendants' motion to dismiss (Doc. No. 16) is GRANTED, and plaintiff's claims are dismissed with prejudice. The Clerk of the Court is directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1075830

Footnotes

1    In considering a motion to dismiss, the Court accepts all well-pleaded factual allegations in the complaint as true, and draws all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). The court may also consider any documents that are attached to, referenced in, or integral to the preparation of the pleadings. *See id.* at 152–53.

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 80 of 118

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City
Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently
incarcerated and proceeding *pro se*, brings this action
pursuant to 42 U.S.C. § 1983 ("Section 1983") against
Correction Officer Benjamin Eason ("Defendant"),
alleging violations of the Eighth Amendment. Now before
the Court is Defendant's motion for summary judgment.
For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis
Bantum Correctional Center ("OBCC") on Rikers Island,
Plaintiff was placed in an intake cell in the OBCC's
receiving area, which he shared with two other individuals.
(56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell
was extremely cold, vermin-infested, and too small to
accommodate three men. (*See* Doc. No. 54-1 ("Compl.")
4, 8.) Plaintiff further alleges that these conditions,
coupled with the constant noise made by the two other
inmates, prevented him from sleeping for the entire 60-
hour period that he was held in the cell. (*See id.* at 4.)

Consequently, he asked Defendant, who was on duty,
to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.)
According to Plaintiff, Defendant responded that there
was "nothing he could do" about the situation. (*Id.* ¶ 9; *see
also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC
to complain about his experience in the cell. (*See* Compl.
at 7.) The New York City Department of Correction
("DOC") has an administrative grievance procedure,
known as the Inmate Grievance and Request Program
("IGRP"), for inmates housed at facilities such as the
OBCC. The IGRP, which was available and in effect at all
times relevant to this lawsuit, requires that inmates first
file a complaint with the Inmate Grievance Resolution
Committee ("IGRC") within ten days of the complained-
of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP
Directive") § IV(D)(1).) The IGRC then attempts to
resolve the grievance informally within five days, and if the
grievance is not informally resolved, then the inmate may
request a formal hearing before the IGRC. (56.1 Stmt. ¶
12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may
appeal the IGRC's decision to the commanding officer, or
her designee, and subsequent appeals may be taken to the
Central Office Review Committee ("CORC"). (56.1 Stmt.
¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's
decision is the final and binding decision of the DOC; if
an inmate disputes the decision of the CORC, he may
independently appeal to the Board of Correction. (IGRP
Directive at 47.) Finally, if an inmate does not receive a
timely disposition at any point throughout the grievance
process, he has the option of either granting an extension
of time to the relevant decisionmaker (i.e., the IGRC,
the commanding officer, or the CORC) or appealing and
proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see
also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting
the grievance and receiving no response, he neither
granted the DOC an extension of time nor appealed. (*See*
Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits
that he is "still waiting" for a disposition of his grievance,
but does not indicate any steps he has taken to appeal any
decision before the IGRC. (*See* Compl. 7.) In response
to a question on the Southern District of New York
Prison Complaint form asking a plaintiff to "set forth any
additional information that is relevant to the exhaustion
of your administrative remedies," Plaintiff repeated a
number of his substantive allegations against the OBCC

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 81 of 118

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 82 of 118

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund,* No. 03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record when one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's

effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no

response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D)(9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 84 of 118

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.,* *Winston v. Woodward,* No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

### Footnotes

1   The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2   Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2050571
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

Linda NELSON, Plaintiff,
v.
Vern HJORTH, Defendant.

8:18CV88
|
Signed 05/02/2018

**Attorneys and Law Firms**

Linda Nelson, Madison, NE, pro se.


MEMORANDUM AND ORDER

Richard G. Kopf, Senior United States District Judge

**\*1** Plaintiff, Linda Nelson, appearing pro se, filed her Complaint (Filing No. 1) on February 23, 2018, and was granted leave to proceed in forma pauperis on March 8, 2018 (Filing No. 8). Nelson paid an initial partial filing fee on April 2, 2018. [1] The court now conducts an initial review of the Complaint to determine whether summary dismissal is appropriate under 28 U.S.C. §§ 1915(e)(2) and 1915A.


I. SUMMARY OF COMPLAINT

Nelson is a pretrial detainee at the Madison County Jail in Madison, Nebraska. She sues the Madison County Sheriff, Vern Hjorth, both in his individual and official capacities, for alleged constitutional violations under 42 U.S.C. § 1983.

Nelson purports to bring this action on behalf of herself and "all others similarly situated." For her claims, Nelson alleges:

1) Nebraska jail standards meant to protect inmates from the wanton and malicious behavior of jail staff are ignored in their entirety by the Administration of Madison County Jail....

2) ... No reading material from any sourse [*sic*] is allowed, regardless of the subject matter, unless it is selected and distributed by jail staff....

3) The ban against reading material includes religious and spiritual books and publications. Only the Protestant Bible is allowed.... Religious activities are segregated based on "Protestant" Bible study and "Catholic services." ...

4) The jail has no grievance procedure.... While the "Inmate Request Form" provided by the jail does have a box to check which says "Grievance," the forms are rarely, if ever, even acknowledged—let alone answered. No grievance ever submitted by Nelson received a response....

5) No due process exists at Madison County Jail. An inmate is confined in "administrative segregation" at the whim of staff. No documentation is ever provided regardless of the length of the segregation. No hearings are ever held regardless of the circumstances. There is no way to appeal any disciplinary actions.... Among the rule violations that will result in "administrative segregation" and a complete denial of visiting is writing a grievance or complaining about jail conditions such as hunger and cold.

6) ... It is openly declared to be [jail policy] intended to make sure inmates are punished simply by the fact of locking people in a cage, making sure they stay hungry and cold, and use psychological pain by banning simple access to current events via the media or books, doing visits on staff whim....

7) ... Staff is allowed to swear at and taunt inmates with impunity....

8) Equal protection is further denied to females in that women are absolutely barred due solely to their gender from the inmate work program....

9) Access to courts is denied by ... refusal to allow access to current law books. The newest edition of Nebraska Statutes allowed inmates is 1999 with updates to 2006. Absolutely no access is allowed to case law. Correspondence from legal sources is open[ed] and reviewed. Using the court to address the conditions of the jail meets with retaliation.

**\*2** 10) ... Phone use is cost prohibitive, at a minimum cost of $20 and limited to purchase on 2 days of the week....

11) Among the infractions for which inmates will be "locked down"—and thus automatically lose visiting for a minimum of one week—is laughing.

12) ... Medical orders from doctors are "vetoed" by jail staff. Nelson was denied a brace and a sling for a wrist and shoulder injury ....

13) No mental health issues are addressed at all.

14) ... An inmate who cannot afford the twenty dollar minimum to place a phone call dares not ever complain about jail conditions because to do so would be to risk all contact with family.

15) ... [Jail staff] have convinced inmates that to try to do anything will result in unacceptable retaliation ...Neb RRS § 47-115 makes the sheriff liable for the negligence and misconduct of the jailers.

16) ... [P]ersonal hygiene is limited to deodorant with no acceptable level of active ingredients and costly products that maximize personal discomfort, such as dandruff shampoo with no active ingredients. No way to clean shower curtains, which have mold on them, now way to clean smocks which smell of other inmates who wore them ..., no t-shirts.... Simple soap is withheld for up to 24 hours.

17) ... [J]ail staff will report to immigration ... inmates who are natural born US citizens who just happen to be brown.

18) Mail from religious volunteers to inmates in the form of post cards with Bible verses are discarded upon receipt, ....

19) Items are often removed from inmate mail (such as drawings) without any sort of notice....

20) Periodicals received in the mail are confiscated without notice to the inmates.

(Filing No. 1 at CM/ECF pp. 5-13).

For relief, Nelson "just want[s] the court to order the sheriff to follow the laws" (Filing No. 1 at CM/ECF p. 5). More specifically, Nelson states:

I would like the court to certify a class action because the problems at Madison County have effected [*sic*] hundreds of people over many years. I would like the court to order the jail (Hjorth) to adhere to the Nebraska Jail Standards and stop punishing people by making them cold, hungry and bored. Order him to stop punishing people without due process. Stop taking visits away. Make the phones actually a reasonable available way to contact family. Order the sheriff to make it so people can reasonably hope to afford a phone call to secure bail[;] ... to provide copies of the Nebraska Jail Standards as mandated by Nebraska law[;] ... to create a true grievance procedure[;] ... not to override medical advice[;] ... [and] to pay all the costs of these proceedings.... [F]ind that Hjorth is guilty of neglect of duty pursuant to Neb RRS § 47-116[;] order Hjorth to pay the punitive damages established by Nebraska law for such neglect of duty[;] ... [and] for any further relief that the court deems proper ....

(Filing No. 1 at CM/ECF pp. 5, 14).

## II. LEGAL STANDARDS ON INITIAL REVIEW

The court is required to review prisoner and in forma pauperis complaints seeking relief against a governmental entity or an officer or employee of a governmental entity to determine whether summary dismissal is appropriate. *See* 28 U.S.C.§§ 1915(e) and 1915A. The court must dismiss a complaint or any portion of it that states a frivolous or malicious claim, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C.§ 1915(e)(2)(B).

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 87 of 118

Nelson v. Hjorth, Not Reported in Fed. Supp. (2018)
2018 WL 2050571

**\*3** Pro se plaintiffs must set forth enough factual allegations to "nudge[ ] their claims across the line from conceivable to plausible," or "their complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

"The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.' " *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999) ). However, "[a] pro se complaint must be liberally construed, and pro se litigants are held to a lesser pleading standard than other parties." *Topchian*, 760 F.3d at 849 (internal quotation marks and citations omitted).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

## III. DISCUSSION OF CLAIMS

For the reasons discussed below, the court finds and concludes that: (1) no actionable claim for relief is stated against Sheriff Hjorth in his individual capacity; (2) Madison County should be substituted as Defendant for Sheriff Hjorth in his official capacity; (3) Nelson cannot bring a class action or assert claims on behalf of other inmates; (4) Nelson cannot bring suit for alleged violations of Nebraska Jail Standards; (5) Nelson has alleged a plausible First Amendment claim to challenge a County policy that bars her receipt of newspaper and magazine subscriptions and has also alleged a plausible Fourteenth Amendment claim to challenge the adequacy of the diet she receives at the Madison County Jail; (6) Nelson's remaining allegations fail to state a claim upon which relief may be granted; (7) Nelson's Motion to Amend

Complaint should be denied; and (8) Nelson's Motion for Appointment of Counsel should be denied.

### A. Individual vs. Official-Capacity Claims

"Public servants may be sued under § 1983 either in their official capacity, their individual capacity, or both." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). Individual-capacity suits seek to impose personal liability upon a governmental officer, agent, or employee for actions taken under color of state law. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). In contrast, suing a defendant in his or her official capacity is generally an alternative means of suing the governmental entity. *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985). The real party in interest is the entity, not the official named. *Id.* at 166 ("As long as the governmental entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"). Official-capacity claims are "functionally equivalent" to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010).

Although Nelson is suing Sheriff Hjorth in his individual capacity as well as his official capacity, the Complaint does not indicate that he was personally involved in, or had any direct responsibility for, the alleged violations of constitutional rights. Nelson correctly notes that the sheriff "shall in all cases be liable for the negligence and misconduct of the jailer" under Neb. Rev. Stat. § 47-115, but that state statute does not apply to a federal civil rights claim brought under 42 U.S.C. § 1983.

**\*4** To state a § 1983 claim, the plaintiff must allege that the defendant was personally involved in or had direct responsibility for incidents that resulted in injury. *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985). Because Nelson does not allege an actionable individual-capacity claim against Sheriff Hjorth, he will be dismissed from the action and Madison County will be substituted as Defendant. *See, e.g.*, *Keup v. Leftler*, No. 8:17CV117, 2017 WL 3601229, at \*2 (D. Neb. Aug. 21, 2017) (on initial review of prisoner complaint claiming that jail policies violated his constitutional rights, court on its own motion added county as defendant and dismissed official-capacity claims).

### B. County Liability

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 88 of 118
Nelson v. Hjorth, Not Reported in Fed. Supp. (2018)
2018 WL 2050571

Local governing bodies, such as counties, are "persons" for the purpose of § 1983, but are liable only for injuries arising from an official policy or custom. *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). An official policy involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy. *Jane Doe A v. Special School Dist.*, 901 F.2d 642, 645 (8th Cir. 1990) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ). To establish the existence of a governmental custom, a plaintiff must prove:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

*Jane Doe A*, 901 F.2d at 646.

Nelson's allegations do not establish the existence of a governmental custom, but she does complain about certain jail policies, which will be discussed in more detail in subsequent sections.

### C. Class Action

Nelson purports to bring this action on behalf of herself and all similarly situated individuals, but a pro se plaintiff who is not an attorney cannot maintain a class action. *See Evans v. Nebraska Beef, Ltd.*, No.8:12CV161, 2013 WL 4517258, at *7 (D. Neb. Aug. 21, 2013) ("A litigant may bring his own claims to federal court without counsel, but not the claims of others."); *Coleman v. Newton*, No.8:08CV10, 2009 WL 1936265, at *1 (D. Neb. June 29, 2009) ("Pro se litigants may not represent other parties, even in class action proceedings.") "Every court that has considered the issue has held that a prisoner proceeding pro se is inadequate to represent the interests of his fellow inmates in a class action." *Craig v. Cohn*, 80 F.Supp.2d 944, 946 (N.D. Ind. 2000). Nelson will only be allowed to sue Madison County on her own behalf, and will not be

permitted to assert the rights of other prisoners in a class action.

### D. Nebraska Jail Standards

The Jail Standards Board established within the Nebraska Commission on Law Enforcement and Criminal Justice is responsible for developing minimum standards for the construction, maintenance, and operation of criminal detention facilities by political subdivisions in Nebraska. *See* Neb. Rev. Stat. § 83-4,124 *et seq.*; *see also* Neb. Rev. Stat. § 47-101 (providing that Jail Standards Board shall prescribe rules for the regulation and government of county jails). The Board's "Standards for Jail Facilities" may be found at Title 81 of the Nebraska Administrative Code.

**\*5** Nelson alleges that the operation of the Madison County Jail fails to comply with these jail standards in several respects. However, "a violation of jail standards does not equate with a violation of the Constitution." *Henderson v. Greeley*, No. 6:13-CV-06137, 2015 WL 1280312, at *2 (W.D. Ark. Mar. 20, 2015). "Jail standards, although helpful and relevant in some cases, do not represent minimum constitutional standards." *Grayson v. Ross*, 454 F.3d 802, 812 (8th Cir. 2006) (quoting *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991) (per curiam) ).

In other words, Nelson cannot bring a § 1983 action based solely upon alleged violations of the jail standards. Thus, the first numbered claim alleged in her Complaint fails as a matter of law.

### E. Alleged Constitutional Violations

Nelson contends she has been deprived of her constitutional rights under the "First, Fifth, Eighth, and Fourteenth Amendments: Specifically the rights to freedom of religion, expression, and to petition the government for a redress of grievances; right of due process; right against cruel and unusual punishments; and the right of equal protection of the laws" (Filing No. 1 at CM/ECF p. 3).

For ease of analysis, Nelson's claims will be categorized as involving (1) the complete denial of access to outside reading materials, (2) restrictions on the free exercise of religion, (3) removing materials from correspondence, opening legal mail, and discarding religious mailings, (4) the prohibitive cost of telephone calls, (5) denial

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 89 of 118

Nelson v. Hjorth, Not Reported in Fed. Supp. (2018)
2018 WL 2050571

of access to the courts, (6) the lack of an effective grievance procedure, (7) retaliation against inmates for filing grievances, (8) lack of due process for placement in administrative segregation, (9) certain conditions of confinement, (10) verbal abuse by jail staff, (11) denial of equal protection for female inmates, and (12) inadequate medical care.

### 1. Access to Reading Materials

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Among other things, the "Constitution protects the rights to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).

Prison policies impinging on inmates' First Amendment rights are valid only if they are reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89-90 (1987). To decide whether a particular policy advances such an interest, the court must consider (1) whether there is a rational connection between the regulation and a neutral and legitimate governmental interest; (2) whether alternative means exist for the inmates to exercise their constitutional rights; (3) the impact of accommodating that right on other inmates and prison personnel; and (4) whether reasonable alternatives to the regulation exist. *Kaden v. Slykhuis*, 651 F.3d 966, 968 (8th Cir. 2011) (citing *Turner*, 482 U.S. at 89-90).

Nelson alleges there is a "total ban against all reading material not provided by the jail," which includes "newspapers, magazines, books, religious publications, legal reviews, the Nebraska Jail Standards, ACLU publications, [and] Holy books other than the Protestant Bible" (Filing No. 1 at CM/ECF p. 6, ¶ 2). In an inmate request form dated December 18, 2017, which is attached to the Complaint, Nelson stated: "I was having my subscriptions (Omaha World Herald [newspaper] and several magazines) forwarded to me but I was told that all reading material (except religious) has been banned from any source." Nelson inquired whether this was true and indicated she could "find nothing in the rule book about it." The response she received next day was simply: "Read

rules on message board." (Filing No. 1 at CM/ECF p. 19). Nelson then notes as part of her pleading:

> **\*6** "Religious" also banned. Anything mailed in will be placed in property without notice. The rules on the "message board" say nothing about it. A followup grievance about it was not answered.

(Filing No. 1 at CM/ECF p. 19).

Liberally construing Nelson's Complaint, the court concludes she has stated a plausible First Amendment claim for challenging Madison County's policy of banning outside reading material, but only insofar as Nelson alleges she was denied access to newspaper and magazine subscriptions. *See Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999) (reversing § 1915A dismissal of inmate's First Amendment claim that he was denied access to printed materials, including "all magazines" and legal and religious materials; given allegation that prisoner was denied publications, prison was obligated to proffer legitimate reason for decision to deny these materials); *Sterling/Sayyed v. Banks*, 72 Fed.Appx. 504, 506 (8th Cir. 2003) (reversing § 1915A dismissal of inmate's First Amendment claim where attachment to complaint supplied necessary facts).

Absolute bans on inmate access to newspapers and magazines, as a general rule, violate the First Amendment because they are an "exaggerated response" to legitimate penological needs. *See Mann v. Smith*, 796 F.2d. 79, 82 (5th Cir. 1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979) ); *see also Koger v. Dart*, 114 F.Supp.3d 572, 583 (N.D. Ill. 2015) (when an easy alternative existed, a total ban on newspapers was an exaggerated response to the jail's concerns); *United States ex rel. Manicone v. Corso*, 365 F.Supp. 576, 577 (E.D.N.Y. 1973) ("There is no basis for total restrictions on prisoners' access to the news in view of their clear First Amendment rights.") Furthermore, a number of courts have held that prisoners have a right to receive and read newspapers. *See e.g. Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir. 1987) (absent restrictions based on legitimate goals of confinement, prison inmates retain First

Amendment right to receive and read newspapers); *Mann*, 796 F.2d 79, 82-83 (county jail's policy of banning newspapers and magazines violated a pretrial detainee's First Amendment rights where the state failed to show the ban served a legitimate government objective); *Wilkinson v. Skinner*, 462 F.2d 670, 673 n. 5 (2nd Cir. 1972) ("refusal to deliver a newspaper would ordinarily be interference with appellant's first amendment rights"); *Rowland v. Jones*, 452 F.2d 1005 (8th Cir. 1971) (prison authorities' denial of access to newspaper "Muhammad Speaks" constituted prior restraint in violation of First Amendment); *Spellman v. Hopper*, 95 F. Supp.2d 1267 (M.D. Ala. 1999) (absolute prohibition on subscription magazines and newspapers applied to administrative segregation inmates in Alabama is not reasonably related to legitimate penological goals).

*Morphis v. Smith*, No. 2:14-CV-02027-MEF, 2017 WL 1128463, at *12-13 (W.D. Ark. Mar. 24, 2017).

While Nelson complains about a "complete ban" on outside reading materials (Filing No. 1 at CM/ECF p. 6, ¶ 2), she has not set forth sufficient facts to show that she has not been allowed access to anything other than her newspaper and magazine subscriptions. Nelson also alleges that "[p]eriodicals received in the mail are confiscated without notice to the inmate" (Filing No. 1 at CM/ECF p. 13, ¶ 20). This may constitute a due process violation. *See Bonner v. Outlaw*, 552 F.3d 673, 676-77 (8th Cir. 2009) ("It is the inmate's interest in 'uncensored communication' that is the liberty interest protected by the due process clause, regardless of whether that communication occurs in the form of a letter, package, newspaper, magazine, etc. Thus, whenever prison officials restrict that right by rejecting the communication, they must provide minimum procedural safeguards, which include notice to an inmate that the correspondence was rejected."). However, because Nelson does not claim to have had any reading materials confiscated without notice, no deprivation of her due process rights is alleged.

### 2. Religious Freedom

**\*7** Nelson claims that "[t]he ban against reading material includes religious and spiritual books and publications" and "[o]nly the Protestant Bible is allowed. No Jewish or Muslim material is allowed." She also alleges that "[r]eligious activities are segregated based on 'Protestant' Bible study and "Catholic services." If an inmate wants to go to the Bible study, he or she is automatically banned from Catholic services and vice versa. If he or she want to go to Bible study, they must agree not to go to Catholic services." (Filing No. 1 at CM/ECF p. 6, ¶ 3).

Nelson does not identify her religious preference or allege any facts to show that the jail's policies have infringed upon her religious freedoms. She therefore does not have standing to litigate this claim. *See McGowan v. State of Md.*, 366 U.S. 420, 429 (1961) (department store employees convicted of violating Sunday "blue laws" lacked standing to bring First Amendment claim under the general rule that "a litigant may only assert his own constitutional rights or immunities.") (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960) ); *Am. Civil Liberties Union of Minnesota v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1093 (8th Cir. 2011) (stating that plaintiffs must allege infringement of their own religious freedoms in order to have standing to bring a free exercise claim).

### 3. Correspondence

Nelson alleges that "[i]tems are often removed from inmate mail (such as drawings) without any sort of notice" so "[t]he inmate has no way of knowing it happened unless the person who wrote the letter happens to say they are enclosing something" (Filing No. 1 at CM/ECF p. 13, ¶ 19). In addition, she claims that "[m]ail from religious volunteers to inmates in the form of post cards with Bible verses are discarded upon receipt, with the inmates ever knowing they were received" (Filing No. 1 at CM/ECF p. 13, ¶ 18).

The Supreme Court has held that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment." *Procunier v. Martinez*, 416 U.S. 396, 418 (1974), *overruled on other grounds by Abbott*, 490 U.S. at 405. As such, "the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." *Id.* at 417 (approving requirement that an inmate be notified of the rejection and have a reasonable opportunity to protest the decision).

Again, however, Nelson does not allege that items have been removed from her mail without notice. Similarly, Nelson claims that "[c]orrespondence from legal sources

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 91 of 118

Nelson v. Tjorth, Not Reported in Fed. Supp. (2018)

2018 WL 2050571

is open[ed] and reviewed" (Filing No. 1 at CM/ECF p. 10, ¶ 9), but does allege that her legal mail has ever been opened outside her presence. [2] Absent such allegations, no actionable claim for relief is stated.

### 4. Telephone Usage

Nelson alleges: "Phone use is cost prohibitive, at a minimum cost of $20 and limited to purchase on 2 days of the week.... A local phone call requires a twenty dollar "phone card," which is then billed at fifty cents per minute for local calls." (Filing No. 1 at CM/ECF p. 10, ¶ 10). She claims that "[a]n inmate on pretrial status is often incarcerated simply because the jail makes it impossible to contact friends or family to even let them know they are in jail" (Filing. No 1 at CM/ECF p. 10, ¶ 10), and also that "[a]n inmate who cannot afford the twenty dollar minimum to place a phone call dares not ever complain about jail conditions because to do so would be to risk all contact with family" (Filing No. 1 at CM/ECF p. 11, ¶ 14).

**\*8** Nelson does not allege that her own ability to place a telephone call is impacted by the "phone card" policy or the usage charges. In any event, "[f]ederal courts ... have consistently rejected First Amendment claims challenging high telephone rates on grounds that prisoners are not entitled to a specific rate for telephone calls and that prisoners failed to allege that the rates were so exorbitant as to deprive them of telephone access altogether." *Hooks v. State of Kentucky*, No. 3:16-CV-00187-CRS, 2016 WL 4180003, at \*3-4 (W.D. Ky. Aug. 5, 2016) (citing cases); *see Kanatzar v. Cole*, No. 17-3115-SAC, 2017 WL 5970836, at \*9 (D. Kan. Dec. 1, 2017) (citing additional cases); *Morrow v. Cty. of Nassau*, No. 15-CV-4793 SJF AKT, 2015 WL 6691672, at \*5 (E.D.N.Y. Nov. 3, 2015) (prisoner's claim that charges for using telephones was "too expensive" failed to state claim for constitutional deprivation); *Holloway v. Magness*, 666 F.3d 1076, 1080 (8th Cir. 2012) (holding that a jail has no First Amendment obligation to provide telephone service "at a particular cost to users"). Nelson's allegations regarding the expense of making telephone calls are not sufficient to state a claim upon which relief may be granted.

### 5. Access to the Courts

It is well established "that prisoners have a constitutional right of access to the courts" which "requires prison authorities to assist inmates in the preparation and

filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 821 & 828 (1977). However, to recover for the deprivation of this constitutional right, "the inmate ... must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). In other words, to prevail on an access-to-the-courts claim, a prisoner must establish that she sustained an "actual injury" by demonstrating "that a nonfrivolous legal claim had been frustrated or was being impeded." *Id. at 353.*

"Actual injury" is not satisfied by demonstrating "just any type of frustrated legal claim." Rather, inmates must only be provided the tools required to pursue direct appeals from convictions for which they are imprisoned, habeas petitions, and actions under 42 U.S.C. § 1983 to vindicate their basic constitutional rights. *Id. at 354-55* (prisons may not impede an inmate's ability to "attack their sentences, directly or collaterally, and ... challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.").

To state an access-to-the-courts claim, "a prisoner must establish [that] the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *Holt v. Howard*, 806 F.3d 1129, 1133 (8th Cir. 2015) (quoting *Williams v. Hobbs*, 658 F.3d 842, 851-52 (8th Cir. 2011) ). "[T]he underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Christopher v. Harbury*, 536 U.S. 403, 416 (2002). The "lost" claim occasioned by the denial of an inmate's access to the courts must "be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.*

Here, Nelson merely alleges that the Madison County Jail's law library has not been kept current and is incomplete (Filing No. 1 at CM/ECF p. 10, ¶ 9). She does not alleged any facts to establish an actual injury. Her access-to-the-courts claim therefore will be dismissed.

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 92 of 118

Nelson v. Hjorth, Not Reported in Fed. Supp. (2018)
2018 WL 2050571

### 6. Grievance Procedure

**\*9** Nelson alleges that "jail policy is to simply ignore (probably throw away) grievances" and that there has never been a response to her grievances (Filing No. 1 at CM/ECF pp. 6-7, ¶ 4). While the lack of a meaningful grievance procedure might excuse the need to exhaust administrative remedies, see Ross v. Blake, 136 S.Ct. 1850, 1855 (2016) ("A prisoner need not exhaust remedies if they are not 'available.' "), it does not provide a cause of action under § 1983. See Merryfield v. Jordan, 431 Fed.Appx. 743, 749 (10th Cir. 2011) (holding that civilly committed sex offender lacked any federal constitutional right to an adequate grievance procedure); see also Lomholt v. Holder, 287 F.3d 683, 684 (8th Cir. 2002) (holding that allegations regarding actions of prison officials in handling prisoner's grievances and regulating access to his attorney were insufficient to state a constitutional claim); Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) (holding that inmates have no "liberty interest" in the processing of their grievances, such as would support § 1983 claim for prison official's failure to pick up his completed grievance forms).

### 7. Retaliation

Nelson alleges that "writing a grievance or complaining about jail conditions such as hunger and cold" or "the twenty dollar minium to place a phone call" will result in an inmate being placed in administrative segregation and losing visiting privileges, and that "[u]sing the court to address the conditions of the jail [also] meets with retaliation" (Filing No. 1 at CM/ECF pp. 7, 10, 12, ¶¶ 5, 9, 14). She claims that jail staff "have convinced inmates that to try to do anything will result in unacceptable retaliation" (Filing No. 1 at CM/ECF p. 12, ¶ 15).

Retaliation such as this is actionable as a First Amendment violation. See Hartsfield v. Dep't of Corr., 107 Fed.Appx. 695, 696 (8th Cir. 2004) (finding district court erred in dismissing claim that defendant wrote a retaliatory misconduct report after plaintiff announced his intention to file a grievance against defendant); Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) (filing of false disciplinary charge against inmate is actionable under § 1983 if done in retaliation for inmate's having filed grievance). Here, however, Nelson does not allege that she personally has been threatened with retaliation or retaliated against. Absent such an

allegation, supported by essential facts, no claim is stated upon which relief may be granted.

### 8. Administrative Segregation

Pursuant to the due process provisions of the Fourteenth Amendment, a pretrial detainee may not be punished prior to a determination of guilt in accordance with due process. Bell, 441 U.S. at 535; see Martinez v. Turner, 977 F.2d 421, 423 (8th Cir. 1992) (requiring pretrial detainee to be placed in administrative segregation is punishment; claim that pretrial detainee was denied due process when placed in administrative detention for refusing to work did not lack arguable basis in law and should not have been dismissed prior to service). But "not every disability imposed during ... detention amounts to 'punishment' in the constitutional sense.' " Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996). "[I]f a particular condition or restriction of ... detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' " Id.

Nelson generally alleges that "[a]n inmate is confined in 'administrative segregation' at the whim of staff, with no hearing or right of appeal (Filing No. 1 at CM/ECF p. 5, ¶ 5), but does not claim that she has ever been placed in administrative segregation or otherwise disciplined without benefit of due process. Nelson further alleges that laughing is considered an infraction (Filing No. 1 at CM/ECF p. 11, ¶ 11), but she does not claim to have been disciplined for this reason. "In order to prevail on a Fourteenth Amendment due process claim, the plaintiff must allege that [s]he was deprived of life, liberty or property by government action." Singleton v. Cecil, 155 F.3d 983, 987 (8th Cir. 1998).

### 9. Conditions of Confinement

**\*10** The Eighth Amendment's prohibition against "cruel and unusual punishments" requires that prison officials provide humane conditions of confinement. "Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984) ). "Pretrial detainees are entitled to at least as great protection under the Fourteenth Amendment as that afforded convicted prisoners under the Eighth

Nelson v. Hjorth, Not Reported in Fed. Supp. (2018)

2018 WL 2050571

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 93 of 118

Amendment." *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010).

A prisoner asserting a conditions of confinement claim must identify the "deprivation of a single, identifiable human need such as food, warmth, or exercise," and "the risk that the prisoner complains of [must] be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993); *Wilson v. Sieter*, 501 U.S. 294, 304 (1991). A conditions of confinement claim based on prison conditions requires a showing of: (1) a deprivation of "minimal civilized measure of life's necessities," and (2) deliberate indifference by prison officials to those basic needs. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Wilson*, 501 U.S. at 304.

Nelson alleges that when it is cold in the jail inmates must stay in bed in order to stay warm; they are not allowed to cover their arms or to wrap a blanket around their shoulders. She also alleges that inmates are fed stale bread, soggy food, and half portions which leads to constant hunger. (Filing No. 1 at CM/ECF pp. 7-9, ¶ 6). In addition, Nelson alleges there is mold on shower curtains and complains that female prisoners must wear unclean smocks with no t-shirts underneath; she also complains about a lack of personal hygiene products. (Filing No. 1 at CM/ECF pp. 12-13, ¶ 16).

Nelson's allegations concerning the food served at the Madison County Jail, which the court construes as involving an official policy of deliberate indifference to inmates' basic needs, are sufficient to state a claim for relief on initial review. *See, e.g., Obama v. Burl*, 477 Fed.Appx. 409, 412 (8th Cir. 2012) (allegations by prisoner that he was constantly hungry from small portions of food, which included some form of beans for every meal except breakfast, no sweets, and watered-down Kool-Aid, were sufficient to survive preservice dismissal); *Day v. Norris*, 219 Fed.Appx. 608, 610 (8th Cir. 2007) (reversing dismissal of prisoner complaint on initial review and finding allegations that plaintiff was served a diet that did not provide him adequate nutrition were sufficient at this stage of the litigation); *Divers v. Dep't of Corr.*, 921 F.2d 191, 193-94 (8th Cir. 1990) (per curiam) (finding not frivolous inmate's allegation that his food was insufficient in amount, cold, unappetizing, prepared from restricted menu, and delivered in unsanitary manner).

As to the other conditions of confinement about which Nelson complains, however, not enough facts are alleged to state a plausible claim for relief. She does not allege, for example, at what temperature the jail is usually kept or how often inmates are uncomfortably cold. Likewise, it is not clear that the mold in the showers or clothing issues are continuing problems or health hazards. While "a long-term, repeated deprivation of adequate hygiene supplies violates inmates' Eighth Amendment rights," *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996), Nelson's complaints only concern the quality of the deodorant and shampoo that is made available to inmates and an alleged delay of up to 24 hours to obtain soap.

*10. Verbal Abuse*

**\*11** Nelson alleges that jail staff are "allowed to swear at and taunt inmates with impunity." (Filing No. 1 at CM/ECF p. 9, ¶ 7). This does not state a claim upon which relief may be granted under § 1983. *See Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000) ("Verbal abuse is normally not a constitutional violation."); *King v. Olmsted Cty.*, 117 F.3d 1065, 1067 (8th Cir. 1997) ("The Constitution does not protect against all intrusions on one's peace of mind. Fear or emotional injury which results solely from verbal harassment or idle threats is generally not sufficient to constitute an invasion of an identified liberty interest.") (quotation marks and citation omitted); *Kalmio v. Mettler*, No. 4:13-CV-083, 2013 WL 4478691, at \*2 (D.N.D. Aug. 20, 2013) ("Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws.") (quotation marks and citations omitted).

*11. Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated people alike, a protection that applies to prison inmates. *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 984 (8th Cir. 2004). In order to establish an equal protection claim, a prisoner must show that he or she was treated differently from similarly-situated inmates and that the different treatment was based upon either a suspect classification or a fundamental right. *Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1016 (8th Cir. 2006); *Weiler v. Purkett*, 137 F.3d 1047, 1052 (8th Cir. 1998).

Nelson claims that "[e]qual protection is denied to females [detained at the Madison County Jail] in that women are absolutely barred due solely to their gender from the inmate worker program" (Filing No. 1 at CM/ECF p. 10, ¶ 8). She alleges:

> While the rules state "anyone" may apply, the reality is that females may not participate. No female has ever worked as an inmate worker at the Madison County Jail. It is absolutely banned. Other excuses are used but the truth is that it is due solely to their gender.

(Filing No. 1 at CM/ECF p. 10, ¶ 8). Nelson does not allege that she applied for and was denied admission to the inmate worker program, or that she would qualify for the program but for her gender.

"A plaintiff has the burden of establishing subject matter jurisdiction, for which standing is a prerequisite." *Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir. 2006). "To establish standing, a plaintiff is required to show that he or she had 'suffered an injury in fact, meaning that the injury is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.' " *Id.* (quoting *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 591 (8th Cir. 2003) ). Because Nelson's Complaint asserts only a facial challenge to the alleged governmental policy or custom, it fails to allege the requisite standing. *See Mosby v. Ligon*, 418 F.3d 927, 933-34 (8th Cir. 2005) (discussing constitutional standing).

In addition, Nelson does not allege that male inmates at the Madison County Jail are similarly situated to female inmates. "Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim." *Keevan v. Smith*, 100 F.3d 644, 648 (8th Cir. 1996) (quoting *Klinger v. Dep't of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994) ).

Nelson also claims "brown" inmates are reported to immigration authorities even though they are U.S. citizens (Filing No. 1 at CM/ECF p. 13, ¶ 17). However, Nelson does not allege that she is a member of this protected class.

### 12. Inadequate Medical Treatment

"A deliberate indifference to a serious medical need claim presents one subset of possible conditions of confinement claims, and specifically asserts that a plaintiff was deliberately deprived of his basic need for medical care." *Christian v. Wagner*, 611 F. Supp. 2d 958, 962 (S.D. Iowa 2009), *aff'd*, 623 F.3d 608 (8th Cir. 2010); *Aswegan v. Henry*, 49 F.3d 461, 463-64 (8th Cir. 1995) ("A claim asserting deliberate indifference to a prisoner's serious medical need is thus best characterized as falling within a specific subcategory of conditions of confinement claims, not as a separate and distinct legal theory."). The same analytical model applies equally to conditions of confinement cases and to deprivation of medical care cases. *Beyerbach v. Sears*, 49 F.3d 1324, 1326 n. 1 (8th Cir. 1995), *abrogation on other grounds recognized by Reece v. Groose*, 60 F.3d 487, 492 (8th Cir. 1995).

**\*12** To prevail on a deliberate indifference to a serious medical need claim, a prisoner detainee must show: (1) she suffered from an objectively serious medical need, and (2) the defendant knew of the need yet deliberately disregarded it. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).

Nelson claims it is "standard operating procedure" for medical orders from doctors to be "vetoed" by jail staff, and, in particular, alleges:

> Nelson was denied a brace and a sling for a wrist and shoulder injury so the doctor asked if I could just tie a towel around my arm to act as a sling if a sling itself is not allowed but was told that a towel isn't supposed to be used as anything but a towel.

(Filing No. 1 at CM/ECF p. 11, ¶ 12).

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 95 of 118

Nelson v. Hjorth, Not Reported in Fed. Supp. (2018)

2018 WL 2050571

As a pretrial detainee, Nelson's claim of inadequate medical care arises under the Fourteenth Amendment, but is nonetheless analyzed under the Eighth Amendment standard. *See Butcher v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006). To establish "custom" liability of a local government entity under § 1983 for failure to provide medical care, the plaintiff must demonstrate (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees, (2) deliberate indifference to, or tacit authorization of, such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct, and (3) the custom was a moving force behind the constitutional violation. *Smith v. City of St. Ann*, 576 Fed.Appx. 621 (8th Cir. 2014) (citing *Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825 (8th Cir. 2013) ). Similarly, a policy that results in inadequate treatment is not unconstitutional unless it evinces deliberate indifference to serious medical needs. *See Jenkins v. Cty. of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009). "Although [Nelson] need not set forth with specificity the existence of an unconstitutional policy or custom at the pleading stage, [s]he must nonetheless present some allegations, references, events, or facts from by which the court could begin to draw an inference that the conduct complained of, namely deliberate indifference to serious medical needs, resulted from an unconstitutional policy or custom of the County or a deliberate choice by a decision-maker with final authority." *Cotton v. Douglas Cty. Dep't of Corr.*, No. 8:16CV153, 2016 WL 5816993, at *6 (D. Neb. Oct. 5, 2016).

Even if it may be assumed that a doctor prescribed using a sling or other device to immobilize Nelson's arm, her allegation that it is "standard operating procedure" for staff to "veto" doctor's orders is not sufficient to show the existence of a policy or custom of deliberate indifference to serious medical needs. There is no allegation that a policymaking official for the County either told jail staff that they could ignore doctors' orders or else knew of and tacitly approved of this alleged practice. There is also no allegation that any specific Defendant was responsible for the denial of the brace and sling or use of the towel.

Nelson further claims that "[n]o mental health issues are addressed at all" (Filing No. 1 at CM/ECF p. 11, ¶ 12), but does not allege that she has ever sought or been denied treatment for mental health issues. As already discussed,

Nelson cannot assert constitutional claims on behalf of the general jail population.

### F. Motion to Amend Complaint

**\*13** On March 30, 21018, Nelson filed a Motion to Amend Complaint (Filing No. 9) to add three Defendants and to include some additional facts. The proposed additional Defendants are: (1) Captain Bula, who allegedly "blocks almost every grievance filed by any inmate ... [and destroys] the paperwork filed by inmates" (Filing No. 9 at CM/ECF p. 1); (2) Sgt. Gene Blank, who allegedly "has been miscalculating inmate sentences" (Filing No. 9 at CM/ECF p. 2); and (3) Sgt Bill Kucera, who allegedly "attempted to block Plaintiff's access to court after Sgt Blank's calculation errors came to light" (Filing No. 9 at CM/ECF pp. 2-3). Nelson further alleges that "inmates are not allowed to know who is supposedly discontinuing their medication" and that this anonymous doctor "never sees the inmates but merely discontinues medication based on 'jail policy,' not medical factors" (Filing No. 9 at CM/ECF p. 3). Nelson claims her shoulder injury was not properly treated. Finally, Nelson alleges that "any inmate who requests to be placed on 'protected custody' automatically loses all visiting rights" and must wear handcuffs to visit the law library (Filing No. 9 at CM/ECF p. 4).

These additional allegations do not correct the pleading deficiencies that have been discussed above, nor on their own do they state a claim upon which relief may be granted. The allegations concerning Capt. Bula's blocking of grievances do not pertain directly to Plaintiff. The same is true of Nelson's allegations regarding the discontinuation of medication and protected custody conditions. Plaintiff does claim that Sgt. Blank miscalculated her sentence, but she alleges only a lack of "due diligence," which is not sufficient to state a claim under § 1983. "Negligent, or even grossly negligent, conduct by government officials cannot be the basis of a constitutional tort claim." *Davis v. Fulton Cty.*, 90 F.3d 1346, 1352 (8th Cir. 1996). Nelson claims Sgt. Kucera attempted to block her access to court, but does not allege any actual injury. *See Lewis v. Casey, supra.* Finally, Plaintiff alleges she will incur medical expenses following her release from jail because of her shoulder injury, but this does not further her "deliberate indifference" claim because she has not alleged sufficient facts to establish liability. The Motion to Amend Complaint therefore will be denied without prejudice.

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 96 of 118
Nelson v. Hjorth, Not Reported in Fed. Supp. (2018)
2018 WL 2050571

### *G. Motion to Appoint Counsel*

The court cannot routinely appoint counsel in civil cases. In *Davis v. Scott*, 94 F.3d 444, 447 (8th Cir. 1996), the Eighth Circuit Court of Appeals explained that "[i]ndigent civil litigants do not have a constitutional or statutory right to appointed counsel." Trial courts have "broad discretion to decide whether both the plaintiff and the court will benefit from the appointment of counsel, taking into account the factual and legal complexity of the case, the presence or absence of conflicting testimony, and the plaintiff's ability to investigate the facts and present his claim." *Id.* Having considered these factors, Plaintiff's Motion for Appointment of Counsel will be denied.

### IV. CONCLUSION

To summarize, Nelson has stated plausible claims for obtaining relief against Madison County with respect to the withholding of her newspaper and magazine subscriptions and with respect to the quality and quantity of food she is provided. The court cautions Nelson that this is only a preliminary determination based on the allegations of the Complaint and is not a determination of the merits of her claims or potential defenses thereto. In all other respects, Nelson's Complaint fails to state a claim upon which relief can be granted against Madison County. No plausible claim for relief is alleged against Sheriff Hjorth in his individual capacity. Nelson cannot sue on behalf of other inmates or bring a class action. Her motions for leave to amend and for appointment of counsel will be denied.

Accordingly,

IT IS ORDERED:

1. The clerk of the court will modify the docket sheet to:

   a. List Linda Nelson as the sole Plaintiff, by striking the words "all other similar situation" after her name; and

   **\*14** b. Add "The county of Madison, Nebraska," as Defendant.

2. All claims alleged against Vern Hjorth, Madison County Sheriff, in his individual and official capacities, are dismissed without prejudice and he shall no longer be a party Defendant.

3. Plaintiff's motion to amend complaint (Filing No. 9) is denied without prejudice.

4. Plaintiff's motion for additional time to pay the initial partial filing fee (Filing No. 10) is denied without prejudice, as moot.

5. Plaintiff's motion for appointment of counsel (Filing No. 11) is denied without prejudice.

6. The only claims alleged in Plaintiff's Complaint that will be allowed are: (1) A First Amendment claim against Madison County for an alleged official policy which has prevented Plaintiff from receiving newspaper and magazine subscriptions (see Filing No. 1 at CM/ECF p. 6, ¶ 2 & p. 18) and (2) a Fourteenth Amendment claim against Madison County for an alleged official policy of feeding her "stale bread, soggy food, and ½ portions to result in constant hunger" (see Filing No. 1 at CM/ECF p. 8, ¶ 6). Any and all other claims alleged in the Complaint are dismissed without prejudice.

7. For service of process on Defendant, "The county of Madison, Nebraska," the clerk of the court is directed to complete a summons form and a USM-285 form for said Defendant using the address "Madison County Clerk, 1313 N. Main Street, Madison, NE 68748," and forward them together with a copy of the Complaint (Filing No. 1) and a copy of this Memorandum and Order to the Marshals Service. The Marshals Service shall serve Defendant.[3] Service may be accomplished by using any of the following methods: personal, residence, certified mail, or designated delivery service. *See* Federal Rule of Civil Procedure 4(e); Neb. Rev. Stat. § 25-508.01 (Reissue 2016).

8. Federal Rule of Civil Procedure 4(m) requires service of the complaint on a defendant within 90 days of filing the complaint. However, Plaintiff is granted, on the court's own motion, an extension of time until 90 days from the date of this order to complete service of process.

9. The United States Marshal shall serve all process in this case without prepayment of fees from Plaintiff.

Nelson v. Hjorth, Not Reported in Fed. Supp. (2018)
2018 WL 2050571

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 97 of 118

10. The clerk of the court is directed to set the following pro se case management deadline: July 30, 2018—Check for completion of service of process.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2050571

Footnotes

1   On April 13, 2018, Nelson filed a Motion for Additional Time to Pay Fee (Filing No. 10). That motion will be denied without prejudice, as moot.

2   The Eighth Circuit has interpreted *Wolff v. McDonnell*, 418 U.S. 539 (1974) to mean that "[p]rivileged prisoner mail, that is mail to or from an inmate's attorney and identified as such, may not be opened for inspections for contraband except in the presence of the prisoner." *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997). However, "[t]o assert a successful claim for denial of meaningful access to the courts ... an inmate must demonstrate that he suffered prejudice." *Id.* at 431 (quoting *Berdella v. Delo*, 972 F.2d 204, 210 (8th Cir. 1992) ).

3   Pro se litigants proceeding in forma pauperis are entitled to rely on service by the United States Marshals Service. *Wright v. First Student, Inc.*, 710 F.3d 782, 783 (8th Cir. 2013). Pursuant to 28 U.S.C. § 1915(d), in an in forma pauperis case, "**[t]he officers of the court shall issue and serve all process, and perform all duties in such cases.**" *See Moore v. Jackson*, 123 F.3d 1082, 1085 (8th Cir. 1997) (language in § 1915(d) is compulsory). *See, e.g., Beyer v. Pulaski County Jail*, 589 Fed. Appx. 798 (8th Cir. 2014) (unpublished) (vacating district court order of dismissal for failure to prosecute and directing district court to order the Marshal to seek defendant's last-known contact information where plaintiff contended that the jail would have information for defendant's whereabouts); *Graham v. Satkoski*, 51 F.3d 710, 713 (7th Cir. 1995) (when court instructs Marshal to serve papers for prisoner, prisoner need furnish no more than information necessary to identify defendant; Marshal should be able to ascertain defendant's current address).

**End of Document**          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 98 of 118

Parson v. York, Not Reported in Fed. Supp. (2017)

2017 WL 1076536

2017 WL 1076536
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Drahcir PARSON, Plaintiff,

v.

Nathan YORK, Sheriff, Warren
County; et al., Defendants.

No. 16-CV-167 (DNH/CFH)
|
Signed 02/28/2017

**Attorneys and Law Firms**

DRAHCIR PARSON, 917 Altamont Ave., Schenectady,
New York 12303, pro se.

Lemire, Johnson Law Firm, OF COUNSEL: GREGG
T. JOHNSON, ESQ., APRIL J. LAWS, ESQ., P.O. Box
2485, 2534 Route 9, Malta, New York 12020, Attorneys
for Defendant Nathan York.

Hon. Eric T. Schneiderman, OF COUNSEL: MARK
G. MITCHELL, ESQ., Assistant Attorney General,
Attorney General for the State of New York, The Capitol,
Albany, New York 12224-0341, Attorney for Defendants
Anthony J. Annucci and Christopher Miller.

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Drahcir Parson ("Parson"), who at
the relevant time in question was in custody at the Warren
County Jail ("Warren C.J."), and later at Great Meadow
Correctional Facility ("Great Meadow C.F."), brings
this action pursuant to 42 U.S.C. § 1983 alleging that
defendants Nathan York ("York"), Anthony J. Annucci
("Annucci"), and Christopher Miller ("Miller"), violated
his rights under the Fourteenth Amendment. See Dkt.
No. 18 ("Am. Compl."). Presently pending is a motion
to dismiss pursuant to Federal Rule of Civil Procedure
("Fed. R. Civ. P.") 12(b)(6) submitted by defendant York,
and a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)
(6) submitted by defendants Annucci and Miller. Dkt.
Nos. 19, 27. Parson submitted a response in opposition to
each motion. Dkt. Nos. 25, 29. Defendant York submitted

a reply. Dkt. No. 26. Defendants Annucci and Miller
also submitted a reply. Dkt. No. 30. For the following
reasons, it is recommended that defendant York's motion
to dismiss be granted, and that defendant' Annucci and
Miller's motion to dismiss be granted in part and denied
in part.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are reviewed in the light most favorable to
Parson as the non-moving party. See subsection II(A)
infra.

Parson was "illegally transferred" to Great Meadow C.F.
from Warren C.J. on December 8, 2014. Am. Compl.
at 2. This transfer occurred prior to the signing of a
substitute jail order, which was signed on January 29,
2015. Id. Upon his transfer to Great Meadow C.F., Parson
was immediately placed in administrative segregation
(or Special Housing Unit, "SHU"). Id. Parson's mother
passed away while he was in administrative segregation
and he was not allowed to attend her funeral. Id.

Parson alleges that Annucci and York applied New York
State regulations "in an arbitrary and capricious fashion"
in facilitating Parson's transfer from Warren C.J. to
Great Meadow C.F. Compl. at 3. Parson also claims that
his transfer was not to exceed thirty days, but Annucci
"rubber stamped" multiple thirty day extensions. Id.

Parson also alleges that, once he was transferred to Great
Meadow C.F., he was confined in the SHU for twenty-
six days without a hearing, and without notice of charges
against him. Compl. at 4. He claims that Miller did not
conduct a "meaningful review" of his SHU confinement,
which is required every sixty days. Id. Parson was also
placed under a seven-day shield order, that was renewed
twice for a total of twenty-one days. Id. During this time,
he was denied hot water and cleaning supplies. Id.

## II. Discussion

### A. Legal Standard

Parson v. York, Not Reported in Fed. Supp. (2017)

2017 WL 1076536

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 99 of 118

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 326, 335 (2d Cir. 2009)) (internal quotation marks omitted). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

**\*2** Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is " 'plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible....") (internal citations omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally." (internal citations omitted)).

## B. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (additional citations omitted)). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Parson v. York, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 100 of 118

2017 WL 1076536

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (additional citation omitted)). [2] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. See e.g., Brown v. Artus, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009). Defendants allege that they were not personally involved in the alleged constitutional violations.

**\*3** Parson contends that defendants Annucci and York facilitated Parson's transfer from Warren C.J. to Great Meadow C.F. without due process. Am. Compl. at 3. The Court finds that Parson has alleged sufficient personal involvement in the transfer for both Annucci and York. Parson has submitted with his complaint documents that show communication between Annucci and York meant to facilitate his transfer. See Dkt. No. 18-1 at 5-6, 12. The complaint also includes letters from Annucci to York pertaining to Parson's continued incarceration at Great Meadow C.F. See id. at 13-17. Thus, Parson has alleged sufficient personal involvement of both Annucci and York at this stage in the proceedings. See Thomas v. Ashcroft, 470 F.3d 491, 497 (2d Cir. 2006) (finding sufficient personal involvement where prison officials "ordered or acquiesced in [the plaintiff's] transfer").

As to defendant Miller, Parson alleges that Miller placed him in administrative segregation upon his transfer to Great Meadow C.F. and subjected him to unconstitutional conditions of confinement. Am. Compl. at 4. Although Parson clearly alleges that Miller placed him in administrative segregation, Parson does not identify any defendant that subjected him to unconstitutional conditions of confinement, namely a cell shield order, lack of hot water, and lack of cleaning supplies. See Am Compl. at 4. As such, the Court recommends that the unconstitutional conditions of confinement claims be dismissed as to Miller for lack of personal involvement. See Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (dismissing unconstitutional conditions of confinement claims against prison officials where there were no "direct" or "indirect" allegations sufficient to permit an inference the [prison officials] had acted or failed to act in any of the ways that would subject [them] to personal liability for the deprivations alleged by [the plaintiff]").

The Court reaches a different conclusion in regard to Parson's claim against Miller regarding his initial and continued placement in administrative segregation. Parson alleges that Miller placed him in administrative segregation, and continued that placement, without due process. See Am. Compl. at 4. Miller simply disputes Parson's allegation of personal involvement. See Dkt. No. 27-1 at 7-8. Thus, at this early stage, Parson has alleged sufficient personal involvement on the part of Miller. See Smart v. Goord, 441 F. Supp. 2d 631, 643-44 (S.D.N.Y. 2003) (declining to dismiss claims against superintendent where the plaintiff alleged that superintendent failed to release her from segregation).

Accordingly, it is recommended that defendant Miller's motion be granted as to Parson's unconstitutional conditions of confinement claim, [3] and denied as to Parson's administrative segregation claim. It is further recommended that defendant Annucci and York's motion be denied as to Parson's transfer claim.

### C. Fourteenth Amendment

#### 1. Due Process

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. Amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." Baker v. McCollan, 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).

**\*4** As a pretrial detainee, Parson's "liberty interest in freedom from restraint is highly qualified and must be balanced against the state's reasons for restraining that liberty[; thus,] restrictions on pretrial detainees ... may not amount to punishment...." Benjamin v. Fraser, 264 F.3d 175, 188 (2d Cir. 2001) (citations and internal quotation marks omitted). Unlike convicted prisoners, who must satisfy the standard of "atypical and significant

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 101 of 118

Parson v. York, Not Reported in Fed. Supp. (2017)

2017 WL 1076536

hardship" outlined in Sandin v. Conner, 515 U.S. 472 (1995), a pretrial detainee need not meet such a stringent standard because "[a] detainee's interest in freedom from unjustified infliction of pain and injury is more substantial...." Id. at 188–90; see also Iqbal v. Hasty, 490 F.3d 143, 146 (2d Cir. 2007), rev'd on other grounds, Ashcroft v. Iqbal, 556 U.S. 662 (2009) ("Th[e Second Circuit] has said that Sandin does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process.").

### a. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). "Aside from any state policy or regulation, the force of the Due Process Clause itself protects pre-trial detainees from restrictive confinement." Shine v. Hofmnn, No. 06–CV–237, 2009 WL 2179969, at *5 (D. Vt. July 22, 2009) (citing Kentucky Dep't of Corr., 490 U.S. at 459–60).

As previously discussed, the Second Circuit has determined that pretrial detainees may not be subjecting to punishment prior to an adjudication of guilt. Benjamin, 264 F.3d at 188 (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)). In determining whether a restriction is punitive, a court may consider

> whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to

> which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable ... and whether it appears excessive in relation to the alternative purpose assigned....

Bell, 441 U.S. at 537–38 (quoting Kennedy v. Mendoza–Martinez, 372 U.S. 144, 168–69 (1963)).

> Absent a showing of an expressed intent to punish, the determination whether a condition is imposed for a legitimate purpose or for the purpose of punishment generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it. Thus, if a particular condition or restriction of pretrial detention is reasonably related to legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless —a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees....

Id. at 538–39 (internal quotation marks and alterations and citations omitted); see also Benjamin, 264 F.3d at 188.

### i. Administrative Segregation Placement

Parson claims that Miller placed him in administrative segregation following his transfer to Great Meadow C.F. on December 8, 2014. He remained in the SHU for twenty-six days until he received a "notice of recommendation,"

2017 WL 1076536

and did not receive a hearing or "procedural protections." Compl. at 2, 4. He was confined in the SHU for eight months while at Great Meadow C.F. Id. at 2.

**\*5** Where a pretrial detainee's detention in segregation is punitive, rather than administrative, it is governed by the standard set forth in Wolff v. McDonnell, 418 U.S. 539 (1974), "which requires written notice of the charges at least twenty-four hours before any hearing, a written statement of factual allegations against the inmate, and at least a limited ability to present witnesses and evidence." Taylor v. Santana, No. 05 Civ. 1860(AKH), 2007 WL 737485, at \*4 (S.D.N.Y. Mar. 6, 2007) (citing Benjamin v. Fraser, 264 F.3d 175, 190 (2d Cir. 2001)) (additional citation omitted). Where the pretrial detainee's detention in segregation is administrative, the confinement is assessed pursuant to the standard set forth in Hewitt v. Helms, 459 U.S. 460 (1983), which states that the detainee "must 'merely receive some notice of the charges against him and an opportunity to present his views' to the prison official charged with deciding whether to impose the restraint." Id. (citing Benjamin, 264 F.3d at 190) (additional citation omitted). Under Hewitt, prison officials may afford the detainee process "within a reasonable time" after the imposition of administrative segregation. Id. (citing Hewitt, 459 U.S. at 476 n.8).

Here, there is no dispute that Parson's placement in the SHU at Great Meadow C.F. was administrative, rather than punitive. Parson makes no allegation that defendants placed him in segregation to punish him, and states in the amended complaint that he was placed in "administrative segregation." See Am. Compl. at 2. Additionally, the exhibits attached to the amended complaint include an "administrative segregation hearing determination" which states that, due to Parson's "assaultive and disruptive behavior," he is being placed in administrative segregation "for the safety of staff and for the ... order of the facility." Id. at 18. Thus, the Court must determine if Parson's complaint gives rise to a liberty interest cognizable under the Fourteenth Amendment.

Courts in this district have determined that "administrative classifications of pretrial detainees, even where the classifications come with restrictive conditions, do not give rise to a liberty interest, absent evidence of an intent to punish." Valdez v. City of New York, No. 11 Civ. 05194(PAC)(DF), 2013 WL 8642169, at \*8 (S.D.N.Y. Sept. 3, 2013) (collecting cases). For example,

placement of a pretrial detainee in maximum security housing due to his possible escape status did not give rise to a liberty interest in Adams v. Galleta, No. 96 CIV. 3750(JGK), 1999 W L 959368, at \*4 (S.D.N.Y. Oct. 19, 1999). In that case, "the 'particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective.' " Id. (citing Bell v. Wolfish, 441 U.S. 520, 539 (1979)). Although Adams was decided on a motion for summary judgment, "a due-process challenge to a detainee's administrative classification may also be dismissed under Rule 12(b)(6), where the plaintiff has alleged no intent to punish and no consequences of the classification that could be considered punitive in nature." Valdez, 2013 WL 8642169, at \*8. Thus, Parson's initial placement in administrative segregation does not trigger a protected liberty interest.

Although Parson does not allege intent to punish on the part of defendants, "[at] some point ... the administrative necessity for involuntary lock-up begins to pale." Covino v. Vermont Dep't of Corrs., 933 F.2d 128, 130 (2d Cir. 1991). Indeed, the Second Circuit found in Covino that a nine-month administrative segregation "smacks of punishment." Id. Here, Parson complains that he was placed in administrative segregation for eight months while at Great Meadow C.F. Am. Compl. at 2. Although the documents attached to Parson's complaint indicate the reasons why he was initially placed in administrative segregation, there is nothing on the record that shows why he remained there for eight months. See Dkt. No. 18-1 at 18. Thus, the Court finds that Parson's due process claim regarding his placement in administrative segregation cannot be dismissed at this stage. See DeLeon v. Rockland Cty. Corr. Facility, No. 10 Civ. 7536(PGG), 2013 WL 1195623, at \*3 (S.D.N.Y. Mar. 22, 2013) (denying summary judgment where pretrial detainee was kept in solitary confinement for seven months). The reasons for Parson's initial placement in the SHU at Great Meadow C.F. are compelling. See Dkt. No. 18-1 at 18 (outlining Parson's history of exposing staff to fecal matter and urine, spitting at staff, and other assaultive and disruptive behavior while housed at Warren C.J.). However, absent any indication from Parson or defendants that Parson's assaultive and disruptive behavior continued for eight months, necessitating administrative segregation for that entire time, the Court finds it inappropriate to dismiss these claims at this juncture, as the continued segregation could "amount[ ] to 'punishment' in the constitutional sense." Bell, 441 U.S. at 537.

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 103 of 118

Parson v. York, Not Reported in Fed. Supp. (2017)

2017 WL 1076536

**\*6** Accordingly, it is recommended that defendants' motion on this ground be denied.

### ii. Transfer from Warren C.J. to Great Meadow C.F.

Parson claims that he was denied due process when Annucci and Miller facilitated his transfer from Warren C.J. to Great Meadow C.F. Am. Compl. at 3. Parson further argues that Annucci and Miller violated New York Correctional Law § 504.2 in transferring Parson from Warren C.J. to Great Meadow C.F. Id.

To the extent that Parson argues that Annucci and Miller violated New York State law in facilitating his transfer, such a claim fails because " 'a violation of state law neither gives [Parson] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim." Doe v. Conn. Dep't of Child and Youth Servs., 911 F.2d 868, 869 (2d Cir. 1990) (quoting Robinson v. Via, 821 F.2d 913, 921 (2d Cir. 1987)); see also Cimino v. Glaze, 490 Fed.Appx. 401, 403 (2d Cir. 2013). "[S]tate statutes do not create federally protected due process entitlements to specific state-mandated procedures." Holcomb v. Lykens, 337 F.3d 217, 224 (2d Cir. 2003).

Parson also fails to state a due process claim regarding his transfer from Warren C.J. to Great Meadow C.F. because "the due process clause is not implicated when a pretrial detainee is transferred from one facility to another." Covino, 933 F.2d at 130 (citing Meachum v. Fano, 427 U.S. 215, 228 (1976)). Further, "the m ere transfer of a pretrial detainee 'to less amenable and more restrictive quarters for nonpunitive reasons' does not constitute punishment in violation of the Due Process Clause." Butler v. N.Y.S. Corr. Dep't, No. 94 CIV 5054 (AGS), 1996 W L 438128, at \*4 (S.D.N.Y. Aug. 2, 1996) (citing Covino, 933 F.2d at 129) (additional citations omitted).

Here, it is clear from Parson's complaint that his initial transfer from Warren C.J. to Great Meadow C.F. was for non-punitive reasons. The letter requesting the transfer sent from York to Annucci states that York was requesting the transfer because Parson was aggressive and assaultive toward staff, and required additional precautions that Warren C.J. could not facilitate. Dkt. No. 18-1 at 5-6. Thus, the transfer alone, which was

clearly facilitated for administrative reasons, does not state a claim for a due process violation. See Butler, 1996 WL 438128, at \*4 ("[T]ransfer between state correctional facilities alone does not amount to "punishment" under the Bell standard."). More importantly, because Parson does not allege that the transfer was punitive, and actually provides the Court with ample evidence showing that the transfer was necessary for administrative reasons, the Court finds that dismissal of his claim is warranted. See McFadden v. Solfaro, Nos. 95 Civ. 1148(LBS), 95 Civ. 3790(LBS), 1998 WL 199923, at \*10 (S.D.N.Y. Apr. 23, 1998) ("The record ... indicates that [the plaintiff], due to his misconduct, caused a strain on resources at the [previous correctional facility] which permitted a transfer to another correctional facility.").

Accordingly, it is recommended that defendants' motion on this ground be granted, and that defendants Annucci and York be dismissed from this action.

### D. Res Judicata

**\*7** Defendant York urges the Court to apply the doctrine of res judicata to dismiss Parson's complaint. Dkt. No. 19-1 at 14-16. York points to two cases that Parson previously filed in this District concerning events that occurred at Warren C.J. See id. at 14-16. Applying the doctrine of res judicata is, very clearly, inappropriate here. The events that occurred in Parson's two previous complaints [4] predated the events that give rise to Parson's complaint here. In fact, both actions were filed in October 2014, a full two months before Parson was transferred to Great Meadow C.F., giving rise to the events described in the instant complaint. York's only argument is that, when Parson amended his complaint in each of these actions while incarcerated at Great Meadow C.F., he did not include the claims regarding his transfer to Great Meadow C.F. or his administrative segregation at Great Meadow C.F. See Dkt. No.19-1 at 14-16. The Court finds this argument unconvincing. As explained above, Parson's claims regarding his transfer and administrative segregation were still accruing in April 2015, when York claims that he should have asserted them. Indeed, if asserted at that time, the Court may have found that they failed to state a claim. Further, in deference to Parson's pro se status, the Court finds that the doctrine of res judicata does not bar Parson's claims regarding his transfer to and incarceration at Great Meadow C.F.

Case 9:17-cv-00906-LEK-TWD   Document 50   Filed 06/21/19   Page 104 of 118

Parson v. York, Not Reported in Fed. Supp. (2017)

2017 WL 1076536

### E. Eleventh Amendment Immunity

Annucci and Miller argue that they are each entitled to Eleventh Amendment immunity relating to Parson's claims against them in their official capacities. Dkt. No. 27-1 at 14-15.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

Moreover, suit against a state official in his or her official capacity is a suit against the entity that employs the official. Faird v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer in his official capacity. Kentucky v. Graham, 473 U.S. 159, 166 (1985).

Here, because Parson seeks monetary damages against defendants for acts occurring within the scope of their duties, the Eleventh Amendment bar applies. However, the Court disagrees with Annucci and Miller that Parson sued them in their official capacities only. See Dkt. No. 27-1 at 12. Although Parson lists Annucci and Miller's "official position" on his complaint, the Court, in deference to Parson's pro se status, assumes that Parson

has brought suit against Annucci and Miller in both their individual capacity as well. See Thomas v. Calero, 824 F. Supp. 2d 488, 498-99 (S.D.N.Y. 2011) (rejecting defendants' argument that plaintiff sued prison officials in their official capacity only since plaintiff's allegations "appear to be intended to plead that the individual defendants were acting under color of state law, a pleading requirement for stating a claim under section 1983").

Accordingly, it is recommended that Annucci and Miller's motion on this ground be granted, to the extent that Parson asserts claims against them in their official capacities.

### F. Qualified Immunity

 **\*8**  The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." Pearson v. Callahan, 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004) (quoting Wilson v. Layne, 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made " 'in light of the legal rules that were clearly established at the time [the official's action] was taken.' " Wilson, 526 U.S. at 614 (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987) (internal quotation marks omitted)); Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: " '(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful.' " Phillips v. Wright, 553 Fed.Appx. 16, 17 (2d Cir. 2014) (quoting Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013)).

Here, the Court finds that Parson has alleged sufficient facts to show that Miller violated his constitutional rights. It is well established that "purposeless restrictions or

Parson v. York, Not Reported in Fed. Supp. (2017)

2017 WL 1076536

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 105 of 118

conditions of confinement can constitute impermissible punishment when imposed on pretrial detainees." Allah v. Milling, 982 F. Supp. 2d 172, 184 (D. Conn. 2013) (finding that prison official was not entitled to qualified immunity from liability for placing the plaintiff in administrative segregation) (citing Bell, 441 U.S. at 535). A defendant may be found to be shielded by qualified immunity on a motion to dismiss only where " 'the complaint fails to allege the violation of a clearly established right.' " Id. (quoting Williams v. Fischer, No. 02 Civ. 4558(LMM), 2003 WL 22170610, at *11 (S.D.N.Y. Sept. 18, 2003)) (citation omitted). Therefore, the Court finds that Miller is not entitled to qualified immunity at this stage in the proceedings. Because the Court finds that Parson has failed to allege a constitutional violation against Annucci or York, the undersigned finds that they are entitled to qualified immunity.

Accordingly, it is recommended that defendant Miller's motion on this ground be denied, and that defendants Annucci and York's motion on this ground be granted.

### III. Conclusion

For the reasons stated above, it is hereby:

RECOMMENDED that defendants York, Annucci, and Miller's motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) be:

1. **GRANTED** as to the Fourteenth Amendment claims regarding (1) Parson's transfer to Great Meadow C.F. against Annucci and York; and (2) unconstitutional conditions of confinement claim against Miller.

2. **DENIED** as to Parson's Fourteenth Amendment Claim against Miller regarding his eight-month placement in administrative segregation at Great Meadow C.F.; and it is further

RECOMMENDED that defendants Annucci and York be dismissed from this action; and it is further

ORDERED that the Clerk serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties m ay lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Sm all v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

### All Citations

Not Reported in Fed. Supp., 2017 WL 1076536

---

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision has affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 Fed.Appx. 16 (2d Cir. 2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

3    Because the Court finds that Miller was not personally involved in Parson's unconstitutional conditions of confinement claim, the Court need not determine whether Parson has stated a claim as to his allegedly unconstitutional conditions of confinement.

4    For the sake of brevity, the Court incorporates into this decision York's description of Parson's two previous lawsuits. See Dkt. No. 19-1 at 5-10.

---

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Rapp v. Barboza, Not Reported in Fed. Supp. (2016)
2016 WL 4223974

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 106 of 118

2016 WL 4223974
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John RAPP, Plaintiff,
v.
Marlo BARBOZA and Thomas Haskell, Defendants.

Civil Action No. 9:13-CV-0599 (NAM/DEP)
|
Signed 07/19/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: JOHN RAPP, Pro se, 13-A-2819,
Washington Correctional Facility, Box 180, Comstock,
NY 12821.

FOR DEFENDANTS: FITZGERALD MORRIS
BAKER, FIRTH, P.C., P.O. Box 2017, 16 Pearl Street,
OF COUNSEL: JOSHUA D. LINDY, ESQ., Glens Falls,
NY 12801.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

 **\*1** *Pro se* plaintiff John Rapp, a prison inmate formerly
held as a pretrial detainee at the Washington County
Correctional Facility ("WCCF"), has commenced this
action against two corrections workers employed at the
facility, pursuant to 42 U.S.C. § 1983, alleging that they
deprived him of his civil rights. In his complaint, as
twice amended, *inter alia,* plaintiff alleges that Corrections
Inspector Marlo Barboza and Mail Room Officer Thomas
Haskell violated his rights under the First Amendment to
the United States Constitution by denying him access to
certain types of books and magazines.

Currently pending before the court is a motion by
defendants Barboza and Haskell for summary judgment
dismissing plaintiff's remaining claims in the action. In
their motion, defendants argue that (1) plaintiff failed
to exhaust his administrative remedies with respect to a
portion of his claim, (2) no reasonable factfinder could
conclude plaintiff's First Amendment rights were violated
based upon the record now before the court, and (3) in

any event they are entitled to qualified immunity from
suit. For the reasons set forth below, I recommend that
defendants' motion be granted.

I. BACKGROUND [1]
At the times relevant to his claims in this action, plaintiff
was a pretrial detainee at the WCCF as a result of his arrest
for third degree sale of a controlled substance. Dkt. No.
49-9 at 2-3. In his complaint, as amended, plaintiff alleges
that on or about February 12, 2013, defendant Haskell, a
mail room officer, denied him access to certain magazines,
including American Curves, Maxim, XXL, Playboy, and
the Sports Illustrated Swimsuit Edition, as well as the
book *One Flew Over The Cuckoo's Nest.* Plaintiff was also
advised that he could not possess the requested magazines
while at the facility because of their sexually explicit
nature and that defendant Barboza maintained a list of
prohibited materials. [2] *Id.* at 7. According to the plaintiff,
defendant Haskell also responded that the book *One Flew
Over The Cuckoo's Nest* could not be obtained because it
"involved a break out from a mental hospital." Dkt. No.
30 at 7-8. Plaintiff also alleges that he asked defendant
Haskell whether he could have books provided to him
by others, and was advised that such materials must be
obtained from a vendor. *Id.* at 8.

It is undisputed that all inmates housed at the WCCF
are provided with a jail handbook that explains facility
policies, including those concerning books, magazines
and periodicals, and that the handbook expressly
prohibits inmates from receiving printed material and/or
publications that present a "clear and present danger"
to the safety of the facility, staff, inmates or the general
public. Dkt. No. 49-9 at 3-4. Included in the handbook's
list of prohibited material that might present such a
"clear and present danger" are "sexually explicit material,
nude photographs or any other offensive content"
and "publications that advocate or condone illegal or
socially unacceptable conduct." *Id.* The handbook also
requires that "[a]ll books, magazines and periodicals ...
be of a paperback version received directly from a
recognized vendor through the mail." *Id.* Supplementing
the handbook setting forth these policies is an Operations
Manual, which also provides similar guidelines regarding
printed materials and publications. *Id.* at 4-5.

 **\*2** Plaintiff filed a grievance regarding the denial of
his right to possess the specific magazines at issue on

Rapp v. Barboza, Not Reported in Fed. Supp. (2016)

2016 WL 4223974

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 107 of 118

February 10, 2013. Dkt. No. 49-6 at 10; *see also* Dkt. No. 30 at 7; Dkt. No. 49-6 at 46-47. That grievance was investigated and adjudicated by Sergeant Michael S. Harp on February 14, 2013. Dkt. No. 49-6 at 10; *see also* Dkt. No. 49-6 at 49. During the course of his investigation, Sergeant Harp met with plaintiff to discuss how publications with sexually explicit and provocative pictures and advertisements can be used as barter and may cause less fortunate individuals to resort to violence to obtain such publications even though they are not allowed to possess other inmate's items. Dkt. No. 49-6 at 10-11. Sergeant Harp advised plaintiff that inmates are not allowed to possess magazines that are "found to be offensive due to their explicit nature or deemed to be a risk to the safety, security and good order of the facility." *Id.* at 10. Based on his finding that the content of the magazines were "deemed as a risk to the safety, security and good order of the facility because of sexually explicit photos and articles about promoting contraband, making weapons, escaping and ... illegal activities," Sergeant Harp concluded that plaintiff's grievance was "unfounded." *Id.* at 11. That determination was upheld on appeal to Michael Gates, the Chief Administrator of the WCCF, on February 26, 2013, and to the Citizen's Policy and Complaint Review Council, on April 16, 2013. *Id.* at 12; *see also* Dkt. No. 49-6 at 51, 55.

On February 28, 2013, plaintiff filed a grievance requesting that he be allowed access to books and publications from all sources. Dkt. No. 49-6 at 13; *see also* Dkt. No. 49-6 at 57. He also grieved the fact that Bibles are not provided in every cell, and complained about the lack of a facility library.[3] *Id.* Plaintiff's February 28, 2013 grievance was investigated and adjudicated on March 4, 2013 by Sergeant DiDio, who found nothing improper about the policy at WCCF requiring that all publications must be secured from an authorized vendor such as Barnes and Noble or Amazon.com, and concluded that plaintiff's grievance was "unfounded." Dkt. No. 49-6 at 13-14; *see also* Dkt. No. 49-6 at 60. That determination similarly was upheld on appeal to the Chief Administrator Gates on March 11, 2013, and the Citizen's Policy and Complaint Review Council, on April 16, 2013. Dkt. No. 49-6 at 14-15; *see also* Dkt. No. 49-6 at 61, 64.

While plaintiff fully exhausted his administrative remedies with respect to the grievances filed on or about February 12, 2013 and February 28, 2013, no grievance was ever filed by him with respect to the alleged decision by

defendant Haskell to deny him permission to receive a copy of the book *One Flew Over the Cuckoo's Nest.* Dkt. No. 49-6 at 15.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on May 24, 2013, asserting only claims for injunctive relief based on his having been denied the ability to receive books and magazines from various outside sources during his confinement at the WCCF, and requesting leave to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Upon review of plaintiff's complaint, and in light of his transfer out of the WCCF and into the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), Senior United States District Judge Norman A. Mordue concluded that plaintiff's claims for injunctive relief were moot and conditionally dismissed his complaint, though affording plaintiff the opportunity to file an amended complaint. Dkt. No. 8.

Plaintiff subsequently filed an amended complaint, which set forth numerous claims arising out of his confinement at the WCCF and sought an award of money damages. Dkt. No. 10. In a decision and order filed March 24, 2014, the court concluded that the amended complaint could not survive *sua sponte* review under 28 U.S.C. §§ 1915(e) and 1915A. *See* Dkt. No. 23. In light of plaintiff's *pro se* status and his good faith effort to comply with the court's prior decision, Rapp was afforded a final opportunity to submit an amended complaint. *Id.*

Plaintiff submitted a second amended complaint ("SAC") on July 18, 2014. Dkt. No. 30. In that SAC, which is the operative pleading, plaintiff named as defendants Warren County Sheriff Nathan York, Warren County Sheriff's Office Captain Mike Gates, Warren County Correctional Facility Sergeant Diddio, Warren County Correctional Facility Sergeant Spring, Warren County Correctional Facility Sergeant Farmer, Warren County Correctional Facility Sergeant Tanner, Warren County Correctional Facility Sergeant Keays, Warren County Correctional Facility Officer Feldsen, Warren County Correctional Facility Officer Perelli, Warren County Correctional Facility Officer Harp, Warren County Correctional Facility Sergeant Rainville, Warren County Correctional Facility Mail Room Officer Thomas Haskell, Warren County Correctional Facility Inspector Marlo Barboza, and Lisa "Doe." *Id.* In his SAC, plaintiff chronicles various incidents at the WCCF, spanning almost one year

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 108 of 118

Rapp v. Barboza, Not Reported in Fed. Supp. (2016)

2016 WL 4223974

in time, that give rise to his claims. The causes of action set forth in that pleading include the claim against defendants Barboza and Haskell for violation of his First Amendment rights, which is the subject of the motion now before the court.

**\*3** On March 25, 2015, the court issued an order accepting plaintiff's SAC for filing and *sua sponte* dismissing certain causes of action in his complaint pursuant to 28 U.S.C. §§ 1915(e) and 1915A. Dkt. No. 36. As a result of that decision, plaintiff's only remaining claim is for violation of his rights under the First Amendment, asserted against defendants Haskell and Barboza. *Id.*

On December 7, 2015, following the close of discovery, defendants moved for the entry of summary judgment. Dkt. No. 49. Thereafter, plaintiff filed three requests to extend his deadline to respond to defendants' motion, all of which were granted for good cause. [4] Plaintiff's third request was granted on January 28, 2016 in a text order, which advised that his new response deadline of March 3, 2016 was "FINAL." Dkt. No. 58. Despite having been granted the third extension, plaintiff failed to respond to defendants' motion. Rather, on March 2, 2016, the day before the expiration of his response deadline, plaintiff filed a letter motion requesting permission to withdraw his action without prejudice based on his inability to timely respond to defendants' motion. Dkt. No. 59.

On March 3, 2016, a text order was issued directing defendants' counsel to prepare a stipulation of dismissal and serve it on plaintiff on or before March 10, 2016, and further directing plaintiff to either sign the stipulation and file it with the court, on or before March 17, 2016, or file a letter indicating he was unwilling to sign this document by that same date. Dkt. No. 61. On March 17, 2016, defendants served plaintiff with a stipulation of discontinuance with prejudice. Dkt. No. 62. Instead of signing the stipulation, plaintiff filed a letter on April 28, 2016, requesting an extension until July 28, 2016 to respond to defendants' motion for summary judgment. Dkt. No. 64. That request was denied by text order issued on May 2, 2016. Dkt. No. 66.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

**\*4** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Plaintiff's Failure to Oppose Defendants' Motion

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 109 of 118

Rapp v. Barboza, Not Reported in Fed. Supp. (2016)
2016 WL 4223974

Before turning to the merits of defendants' arguments, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiff's complaint.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with Local Rule 7.1(b)(3). *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.). When a non-moving party fails to respond to a motion for summary judgment, the movants' burden on their motion "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Henry v. Dinelle, et al.*, 10-CV-0456, 2011 WL 5975027, *10 (N.D.N.Y. Nov. 29, 2011) (quoting *Xu-Shen Zhou v. S.U.N.Y. Inst. of Tech.*, 08-CV-0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sep. 14, 2011), *vacated in part on other grounds by* 499 Fed.Appx. 105 (2d Cir. Oct. 10, 2012)). Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted,

if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.); *Henry v. Dinelle, et al.*, 10-CV-0456, 2011 WL 5975027, *10 (N.D.N.Y. Nov. 29, 2011) (quoting *Xu-Shen Zhou v. S.U.N.Y. Inst. of Tech.*, 08-CV-0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sep. 14, 2011), *vacated in part on other grounds by* 499 Fed.Appx. 105 (2d Cir. Oct. 10, 2012)).

It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged, thus permitting the court to deem these facts to have been admitted.[5] *See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

**\*5** Based upon plaintiff's failure to oppose defendants' motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted to the extent they are supported by accurate record citations, and that the motion be granted if determined to be facially meritorious.

## C. Failure to Exhaust Available Administrative Remedies

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging

**Rapp v. Barboza, Not Reported in Fed. Supp. (2016)**

2016 WL 4223974

prison conditions, including suits brought under Section 1983.").

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

At the time defendants filed their motion, the law within this circuit required an analysis pursuant to a three-part test for determining whether dismissal of an inmate plaintiff's complaint was warranted based upon his failure to satisfy the PLRA's exhaustion requirement. *See Macias*, 495 F.3d at 41-42; *Hemphill v. New York*, 380 F.3d 680, 688-89 (2d Cir. 2004). That test had been articulated by the Second Circuit as follows:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact available to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies

> were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

**\*6** *Hemphill*, 380 F.3d at 686. Since *Hemphill* and its companion cases were decided, the "special circumstances" exception to the exhaustion requirement has been rejected by the Supreme Court.[6] *See Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). Whether non-exhaustion is excusable now exclusively "hinges on the 'availab[ility]' of administrative remedies." *Id.*

The Supreme Court has identified three circumstances in which administrative remedies may be "unavailable." *Id.* at 1859-1860. First, administrative procedures are unavailable when they "operate[ ] as a simple dead end – with officers unable or consistently unwilling to provide any relief[.]" *Id.* at 1859. Second, they are unavailable when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, they are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." *Id.* at 1860.

With one exception, plaintiff's claims are based upon circumstances that were the subject of grievances filed by the plaintiff, and pursued to completion. Plaintiff's SAC asserts a cause of action for violation of his rights under the First Amendment based on defendant Haskell's refusal to obtain a copy of the book *One Flew Over The Cuckoo's Nest.* In support of their motion seeking dismissal of that claim, defendants have adduced record evidence, in the form of an affidavit from WCCF Jail Administrator Michael Gates, showing that plaintiff failed to file a grievance related to defendant Haskell denying him access to that book. Dkt. No. 49-6 at 15. The record evidence further establishes that a grievance procedure was available to plaintiff, and that, in fact,

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 111 of 118

Rapp v. Barboza, Not Reported in Fed. Supp. (2016)

2016 WL 4223974

plaintiff utilized the grievance procedure on the same day that he was allegedly denied that book to grieve about defendant Haskell denying him access to magazines. Dkt. No. 49-6 at 46-47. The record additionally shows that plaintiff utilized the grievance procedure on fifteen other occasions in 2013. See Dkt. No. 49-6 at 84-163.

Plaintiff has failed to offer any excuse for his failure to grieve defendant Haskell's alleged denial of his request to obtain a copy of the book *One Flew Over The Cuckoo's Nest*. Nor is there anything in the record to support a finding that the grievance procedure in place at the WCCF was not available to the plaintiff. Accordingly, I recommend that plaintiff's claim based on defendant Haskell's alleged denial of plaintiff's request to obtain a copy of the book *One Flew Over The Cuckoo's Nest* be dismissed for failure to exhaust administrative remedies.

    D.  Analysis of Plaintiff's First Amendment Claims
In his SAC, plaintiff alleges that defendant Barboza maintained a predetermined list of prohibited materials on which defendant Haskell relied in depriving Rapp of certain requested magazines. Dkt. No. 30 at 7. Plaintiff also complains about a policy at the WCCF that limits the manner in which inmates may access books and other publications.[7] *Id.* at 8. Plaintiff's SAC is nonetheless ambiguous, in that it does not clearly state whether he is challenging the existence of a WCCF policy restricting inmate access to "sexually explicit material, nude photographs or any other offensive content" or instead the application of that policy. In addressing defendants' motion, I will analyze both issues as they arise under the First Amendment.

    1.  Facial Validity

 **\*7**  It is well-settled that the First Amendment serves to protect the flow of information to prisoners; thus, any limitations on prisoner access to information must be reasonably related to a legitimate penological interest. *See* Turner v. Safley, 482 U.S. 78, 89-90 (1987); *see also* Thornburgh v. Abbott, 490 U.S. 401, 407-08 (1989); Bell v. Wolfish, 441 U.S. 520, 545, 550-51 (1979). The Supreme Court has identified certain factors that inform the issue of whether a prison regulation reasonably relates to a legitimate penological interest, including whether (1) there exists a rational relationship between the regulation

and the proffered legitimate governmental interest; (2) inmates have available alternative means of exercising their asserted rights; (3) accommodating the asserted constitutional right will have a significant "ripple effect" on fellow inmates or prison staff, and the allocation of prison resources; and (4) alternative means exist for the prison to easily serve its interests that would not infringe upon the rights of prisoners. *See id.* at 89-90; Giano v. Senkowski, 54 F.3d 1050, 1053-1054 (2d Cir. 1995). Courts have applied this four-factor test, developed principally to apply in cases involving convicted inmates, to regulations impacting pretrial detainees as well. *See, e.g.,* Mauro v. Arpaio, 188 F.3d 1054, 1058-1060 (9th Cir. 1999) (applying *Turner* factors to First Amendment free exercise claim brought by pretrial detainee); *see also* Bell, 441 U.S. at 536-38 (noting that proper inquiry in determining constitutionality of conditions of pretrial detention is whether such conditions amounted to punishment of detainee, which depends on whether conditions were imposed for the purpose of punishment or were merely incidents of some other legitimate governmental purpose).

In the instant case, defendants have articulated a legitimate penological interest in prohibiting inmates housed at the WCCF from having access to sexually explicit material. The interest identified seeks to reduce the incidence of inmate violence.[8] Dkt. No. 49-6 at 49, Dkt. No. 49-10 at 14. A rational relationship between prohibiting inmates from accessing sexually explicit material and the legitimate interest in reducing inmate violence exists because, as was explained to plaintiff by Sergeant Michael Harp, the introduction of sexually explicit material into a prison setting would likely be regarded as permitting possession of a commodity in high demand, which "may be used as barter and may cause less fortunate [inmates] to resort to violence to obtain such publications." Dkt. No. 49-6 at 49. The fact that a determination of whether material is "sexually explicit" is made on a "case by case basis," Dkt. No. 49-8 at 3, bolsters defendants' claim, evidencing an intent by the WCCF policymakers to ensure that restrictions are rationally related to the legitimate objective.[9]

The second *Turner* factor is not dispositive in this case. While there are no alternative means for inmates at WCCF to access sexually explicit materials, a blanket restriction on materials that create a safety risk at a prison facility does not alone render the limitation unconstitutional, particularly where, as here, inmates are

Rapp v. Barboza, Not Reported in Fed. Supp. (2016)

2016 WL 4223974

allowed access to a broad range of other publications. *See, e.g., Thornburgh*, 490 U.S. at 403-05, 417 (upholding the facial validity of regulations barring "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity" and concluding that the second *Turner* factor was satisfied because "the regulations at issue in the present case permit a broad range of publications to be sent, received, and read").

**\*8** With respect to the third *Turner* factor, it is foreseeable that allowing inmates to access sexually explicit material could have a significant ripple effect on fellow inmates and prison staff through an increased incidence of violence and unwanted inmate bartering. *See, e.g., Thornburgh*, 490 U.S. at 418.

As it relates to the fourth *Turner* factor, plaintiff has not offered an argument for an alternative that fully accommodates prisoners' rights with respect to accessing sexually explicit materials at *de minimis* cost to valid penological interests. As such, there is no proof in the record that the WCCF's policy regarding sexually explicit material represents "an 'exaggerated response' to the problem at hand." *Thornburgh*, 490 U.S. at 418.

Having examined the relevant factors, and because plaintiff has failed to adduce record evidence showing that denying him access to the desired magazines was for the purpose of punishment, as opposed to in furtherance of a legitimate governmental purpose, I conclude that the WCCF's policy regarding sexually explicit materials is not constitutionally improper. Accordingly, I recommend dismissal of plaintiff's First Amendment claim to the extent it is based on alleged facial unconstitutionality of the WCCF's policy. [10]

### 2. Validity as Applied

To the extent that the plaintiff is complaining regarding the application of the policy, his claim against defendant Barboza is based solely on a hearsay statement allegedly made to him by defendant Haskell, suggesting that defendant Barboza maintains a list of prohibited materials. Dkt. No. 30 at 7. The record evidence adduced by defendants shows that defendant Barboza did not maintain any such list and, further, that determinations regarding what constitutes sexually explicit material are

made on a case by case basis. Dkt. No. 49-7 at 2-3. Since there exists no admissible evidence in the record showing that defendant Barboza played any role in the alleged determination that the magazines requested by the plaintiff constitute sexually explicit material, I recommend that plaintiff's claim against her arising from her alleged unconstitutional application of the WCCF's policy be dismissed for lack of personal involvement. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983."); *Selah v. Fischer*, 09-cv-1363, 2015 WL 1893340, at *9 (N.D.N.Y. Apr. 15, 2015) (Report-Recommendation of Peebles, M.J., adopted by Sharpe, C.J.) ("Because the record is lacking in any evidence of defendant Fischer's personal involvement in the decisions rendered that allegedly denied plaintiff the right to exercise his chosen religion, I recommend that all claims against him be dismissed.").

**\*9** Plaintiff's claim against defendant Haskell fares no better. In his SAC, plaintiff claims that he asked defendant Haskell whether he could receive magazines such as the Sports Illustrated Swimsuit Edition, Playboy, Maxim, American Curves, and XXL and was told that they were prohibited based upon a list prepared by defendant Barboza. Dkt. No. 30 at 7. In his affidavit, defendant Haskell expressly contradicts that allegation, stating "[p]laintiff Rapp and I never had any conversations whatsoever regarding his access to printing materials and publications." Dkt. No. 49-8 at 3. Based upon these conflicting accounts, an issue of fact exists as to whether the two had a conversation regarding those materials.

Nonetheless, in his SAC plaintiff does not allege that defendant Haskell was the decision-maker who denied him access to the requested magazines. Indeed, plaintiff's SAC is non-specific on this point. In light of the vague allegations in the SAC and the unopposed record evidence subsequently adduced by defendants, I find that no reasonable factfinder could conclude that defendant Haskell denied plaintiff's request for access to those materials. [11]

Plaintiff's remaining claim relates to enforcement of the WCCF policy that requires "all books, magazines and periodicals to ... be of a paperback version [and] received directly from a recognized vendor through the mail." Dkt. No. 49-6 at 2-3, 26. Plaintiff alleges that he "asked

Rapp v. Barboza, Not Reported in Fed. Supp. (2016)
2016 WL 4223974

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 113 of 118

[defendant] Haskell if [he] could get books dropped off to [him]" and was told that books "had to come from a vendor," which prompted plaintiff to file a grievance. Dkt. No. 30 at 8. Plaintiff further alleges that he "asked [defendant] Barboza about the policy on May 15, 2012 and she stated that is how it is and the only person she has to answer to is Sheriff York." *Id.* Plaintiff has not identified what books he wanted dropped off to him, or how defendants otherwise applied the policy in an unconstitutional manner. Rather, plaintiff has alleged only that the defendants told him what he could not do as a general matter due to the existence of the policy. The court therefore construes this aspect of plaintiff's First Amendment claim only as a challenge to the existence of the policy itself, and not as a challenge to the application of that policy.

**\*10** It is undisputed that neither defendant Barboza nor defendant Haskell are policymakers. Dkt. Nos. 49-7 at 3 and 49-8 at 3. Moreover, there exists no evidence in the record from which a rational factfinder could conclude that either defendant was personally involved in the creation of the paperback vendor policy. Dkt. No. 49-6 at 2; Dkt. No. 49-7 at 3; Dkt. No. 49-8 at 3. Accordingly, plaintiff's claim against them arising from the alleged unconstitutional nature of the paperback vendor policy must be dismissed for lack of personal involvement. [12] *See Gabriel*, 889 F.Supp.2d at 396; *Zikianda*, 2015 WL 5510956, at \*26.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff claims that defendants Barboza and Haskell deprived him of access to certain written materials in violation of his First Amendment rights. Plaintiff failed to exhaust his administrative remedies with respect to his claim that he was denied access to a book, and has failed to establish any personal involvement of defendants Barboza and Haskell with respect to his other claims. Plaintiff has also not established that any WCCF policy is unconstitutional and, even assuming defendant Haskell denied Rapp access to magazines deemed to be "sexually explicit materials," this claim should be dismissed on the basis of qualified immunity. Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 49) be GRANTED, and that plaintiff's second amended complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4223974

---

Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2    There is evidence in the record showing that defendant Barboza did not maintain any such list. Dkt. No. 49-7 at 2, 4-5; Dkt. No. 49-9 at 14. Moreover, defendant Haskell denies ever having any conversations with plaintiff regarding his access to printed materials and publications. Dkt. No. 48-8 at 2-3, 5; Dkt. No. 49-9 at 15.

3    Plaintiff has not raised those issues in his second amended complaint.

4    Plaintiff filed his first request on or about December 28, 2015; the second request was made on January 11, 2016; and the third request was received on January 27, 2016. *See* Dkt. Nos. 51, 54, and 57.

5    Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *See* N.D.N.Y.L.R. 7.1(a)(3)(emphasis in original).

6    *Hemphill* was decided in 2004 as one of the several cases addressing exhaustion. The other companion cases were *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004); and *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004).

Rapp v. Barboza, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-00906-LEK-TWD    Document 50    Filed 06/21/19    Page 114 of 118

2016 WL 4223974

**7**    Defendant Haskell has denied having had any conversation with plaintiff regarding his access to printed materials and publications at the WCCF. Dkt. No. 49-8 at 3. Since plaintiff's SAC is sworn to under penalty of perjury, Dkt. No. 30 at 13, however, and flatly contradicts the denial, an issue of fact exists, and I must assume for purposes of deciding this motion that such a conversation occurred.

**8**    Plaintiff does not dispute that prison safety and security are legitimate penological interests. *See also Campos v. Coughlin*, 854 F.Supp. 194, 207 (S.D.N.Y. 1994) ("[P]rison security and penological institutional safety goals are indeed a most compelling governmental interest."); *Muhammad v. Coughlin*, 904 F.Supp. 161 (S.D.N.Y. 1995) (finding compelling interest in internal order in prisons); *Breland v. Goord*, No. 94 Civ. 3696, 1997 WL 139533, at *4 (S.D.N.Y. March 27, 1997) ("There is no question that prison safety and security are legitimate penological interests.").

**9**    Commission of Correction Minimum Standards Section 7026.2 subsection (e) provides that "[w]hen the introduction into a facility of any printed material or publication is thought to constitute a threat to the safety, security or good order of the facility, such printed material or publication shall be forwarded to the chief administrative officer. The chief administrative officer shall read and review such printed material and shall make a determination as to whether it shall be censored." 9 NYCRR § 7026.2.

**10**    Since defendants Haskell and Barboza are not policymakers, plaintiff's claim against them should alternatively be dismissed for lack of personal involvement to the extent it is based on the existence of the policy, as distinct from its application. *See, e.g., Gabriel v. County of Herkimer*, 889 F.Supp.2d 374, 396 (N.D.N.Y. 2012) (concluding that a nurse who was "not a policymaker" could not "be liable for any unconstitutional policies of the County, should they be found"); *Zikianda v. County of Albany*, 12-cv-1194, 2015 WL 5510956, at *26 (N.D.N.Y. Sept. 15, 2015).

**11**    Even if a factfinder could conclude, based upon the current record, that defendant Haskell denied plaintiff access to the materials determined to be sexually explicit, I would recommend that plaintiff's claim against him be dismissed on the basis of qualified immunity, and specifically based upon the fact that what may constitute "sexually explicit materials" is not so clearly established that a reasonable official would understand that finding the content of a magazine sought by plaintiff to be sexually explicit violates his rights under the First Amendment. *See Prison Legal News v. Stolle*, 13-cv-0424, 2014 WL 6982470, at *15-*16 (E.D. Va. Dec. 8, 2014) (concluding that jail employees were shielded, under the doctrine of qualified immunity, from a claim for money damages based on their determination that "photographs of women and men in lingerie, skimpy swimsuits, or other revealing clothing" constituted "sexually explicit materials" because "the state of the relevant law ... does not indicate that a jail is prohibited from excluding all incoming publications containing revealing images of individuals in sexual poses overtly intended to sexually arouse the viewer"); *Elfand v. County of Sonoma*, 11-cv-0863, 2013 WL 1007292, at *4 (N.D. Cal. Mar. 13, 2013) (upholding the constitutionality of a jail's censorship of issues of Maxim Magazine and GQ Magazine that displayed pictures of woman and men in "underwear, bikinis, and tight and scant clothing revealing breasts and buttocks" to include an image of a woman in a "see-through bra and 'thong' underwear with her buttocks raised"); *Woods v. Director's Review Committee*, 11-cv-1131, 2012 WL 1098365, at *1, *4 (S.D. Tex. Mar. 30, 2012) (concluding that the defendants were entitled to qualified immunity in a case challenging a Texas prison's censorship of nude photos that had been "blurred in such a way as to disguise or cover up any exposed nudity," noting that there was "no clear statement" in the law that would put an official on notice that it was unlawful to ban such images). Indeed, plaintiff has not argued to the contrary. Nor has plaintiff cited any cases in which prison officials were held to have violated a prisoner's First Amendment rights by withholding similar images.

**12**    Defendants have also articulated a legitimate penological interest in maintaining the policy – that is, to promote internal security by reducing the risk of hidden contraband within the facility. Dkt. No. 49-6 at 5; Dkt. No. 49-9 at 5. In addition, this policy does not ban certain materials altogether, but rather creates an alternative means for an inmate to access these materials, and plaintiff has failed to point to an alternative that would more fully accommodate his rights at *de minimis* cost to the facility's valid penological interests. Under such circumstances, plaintiff's First Amendment claim related to the alleged unconstitutionality of the policy should alternatively be dismissed on the merits. *See Jones v. Salt Lake County*, 503 F.3d 1147, 1158-1159 (10th Cir. 2007) (concluding that "the County Jail's paperback book policy, which allows inmates to obtain paperback books from the jail library and, with permission, the publisher, is rationally related to the legitimate governmental objective of prison security [because] [a]llowing inmates to purchase paperback books only from the publisher prevents contraband from being smuggled into the jail and lessens the administrative burden on jail personnel who must inspect each book[,]" noting also the existence of "alternative means of obtaining reading material" where inmates could obtain books from the jail library and possess newspapers and certain magazines).

---

**End of Document**                                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3909065
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Pasquale VERRILLI, Plaintiff,
v.
Correction Officer Brian W. WINCHELL,
Sergeant Timothy C. Kingsley, and Several
Unknown Correction Officers, Defendants.

No. 1:09–CV–837 (FJS/RFT).
|
Sept. 29, 2010.

**Attorneys and Law Firms**

Sundack & Associates, LLC, Tracie A. Sundack, Esq., of
Counsel, White Plains, NY, for Plaintiff.

Office of the New York, State Attorney General,
Aaron M. Baldwin, AAG, of Counsel, Albany, NY, for
Defendants.

**MEMORANDUM–DECISION AND ORDER**

SCULLIN, Senior District Judge.

**I. INTRODUCTION**

 *1  On July 22, 2009, Plaintiff, an inmate incarcerated at
Great Meadow Correctional Facility ("Great Meadow"),
brought this action, pursuant to 42 U.S.C. § 1983, alleging
that Defendants violated his civil rights under the Eighth
Amendment to the United States Constitution. Currently
pending before the Court is Defendants' motion for
summary judgment.

**II. BACKGROUND** [1]

On July 26, 2008, a fellow inmate assaulted Plaintiff while
he was incarcerated at Great Meadow. As a result of the
assault, Plaintiff suffered severe injuries.

Following the assault, Plaintiff was removed from the
facility until July 31, 2008. Upon his return, Plaintiff was

placed in isolation. On August 8, 2008, Plaintiff filed an
appeal of the facility's disciplinary finding.

On August 18, 2008, Plaintiff was again removed
from the facility for additional medical treatment and
did not return to Great Meadow until August 31,
2008. On the day following Plaintiff's return to Great
Meadow, he was placed into general population; and,
on September 15, 2008, Plaintiff attempted to file a
grievance. Great Meadow's Inmate Grievance Resolution
Committee ("IGRC") rejected the grievance as untimely.

On November 11, 2009, Defendants filed the present
motion for summary judgment. Defendants assert that the
Court must dismiss Plaintiff's complaint because he failed
to exhaust administrative remedies.

**III. DISCUSSION**

Under 42 U.S.C. § 1997e(a), an inmate must exhaust
all administrative remedies prior to bringing any suits
challenging the conditions of his confinement. *See
Porter v. Nussle*, 534 U.S. 516, 524 (2002); *see also
Woodford v. Ngo*, 548 U.S. 81, 84–85 (2006). This
exhaustion requirement applies to all prison-condition
claims, including federal civil rights cases. *See Woodford*,
548 U.S. at 85 (citation omitted); *Porter*, 534 U.S. at 524
(citations omitted).

Exhaustion for an inmate in New York State Department
of Correction's ("DOCS") custody is generally achieved
through the inmate grievance program ("IGP"). *See* N.Y.
Comp.Codes. R. & Regs. tit. 7, § 701.1 *et seq.* (2001).
The IGP establishes a twenty-one day limitations period
for inmates to grieve an alleged incident, although they
may file an application to toll the filing deadline. *See id.*
at §§ 701.7(a)(1), 701.6(g). The IGP is composed of three
tiers: (1) an inmate files a grievance, which the Inmate
Grievance Resolution Committee ("IGRC") reviews; (2)
the inmate takes an appeal from the IGRC's adverse
decision to the superintendent of the facility; and (3)
the inmate takes an appeal from the superintendent's
adverse decision to the Central Office Review Committee
("CORC"). *See Hemphill v. New York*, 380 F.3d 680, 682
(2d Cir.2004) (discussing the IGP process).

Although the Supreme Court has deemed exhaustion
mandatory, the Second Circuit has recognized that "

'certain caveats apply.' " *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (quoting *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (other citation omitted). When an inmate fails to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to his claims. *See id.* A court must consider whether

**\*2** (1) administrative remedies [we]re not available to the prisoner;

(2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or

(3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Id.* (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In the present matter, it is clear that Plaintiff did not exhaust his administrative remedies. Contrary to Plaintiff's assertion, his untimely grievance, which the IGRC denied as untimely, does not satisfy the PLRA's exhaustion requirements. *See Pacheco v. Drown,* No. 9:06–CV–0020, 2010 WL 144400, \*20 (N.D.N.Y. Jan. 11, 2010) (quoting *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004)). Accordingly, the Court must determine whether, pursuant to *Hemphill,* Plaintiff's failure to exhaust his administrative remedies bars his claim for relief.

**A. Availability of administrative remedies**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *See Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Id.* at 688 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). In making this determination, "courts 'should be careful to look at the applicable set of grievance procedures [.]' " *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (quotation omitted). A court may consider exhaustion unavailable in situations where the plaintiff is unaware of the grievance procedures or did not understand them, *see Ruggiero,* 467 F.3d at 178, or where the defendants' behavior prevents

him from seeking administrative remedies, *see Hemphill,* 380 F.3d at 686. [2]

Plaintiff attended orientation during his first week of incarceration at Great Meadow. At orientation, a representative from IGP explained the grievance procedures and gave Plaintiff a packet with information regarding the grievance process. *See* Declaration of Brandi White dated November 3, 2009 ("White Decl."), at ¶ 8 and Exhibit "A." A brochure that Plaintiff received informs inmates that, "[i]f you are not sure if your issue is grievable, file it anyway to be safe. If it is not grievable you will be notified who/where to address your concern." *See id.* at Exhibit "A." The information provided clearly and succinctly explained the grievance process so as to make it available to a similarly situated individual of ordinary firmness.

Moreover, prior to this incident, Plaintiff had filed other grievances while at Great Meadow. *See id.* at Exhibits "C" and "D." Therefore, Plaintiff cannot now claim that he was unaware of or that he did not understand the grievance procedures.

**\*3** Further, Plaintiff's argument that a failure-to-protect claim is not grievable under the regulations is simply without merit. *See* Plaintiff's Memorandum of Law at 6. Plaintiff cites to a New York City Department of Correction's regulation that specifically excludes assault as a grievable matter. *See id.* (citation omitted). However, Plaintiff has not brought an assault claim, but a failure to protect claim. Even more telling is the fact that the case law is replete with cases dismissing failure-to-protect claims on exhaustion grounds, thereby indicating that such claims are, in fact, grievable. *See, e.g., Price v. Engert,* 589 F.Supp.2d 240, 247 (W.D.N.Y.2008) (citation omitted); *McCray v. Smith,* No. 9:07–CV–415, 2009 WL 2762166, \*3–\*4 (N.D.N.Y. Aug. 25, 2009); *Colon v. Furlani,* No. 07–CV–6022L, 2008 WL 5000521, \*1–\*2 (W.D.N.Y. Nov. 19, 2008).

Finally, Plaintiff's argument that his injuries and placement in isolation upon return to Great Meadow rendered the grievance process unavailable is, at best, disingenuous. As discussed, Plaintiff had twenty-one days to file his grievance after the incident on July 26, 2008. Plaintiff returned to Great Meadow on July 31, 2008, and was able to attend a disciplinary hearing on August 7, 2008. *See* Plaintiff's Statement of Material Facts at ¶¶

4, 11. On or about August 8, 2008, Plaintiff wrote and filed an appeal in response to the disciplinary hearing judgment; the same time period in which Plaintiff claims that he was unable to file a grievance because of his injuries and placement in isolation. *See id.* Based on the foregoing, it is clear that Plaintiff's injuries and placement in isolation did not render the grievance process unavailable. *See McCray,* 2009 WL 2762166, at *3–*4 (holding that summary judgment on exhaustion grounds was appropriate notwithstanding the plaintiff's allegations that he was unable to file the grievance within the required time frame due to a lengthy recuperation from injury and his transfer to another facility).

Accordingly, the Court finds that the administrative remedies were available to Plaintiff.

**B. Estoppel**

A plaintiff attempting to estop a defendant from invoking the exhaustion defense must allege that the defendant took some affirmative action to prevent the plaintiff from using the otherwise available grievance procedures. *See Ruggiero,* 467 F.3d at 178. Some such affirmative actions include beating, denying grievance forms and writing implements, and threatening retaliation. *See id.* (citing *Ziemba [v. Wezner,* 366 F.3d 161,] 162 [ (2d Cir.2004) ] ).

Plaintiff asserts that, "[d]ue to decisions of various correctional employees, particularly the decision to isolate Plaintiff from family, other inmates and advisors, all of whom could have offered useful advice, insight and assistance to Plaintiff, defendants should be estopped from arguing non-exhaustion of remedies." *See* Plaintiff's Memorandum of Law at 8.

**\*4** Plaintiff does not claim that Defendants denied him writing utensils or the requisite forms or that they threatened or beat him so as to render an otherwise available grievance procedure unavailable. Moreover, as already discussed, although Plaintiff may have been in isolation, he was still able to file an appeal from his disciplinary hearing judgment during the time that he could have filed a timely grievance.

Accordingly, the Court finds that Plaintiff has alleged no facts warranting the application of estoppel.

**C. Special circumstances**

Plaintiff claims that there are special circumstances present that justify his failure to exhaust his administrative remedies. *See* Plaintiff's Memorandum of Law at 9. First, he claims that his disciplinary action appeal was sufficient "to provoke action on the part of correctional officials." *See id.* (citing *Johnson v. Testman,* 380 F.3d 691, 696–97 (2d Cir.2004)). Plaintiff's reliance on *Johnson* is misplaced.

In *Johnson,* the Second Circuit "considered whether a prisoner could satisfy the PLRA's exhaustion requirement by raising his grievance in the BOP's disciplinary proceedings and appeals process." *Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing [*Johnson,*] 380 F.3d at 694). The Second Circuit remanded so that the district court could determine

> (1) whether ... the prisoner was justified in believing that his complaints in the disciplinary appeal *procedurally* exhausted his administrative remedies because the prison's remedial system was confusing, and (2) whether the prisoner's submissions in the disciplinary appeals process exhausted his remedies *"in a substantive sense"* by "afford[ing] corrections officials time and opportunity to address complaints internally."

*Id.* (quoting *Johnson,* 380 F.3d at 696–98) (internal citation omitted).

As in *Macias,* Plaintiff does not assert that he "reasonably believed he had satisfied the PLRA's exhaustion requirement by filing tort claims and by complaining informally to prison staff." *Id.* (footnote omitted). "Regardless of whether his tort claims or informal complaints put the prison officials on notice of his grievance *'in a substantive sense,' Johnson* makes clear that to satisfy the PLRA a prisoner must also *procedurally* exhaust his available administrative remedies." *Id.* (quoting *Johnson,* 380 F.3d at 697–98).

As *Macias* makes clear, notice of Plaintiff's complaints, through some other means, such as a disciplinary appeal, is insufficient to satisfy the exhaustion requirement. *See Withrow v.. Taylor,* No. 9:05–CV–1129, 2007 WL 3274858, *10 (N.D.N.Y. Nov. 5, 2007) (citing *Macias v. Zenk,* 495 F.3d 37, 42–44 (2d Cir.2007)). *Johnson* is particularly inapplicable here because the Court has already determined that the IGP procedures were available to Plaintiff.

Moreover, Plaintiff's untimely grievance does not serve to exhaust his administrative remedies. *See Macias,* 495 F.3d at 41 (citation omitted). Rejecting the argument that denial of a grievance as untimely implies exhaustion, the Supreme Court explained that compliance with procedural rules is critical because "[a] prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction[.]" *Woodford,* 548 U.S. at 95. Accordingly, Plaintiff's untimely grievance does not constitute a special circumstance.

 **\*5** Plaintiff further argues that "the general absurdity of grieving an assault" is a special circumstance, excusing his failure to exhaust. *See* Plaintiff's Memorandum of Law at 9. This contention warrants little discussion. First, Plaintiff is not "grieving an assault," but a failure to protect. Second, contrary to Plaintiff's insinuation, the sole purpose of the PLRA is not simply to provide sufficient notice to prison officials and allow them time to redress situations before a lawsuit is filed. *See id.* at 9–10. As the Second Circuit has stated, "the purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process." *Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) (citations omitted). Allowing Plaintiff, a prisoner proven to be familiar with the grievance procedures, to proceed with this action, in the absence of any unique circumstances, would clearly run afoul of the PLRA's purposes.

Accordingly, the Court the Court finds that there are no special circumstances that justify Plaintiff's failure to exhaust his administrative remedies.

# IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3909065

---

Footnotes

1    Unless otherwise noted, the parties do not contest the facts.

2    The case law does not clearly distinguish between situations in which the defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which the defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. *See Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004) (citation omitted). Therefore, there is some overlap in the analysis of these claims.

---